

FILED
AUG - 1 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

Eastern Division

1:22CV01351

Case No. _____ (to be filled in by the Clerk's Office)

JUDGE POLSTER

Jury Trial: *(check one)*   ☒ No   ☐

**MAG. JUDGE PARKER**

Frank Dominic Dundee
_____

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

–v–

University Hospitals Health System, Inc.
_____

*Defendant(s)*
*(Write the full name of each defendant who is being sued.  If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

####    A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach
additional pages if                      needed.

Name            Frank Dominic Dundee

Street Address  7707 Amberwood Trail

1

| | | |
|---|---|---|
| City and County | Boardman   Mahoning County | |
| State and Zip | | |
| Code | Ohio  44512 | |
| Telephone | | |
| Number | 330-398-8274 | |
| E-mail Address | fdundee@gmail.com | |

## B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | University Hospitals Health System, Inc. |
| Job or Title *(if known)* | c/o  Katie Carwardine |
| Street Address | 3605 Warrensville Center Road |
| City and County | Shaker Heights    Cuyahoga County |
| State and Zip Code | Ohio  44122 |
| Telephone Number | (216) 767-8229 |
| E-mail Address *(if known)* | Katie.Carwardine@uhhospitals.org |

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be  heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the  parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties  is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of  another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a  diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒    Federal question          ☐  Diversity of citizenship

2

Fill out the paragraphs in this section that apply to this case.

**A.      If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

**Title I of the Americans with Disabilities Act of 1990 and Title VII of the Civil Rights Act of 1964**

---

**III.      Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal        arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include        the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any        punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or        punitive money damages.

**Dundee requests all lost wages including bonuses, the employee lost from the date of termination, June 17, 2020, until the present. Loss of benefits should be also calculated when determining lost earnings as well as medical and other expenses incurred from June 17, 2020 until the present.**

**Dundee also seeks punitive damages for UH's egregious conduct that violated the Americans with Disabilities Act (ADA), which prohibits discrimination and retaliation based on an employee's disability; the maximum allowed under the EEOC for a business the size of University Hospitals Health System, Inc of $300,000.**

---

**IV.      Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.      For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____

Signature of Plaintiff: _____

Printed Name of Plaintiff:    Frank Dominic Dundee

## V.     Statement of Claim

1.     The Defendant, University Hospitals Health System, Inc. (UH), retaliated with an adverse action against the plaintiff, Frank Dundee, for asserting his rights under the ADA.  Dundee sought a reasonable accommodation from UH, over a period of years, submitting paperwork to Human Resources formally on 7/28/2018, as his disability, Hereditary Spastic Paraplegia (HSP), deteriorated, making the workplace untenable.  UH stonewalled granting a reasonable accommodation with the intention of ending Dundee's employment with the organization, either through constructive discharge or outright termination.  UH never cited "undue hardship" as a reason for refusing the reasonable accommodation.  The preponderance of evidence in the Plaintiff's charge of retaliation and failure to accommodate means that the Plaintiff will show that his version of facts, causes, damages, or fault is more likely than not the correct version; the Plaintiff has the greater weight of the evidence against UH.

- 1-1. Information from emails exchanged between that Plaintiff and Heather Harmon, VP Human Resources and Patricia Tumbush, Director of Pharmacy, may cause a factfinder to conclude that the employer, UH, acted in bad faith in the interactive process that is essential to exploring the options for reasonable accommodation under Title I of the ADA.  The factfinder might find that UH may be liable if it can be reasonably concluded that the Plaintiff would have been able to perform the job through telework at home.

- 1-2.  The Supreme Court's burden-shifting framework does not affect the interactive process triggered by an individual's request for accommodation.  An employer, such as UH, should still engage in this informal dialogue to obtain relevant information needed to make an informed decision.

- 1-3.  In US Airways, Inc. v. Barnett, 535 U.S., 122 S. Ct. 1516 (2002), the Supreme Court laid out the burdens of proof for an individual with a disability (plaintiff) and an employer (defendant) in an ADA lawsuit alleging failure to provide reasonable accommodation. The "plaintiff/employee, to defeat a defendant/employer's motion for summary judgment, need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." Once the plaintiff has shown that the accommodation s/he needs is "reasonable," the burden shifts to the defendant/employer to provide case-specific evidence proving that reasonable accommodation would cause an undue hardship in the particular circumstances.  The Plaintiff can show that the accommodation of telework from home was reasonable.

- 1-4.  The Plaintiff's proposed modification/adjustment of telework from home is "reasonable" because it seems reasonable on its face, i.e., ordinarily or in the run of cases; this means telework from home is "reasonable" because appears to be "feasible" or "plausible."  Telework from home, as an accommodation, is effective in meeting the needs of the Plaintiff.  In the context of job performance, this means that telework from home enables the Plaintiff to perform the essential functions of the position, order verification, phone queries, problem solving and other duties that technology such as Zoom would enable.   With this reasonable accommodation, the Plaintiff has an equal opportunity to enjoy the benefits and privileges of employment that employees without disabilities enjoy.

- 1-5.  The only statutory limitation on University Hospital's obligation to provide "reasonable accommodation" is that no such change or modification is required if it would cause "undue hardship" to the employer.   UH never stated that telework from home imposed significant difficulty or expense and focuses on the resources and circumstances of UH in relationship to the cost or difficulty of providing the Plaintiff's specific accommodation, which was not unduly extensive, substantial, or disruptive, or would fundamentally alter the nature or operation of UH's business.

- 1-6.  UH never considered job restructuring to allow the Plaintiff's accommodation of telework from home.  UH never discussed reallocating or redistributing marginal job functions that the Plaintiff might be unable to perform because of his disability nor altering when and/or how a function, essential or marginal, is performed.  UH was steadfast in insisting that Dundee remain on 3rd shift and insisted that being on 3rd shift was an essential function of the job.

- 1.7  The ADA specifically lists "reassignment to a vacant position" as a form of reasonable accommodation.  This type of reasonable accommodation must be provided to an employee who, because of a disability, can no longer perform the essential functions of his/her current position, with or without reasonable accommodation, unless the employer can show that it would be an undue hardship.  UH hired and assigned two less experienced employees, pharmacists Amanda Lausin and Ashley Jones, to positions that were operated essentially by telework in the ICU and the Emergency Room, respectively, that Dundee could have been awarded with his superior experience and could have assigned one of those employees to work Dundee's 3rd shift position.

- 1-8.  Dundee filed charges with the OCRC, CLE B4 (44821) 08222018, Andrea Herrmann investigator, for UH's failure to accommodate in October of 2018:
  *Ms. Kara Ladaika convened a meeting prior to August 14, 2018, with the "ADA team" in order to review signed ADA documents from my personal physician, that were a requirement stipulated by UH policy before any discussions of a reasonable accommodation could take place, despite the fact that my impairment was obvious.  It is critical to my charge that UH not only release the names of the members of the "ADA team" but also release any minutes/notes from that meeting(s).*
  *The composition of a letter that rejected the proposal to work-from-home as a reasonable accommodation, out of hand and prior to any discussions with me, that was faxed to my physician on August 21, 2018, from Ms. Debora Templin, was a direct result of those discussions from the "ADA team."*

- 1-9.  Certain considerations may be critical in determining whether a job can be effectively performed at home, including (but not limited to) the employer's ability to adequately supervise the employee and the employee's need to work with certain equipment or tools that cannot be replicated at home.  [The equipment needed for the

6

Plaintiff to perform telework from home is the same equipment, not much more than a laptop and a phone, used in the workplace and was used for years by other employees, who were not disabled, to perform telework from home.]  In contrast, employees may be able to perform the essential functions of certain types of jobs at home.  For these types of jobs, an employer may deny a request to work at home if it can show that another accommodation would be effective or if working at home will cause undue hardship. [University Hospitals never demonstrated that another accommodation would be effective nor did UH ever demonstrate that telework from home caused an undue hardship.]

2.      Dundee demonstrated that he suffers from a disability and that he was nevertheless able to perform the essential functions of his job; either with or without reasonable accommodation from UH, who despite knowing of his alleged disability, did not reasonably accommodate it, continually over a period of years refusing the Plaintiff's request of telework from home outright and never explaining why their attorney labeled the Plaintiff's request as "unreasonable" in the Respondent's Position Statement to the EEOC.  The inherent nature of this failure-to-accommodate claim, as opposed to a disparate-treatment claim, in part, that Dundee's failure-to-accommodate claim alleges that UH failed to act, whereas an adverse employment action allegation claims that UH acted wrongfully, as in Dundee's pretextual termination; the EEOC's views on the matter in administering the ADA, specifically omit an adverse employment action requirement in its reasoning. UH did fulfill the adverse action requirement with termination under pretext; but UH's failure to accommodate itself satisfies that element.

2-1. On August, 21, 2018, Deborah L. Templin, Director, Disability & Occupational Risk Control sent this fax to the Plaintiff's physician, Dr. Denise Bobovnyk, in response to the Plaintiff's formal request, though it was not necessary under Title I of the ADA for a person with an obvious impairment.  The Plaintiff was anxious for several years that once he began discussions about a reasonable accommodation, that the powers that be in his direct reporting structure and in the department of human resources, four of whom the Plaintiff reported to the EEOC previously and exhibited animus towards the Plaintiff, would try to use his request as a tool to find the Plaintiff unable to perform the essential functions of his job as a Staff Pharmacist, instead of

7

actually obeying the law and constructively discussing the accommodation of telework from home.  A factfinder can readily confirm UH's discriminatory animus and the intent to somehow twist the Plaintiff's request into proof that he should be removed from his position from the wording of Templin's fax (fax from Templin italicized):

*Re: Our employee and your patient: Frank Dundee Dear Dr. Bobovnyik:*

*I am writing you in regard to the above referenced employee's request for reasonable accommodation under the Americans with Disabilities Act (ADA) and the ADA Amendments Act.*

***We are evaluating his request and will need some additional information in order to determine if Frank is able to perform the essential functions of his job as a Staff Pharmacist.***

*The Staff Pharmacist position during the night shift includes the following essential functions:*

*The duties of the Staff Pharmacist requires a pharmacist to be physically present.*

*The night shift starts at 9pm and the evening shift pharmacist leaves at 10:30pm as well as the evening shift technician.*

*The pharmacist staffs completely alone starting at 10:30pm until a technician arrives at 6am for day shift.*

*The pharmacist is required to not only complete order verification, but also fill orders needed for the units. This includes compounding sterile products in the IV room. There are frequently stat medication drips that are needed if a critical patient comes in during this shift.*

*A pharmacist also needs to be present to remove any controlled meds that would be needed from the CSM Omnicell cabinet.*

*The employee is requesting a permanent accommodation to work from home to verify patient orders and answer telephone calls. However, these tasks as requested by the employee do not meet the essential functions of the position.*

- 2-2.  The position is that of a Staff Pharmacist, **and is not shift-dependent**, as UH would insist on using as the MAIN, and only reason to deny the Plaintiff's request for telework from home, without discussion, from August 21, 2018 until wrongfully terminating the Plaintiff on June 17, 2020.  The Plaintiff could have been shifted easily to another time of

8

day, but UH never considered that option.  The essential functions of a staff pharmacist are using his education and training to insure that physician orders are correct and to expeditiously validate those orders so that the medications are available to be administered by a nurse or physician to a patient; the other essential function of a Staff Pharmacist is answering questions and solving problems for nursing staff and physicians using his unique education, skills, experience and training.

- 2-3.  Everything else in the staff pharmacist job description has been rendered marginal by advances in technology, like so many jobs.  Apps such as Zoom and Face-Time can be accessed remotely and provide real-time ability to monitor technicians and medications; barcodes on each medication that must be cleared by a barcode scanner at the patient's bedside prior to administration; dispensing machines like Omnicell on each nursing unit, Surgery, Recovery Room, Cath Lab and Oncology Unit that are checked by barcode at the machine before dispensing.  The profession of a hospital pharmacist, in general, has been marginalized by technology to the point that nearly every role occupied by a "Staff Pharmacist," on-site can be performed off-site.  Furthermore those roels can be performed by a certified technician equipped with a smartphone or a laptop.  Of course, there is a knee-jerk reaction to such a statement by many pharmacists, but technology wins out.  The Plaintiff graduated in 1976, working without technology, and knows that the role of the hospital pharmacist is fast being replaced by technological advances.

*Therefore, we are requesting that you review the enclosed job description and physical standards, along with this letter and provide your medical opinion as to whether or not the employee can perform the essential functions of his position at the work location, with or without reasonable accommodation.*

- 2-4.  In Carroll v. Xerox Corp., the First Circuit stated that in ADA failure-to-accommodate claims, the plaintiff "must show (1) that he suffers from a disability or handicap…, that (2) he was nevertheless able to perform to perform the essential functions of his job, either with or without reasonable accommodation, …. [and] (3) [that the employer], despite knowing of his alleged disability, did not reasonably accommodate it."

- 2-5. As Additional Circumstantial Evidence: When offered in conjunction with other circumstantial evidence, to be probative they must merely: (1) show discriminatory animus **[from Lerman, Lynce and Osborne]**; (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker **[from Lerman, Lynce and Osborne]**. Goudeau v. National Oilwell Varco, L.P., 793 F.3d 470 (5th Cir. 2015).

3.     UH denied or ignored Dundee's request for a reasonable accommodation of telework. Negligence by employers like UH, who don't take appropriate steps to accommodate a disabled employee, like Dundee, are grounds for constructive discharge. However, UH terminated Dundee two months before he was going to be forced to resign under the unbearable working conditions that only got worse from January to June, 2020.

4.     On June 17, 2020, UH terminated Dundee under pretext, for Dundee's absence of 5 minutes, from the Department of Pharmacy at UH Geauga Community Hospital, occuring at 5:55 am to 6:00 am, on May 27, 2020.  For nine years, from May 1, 2010 to June 1, 2019, Dundee worked alone as the staff pharmacist on 3rd shift, which required his absence from the Department of Pharmacy, EACH SHIFT, for periods of 5 minutes or more, simply to use the restroom which was down the hall and outside the Department.  Dundee and other staff pharmacists on 2nd and 3rd shift were similarly absent from the Pharmacy Department for 5 minutes or more EACH shift for bathroom breaks, lunch breaks, patient care issues and official Department of Pharmacy Policy. These facts were readily known to UH at the time of Dundee's and reveal the extensive use of PRETEXT to terminate the Plaintiff on June 17, 2020:

- 4-1. Other pharmacists had punched out early during the covid-19 pandemic, out of fear of exposure. **Pharmacist Susan Thabit punched out longer than 5 minutes early before Mr. Dundee arrived on shift during the pandemic.** A search through the time and attendance logs from March 1, 2020, to May 27, 2020, will reveal the exact date(s).  Ms. Tumbush has access to all of the time and attendance documents and would have been aware of Ms. Thabit leaving early, before another pharmacist was on duty and leaving two pharmacy technicians alone in the department, Mr. Glenn Johnson and Ms. Tracey Thoms.   Ms. Thabit was not terminated for punching out early.

- 4-2. The Employer's Given Reason For Termination Is Factually False, That May Prove Pretext: Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll., 719 F.3d 356, 365 n. 10 (5th Cir. 2013). In Haire, the court reversed summary judgment for the employer in a discrimination case, and held that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination even without further evidence of defendant's true motive.")

- 4-3. In *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 146-7 (2000), the Supreme Court held that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Also, Reeves allows the trier of fact to consider the evidence used to establish a *prima facie* case of discrimination (first prong of McDonnell Douglas) when they are deciding the final prong of McDonnell Douglas framework. Notably, the Supreme Court later held that "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'"

- 4-4. The court also cited the fact that Westmoreland's otherwise positive 30-year employment record shows that this was an isolated incident for which lesser sanctions were available: Dundee was arguably the best pharmacist in the entire UH system based on the opinions of nursing staff ("Thank God it's you" when Dundee answered the phone) most productive proved by recorded data, best attendance over a 10 year period, with the most varied experience assembled during his 43 year career, allowing him to solve problems in ways that no other pharmacist was even aware of (compounding and extemporaneous use of medications), and most renowned worldwide as writing an article that one professor called, "The Bible of pediatric community pharmacy," and included in a college text used for teaching medical students. Below is an email reply from a pharmacist who is a native of Poland and who worked with the Plaintiff about three years ago. The Plaintiff wrote the Polish pharmacist regarding the war in Ukraine and how Poland was involved with refugees. The Plaintiff did not know if the pharmacist would remember him. The reply email speaks to the Plaintiff's skills as recognized by nursing

staff:

Krzysztof Ozga <krozga22@gmail.com> Mon, Mar 21, 7:49 PM

Hi Frank, I remember you as a favorite pharmacist of all nurses.  Hard times are coming. Niech Żyje Rewolucja!!!  Best, Krzysztof

- **4-5. Delay,** Peirick v. IUPUI Athletics Department: UH never warned the Plaintiff that closing the pharmacy department for 5 minutes or less could lead to dismissal.  UH's over two week delay in addressing its alleged concerns, either by suspension or termination, undermines its claim that the Plaintiff's behavior was severe.  In sum, The Court should find UH's post hoc explanations, delay, exaggeration, and unusual conduct more than enough to create a question of fact concerning the legitimacy of its explanations for the Plaintiff's termination.

- **4-6.  Comparators,** Dorman v. Norton:  The Plaintiff will demonstrate that similarly situated employees were treated differently as far as NOT being disciplined for punching out before being replaced by another pharmacist while TWO technicians were left unsupervised [Susan Thabit, March or April, 2020 on the time records]  to establish that the proffered reason by UH for the adverse job action was a pretext.

- **4-7. Deviation from Policy,** Dartt v. Browning-Ferris:  Evidence that UH may have deviated from its normal management procedures when it summarily terminated Dundee, two weeks out from the incident, could support a reasonable inference that UH had terminated Dundee because of his disability.

- **4-8. Deviation from Policy,** A. Larson, Employment Discrimination §8.04, at 8-81 to 8-82 (rev. ed. 2015): Pretext is demonstrated in UH's post hoc explanations and misuse of its own disciplinary policy are overt irregularities in the procedures for discharge.

- **4-9. Disbelief or Mendacity,** St. Mary's Honor Center v. Hicks:  A factfinder should express disbelief in the reasons put forward UH for the Plaintiff's termination (particularly because of a suspicion of mendacity) tied together with the elements of the prima facie case, may suffice to show intentional discrimination against providing a reasonable accommodation.

- **4-10. Lying in Wait,** Hamilton v. General Electric:  UH, over a period of years, waited for a legal, legitimate reason to fortuitously materialize, such as the Plaintiff being absent the pharmacy for 5 minutes of less, and then used it to cover up UH's true, longstanding motivations for firing Dundee, UH's actions constitute the very definition of pretext.

12

- **4-11. Severe Punishment,** Stalter v. Wal-Mart :  More compelling is the severity of the punishment, termination, in relation to the alleged offense, legally being absent from the pharmacy for 5 minutes or less. This should strike The Court as swatting a fly with a sledgehammer. That UH felt compelled to terminate Dundee for this offense does not pass the straight-face test.

- **4-8, Discriminatory Animus:**  In the second paragraph of the Respondent's Position Statement, submitted October 18, 2020, Attorney Rachael Israel, who consulted with UH officials, provided advice regarding the Plaintiff's termination for a 5 minute absence from the department on May 27, 2020, and  prepared the statement, stated, *"Over the years, University Hospitals has worked extensively with Mr. Dundee to reasonably accommodate his alleged disability (Hereditary Spastic Paraplegia)."*  *Note the use of the word "alleged" disability.  The Plaintiff was obviously disabled and yet allowed his physician to give UH officials access to his medical records, including his genetic profile confirming the diagnosis of HSP.  Use of the word "alleged" to besmirch the Plaintiff is evidence of discriminatory animus.

**Inaccurate Statements in EEOC Position Statements May Be Proof Of Pretext:**

- 4-9.  Miller v. Raytheon Co., 716 F.3d 138 (5th Cir. 2013). Affirming a seven-figure jury verdict in an age discrimination case partially because "[a]t trial, Miller presented undisputed evidence that Raytheon made erroneous statements in its EEOC position statement."

- 4-10.  Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 239-40 (5th Cir. 2015) (holding that a jury may view "erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination."

- 4-11.  McInnis v. Alamo Comm. College Dist., 207 F.3d 276, 283 (5th Cir. 2000) (reversing summary judgment that had been entered for the employer in a discrimination case partially because the employer's report to the EEOC "contained false statements. . . .").

13

**4-12 Attorney Rachael Israel, representing the Defendant wrote in the University Hospitals Position Statement(s) to the EEOC (in italics):**

*Moreover, the "New Information" submitted by Mr. Dundee does not change the fact that he voluntarily abandoned the patients and staff at UH Geauga Medical Center and left a pharmacy technician handling dangerous drugs without supervision when he clocked out before the end of his shift on May 27, 2020.*

- This statement is wholly inaccurate because the technician in question, Tracey Thoms, was upstairs on the nursing units and NOT in the pharmacy department when the Plaintiff was absent from the pharmacy department from 5:55 am to 6:00 am, May 27, 2020. Furthermore, even if a pharmacy technician was in the department without a pharmacist present, it was allowed by Section **4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy.** This occurs daily in every hospital pharmacy in the State of Ohio, with FULL KNOWLEDGE of the Board of Pharmacy.

*Mr. Dundee claims that he left early to "comply with social distancing recommendations," but no such recommendations required him to leave the hospital premises without ensuring that another licensed pharmacist had assumed responsibility for the UH Geauga Medical Center pharmacy, technicians and patients.*

- Complying with social distancing recommendations was ancillary to the prime reason, which is the fact that two members of oncoming staff had been exposed to immediate family positive for covid-19 and were not permitted to quarantine by Supervisor Tumbush.
- The singular reason causing Dundee's absence was to avoid exposure to the possibly covid-19, contagious, staff members, because Dundee, at nearly age 67 was most at risk to succumb to covid-19 under CDC recommendations and Dundee had an existing co-morbidity, Hereditary Spastic Paraplegia, which made him more vulnerable. Consider this in conjunction with the fact that the situation clearly presented a risk of death or serious physical harm to Dundee, there was not sufficient time for OSHA to inspect, and Dundee brought

the issue of covid-19 exposure to the attention of UH and Ms. Tumbush, and Dundee had a legal right to refuse to work in a situation in which he would be exposed to the hazard, under OSHA rules.  It was also incumbent on Supervisor Tmbush to inform pharmacy staff on May 26, 2020 and May 27, 2020, of any steps that UH took under the Pandemic Policy to scrutinize Ms. Creedon and Ms. Farah prior to allowing them to report; **none of the staff were apprised of any steps taken by UH.**

*Moreover, the fact that Mr. Dundee abandoned his co-workers*

- A pharmacist cannot be accused of abandonment.  A physician and/or a nurse can be accused of abandonment because of the personal relationship established with the patient.  A pharmacist does not establish a personal relationship with a patient; such relationship is outside the scope of practice and would be illegal.  Courts have ruled using the Doctrine of the Learned Intermediary that a physician, NOT even a pharmacist, has a legal duty to warn regarding medication use.  So, accusations of patient abandonment are not any more applicable to a pharmacist than they would be to a worker maintaining a boiler to provide heat to the patient; it is pure histrionics and an example of pretext.  In the hospital setting, the pharmacist is neither fish nor fowl: neither physician nor nurse.

*Mr. Dundee's misconduct was severe and inexcusable.*

- Stalter v. Wal-Mart :  More compelling is the severity of the punishment, termination, in relation to the alleged offense of legally being absent from the pharmacy for 5 minutes or less. This should strike The Court as swatting a fly with a sledgehammer. That UH felt compelled to terminate Dundee for this offense does not pass the straight-face test.

*however, University Hospitals concluded that the work- from-home request could not be granted, and Mr. Dundee accepted other accommodations that were provided to him.*

- Dundee NEVER acquiesced to UH's rejection of telework from home and, in-fact, filed a discrimination claim with the OCRC.  Dundee dropped the OCRC charge because he sensed bias in the OCRC representative, Andrea Herrmann, and has emails as evidence.  Also, Dundee's acceptance of a parking place and flexible punch-in and punch-out in

order to avoid being disciplined was NOT in lieu of telework from home. There was no quid pro quo nor could there be under Title I of the ADA. Dundee never gave up on the request because he knew it was both reasonable and beneficial to his employer, UH. *Ms. Tumbush researched the feasibility of having a UH Geauga Medical Center Clinical Pharmacist work from home and consulted with the Ohio State Board of Pharmacy inspector*

- Ms. Tumbush was ill-equipped to do cogent research on the feasibility of telework from home and neither was the State Board Agent. Neither had performed telework from home so they could not speak intelligently on the subject; yet the Plaintiff helped to pioneer telework from home for rival, The Cleveland Clinic, for 24 months from 2007 to 2009, being the first full-time pharmacist hired into the Work-From-Home-Program, that still operates successfully to the present time. The person that Ms. Tumbush should have consulted was the Plaintiff, Dundee, for her research into the feasibility telework from home, yet neither she, nor anyone else from UH involved in Dundee's request for accommodation had a deep and meaningful discussion with Dundee, spelling out the costs, the logistics nor the benefits to the employer, UH. The inclusion of the "Ohio State Board of Pharmacy Inspector" in the UH Position Statement is merely window-dressing in an attempt to present UH as performing due-diligence. It is a deceptive statement, at best.

**4-13     UH Attorney Rachael Israel and the tort of Abuse of Process.**

While deposing Frank Dundee in the unrelated case, Frank Dundee v. University Hospitals, United States District Court for the Northern District of Ohio, Case No. 1:19 CV 01141, Attorney Isael asked a question unrelated to the above case [*Q. A. Q. A. I'm handing you Defendant's Exhibit 8 [OCRC Charge No. CLE B4 (44821) 0822218]. Do you recognize that document?*], for the purpose of using Dundee's testimony in the UH Position Statement to the EEOC; the deposition took place on March 10, 2020, a full three months prior to Dundee's termination over being absent 5 minutes from the pharmacy department on May, 27, 2020. The misuse of legal process, a deposition in this case, for an ulterior purpose, as a construct to defend against a future wrongful termination claim for failure to reasonably accommodate, in a

discrimination lawsuit under Title I of the ADA, exposes UH as acting with mendacity, discriminatory animus and lying-in wait for the right opportunity to present itself to use pretext to terminate Dundee.   The elements for abuse of process, implicating Attorney Israel and UH, (1) the use of an illegal or improper use of process, a deposition on a completely unrelated matter (2) an ulterior motive or improper purpose, such as terminating Dundee in order to avoid granting the reasonable accommodation of telework from home and (3) harm to a litigant, Dundee's wrongful termination under pretext, are all present for the fact-finder.  Abuse of process has been described as misusing a "criminal or civil process against another party for a purpose different than the proceeding's intended purposes" and thereby causing the party damages.  For example, if a person, Attorney Israel, uses a deposition for an ulterior motive that is not related to the lawsuit (Case No. 1:19 CV 01141), then there may be an abuse of process claim available. Again, the lawsuit itself may be perfectly valid (as well as the cause of action involved), but the deposition of March 10, 2020, in this example, does not serve the purpose of the lawsuit and was used as a critical argument in the UH Position Statement to the EEOC.  The test of abuse of process is whether a judicial process was used to coerce.  A fact-finder using the evidence of abuse of process in this case, can demonstrate the Defendant, UH, through their representative, Attorney Israel: (1) contemplated an ulterior motive in using the process, and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings.  The objective is not to pursue the tort of abuse of process.  The objective is to expose the mendacity, animus and planning (lying in wait) on the part of University Hospitals in order to terminate Dundee BEFORE granting a reasonable accommodation of telework from home.  The abuse of process on the part of UH has enough probative value to allow a factfinder to reasonably conclude that University Hospitals violated Title I of the ADA in this prima facia charge of wrongful termination and discrimination.

5.    CIRCUMSTANCES FOR TERMINATION: DISCHARGE NOTICE (UH reasons for termination in italics):

*On 05/27/2020, you knowingly and without cause (False) left your shift early with disregard to substantial and unjustifiable risk to our patients and pharmacy technician staff. Your behavior endangered the health and safety of our patients. In addition, you left a pharmacy technician performing her duties and therefore practicing without direct supervision, putting her license at risk.*

- 5-1. There was no pharmacy technician (Tracey Thoms was delivering morning meds and the cart) in the pharmacy for the 5 minutes or less that the pharmacy was closed due to imminent workplace danger.

- 5-2. And even if a pharmacy technician was in the department without a pharmacist present, it was allowed by Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy and occurs daily in every hospital pharmacy in the State of Ohio with FULL KNOWLEDGE of the Board of Pharmacy.

- 5-3. The term "health care institution" shall include any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged person.[1]  29 USC § 152(14)

*Note the policy and procedure violated:*
*HR-72 Corrective Action - Reasons for Discharge of Employment*

*#17-Any conduct which is seriously detrimental to patient care, other individuals or entity or operations.*

- 5-4. UH never provided a list of patients who were harmed by the Plaintiff legally closing the pharmacy during the 5 minutes or less that there was no registered pharmacist on duty.  Nor did they say what operations were seriously imperiled in that 5 minutes or less.  The Plaintiff was terminated, after a suspicious two week delay, under manufactured pretext.  **UH could have immediately suspended the Plaintiff on May, 27, 2020, within hours of the Plaintiff closing the pharmacy for 5 minutes or less to protect himself from deadly exposure to covid, which is allowed under OSHA regulations, while UH investigated the incident.  Instead UH allowed the Plaintiff to work another 7 shifts, from June 3, 2020, to June 10, 2020, without ever informing or confronting the Plaintiff regarding the absence on May 22, 2020.**

18

*#27- Any other serious offense deemed to be in violation of UH, entity or departmental policy, practices, rules or procedures.*

- 5-5.  Overly broad and used as a pretext for termination

*Ohio Revised Code  (laws pertinent to the practice of Pharmacy)*
*4729.27 Pharmacist must be in full and actual charge of pharmacy*

- 5-6.  This is contradicted by Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy which states: **(B)** *If in the pharmacist's professional judgment they determine, for reasons of security or otherwise* [imminent danger of injury or death], *that the pharmacy should close during the pharmacist's absence, then the pharmacist shall close the pharmacy and remove all staff from the pharmacy during the pharmacist's absence.*

- 5-7.  Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy: **(A)** A pharmacist practicing within an institutional facility may temporarily leave the pharmacy to engage in the practice of pharmacy within the institutional facility without closing the pharmacy and removing staff from the pharmacy if the practicing pharmacist can ensure there are adequate security measures and policies to maintain the security of the drug stock in the pharmacist's absence.**(B)** If in the pharmacist's professional judgment they determine, for reasons of security or otherwise, that the pharmacy should close during the pharmacist's absence, then the pharmacist shall close the pharmacy and remove all staff from the pharmacy during the pharmacist's absence.**(C)** During the pharmacist's absence, no dangerous drugs shall be dispensed unless the pharmacist has conducted a final association of the drug with a patient and has complied with all other applicable rules prior to dispensing a dangerous drug.**(D)** During such times that the pharmacist is temporarily absent from the pharmacy, the pharmacy staff may continue to perform the non-discretionary duties authorized in accordance with Chapter 4729. of the Revised Code and agency 4729 of the Administrative Code. However, any duty performed by any member of the staff shall be reviewed by the pharmacist upon the pharmacist's return to the pharmacy.**(E)** The institutional facility shall have written policies and procedures regarding the operation of the pharmacy during the temporary absence of the pharmacist. The policies and procedures shall include the authorized duties of pharmacy staff, the pharmacist's responsibilities

for checking all work performed by staff, and the pharmacist's responsibility for maintaining the security and control of the drug stock.**(F)** Unless otherwise authorized in agency 4729 of the Administrative Code, this rule does not permit non-pharmacist personnel from having unsupervised access to drug stock when an institutional pharmacy is closed. Replaces: 4729-17-07 Ohio Admin. Code 4729:5-9-02.10 Effective: 2/1/2022

*4729.55 (regarding Pharmacist) will maintain supervision and control over the possession and custody of dangerous drugs and controlled substances*

- 5-8. In the institutional setting, which is a hospital, technicians are not under the "direct supervision" of the pharmacist when delivering or restocking dangerous drugs to Omnicell machines for hours at a time. In EVERY hospital pharmacy in the State of Ohio.

- 5-9. This is contradicted by Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy

*4729-17-08 Minimum standards for an institutional pharmacy*

- 5-10. This is contradicted by Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy

*4729:1-4-02 Duty to report*

- 5-11. The Plaintiff did report for his shift on May, 28, 2020, as scheduled.

*4729:3-3-03 Registered pharmacy technicians*

- 5-12. There was no pharmacy technician in the pharmacy for the 5 minutes or less that the pharmacy was closed due to imminent workplace danger. And even if a pharmacy technician was in the department without a pharmacist present, it was allowed by Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy and occurs daily in every hospital pharmacy in the State of Ohio with FULL KNOWLEDGE of the Board of Pharmacy.

- 5-13.  The term "health care institution" shall include any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged person.[1]  29 USC § 152(14)

*4729-5-01 Definitions - "Direct supervision"*

- 5-14.  This is contradicted by Section 4729:5-9-02.10 - Temporary absence of a pharmacist in an institutional pharmacy

*4729.16 Disciplinary actions*

- 5-15.  The State board took no disciplinary actions

6.    Inaccurate or false accusations in the Respondent's Position Statement to the EEOC (in italics):

*When questioned about his abandonment of the UH Geauga Medical Center Pharmacy*

- 6-1.  A pharmacist cannot be accused of abandonment.  A physician and/or a nurse can be accused of abandonment because of the personal relationship established with the patient. A pharmacist does not establish a personal relationship with a patient; such relationship is outside the scope of practice and would be illegal.  Courts have ruled using the Doctrine of the Learned Intermediary that a physician, NOT a pharmacist, has a duty to warn regarding medication use.  So, accusations of patient abandonment are not any more applicable to a pharmacist than they would be to a worker maintaining a boiler to provide heat to the patient; it is pure histrionics.  In the hospital setting, the pharmacist is neither fish nor fowl: neither physician nor nurse.

- 6-2.  It is more likely that the employer, University Hospitals, is guilty of patient abandonment for short-staffing.  Hospitals function like businesses and try to minimize staff to cut costs and increase profits.  UH is being hypocritical using histrionics to justify terminating the Plaintiff for being absent the department for 5 minutes by magnifying the

consequences of even and absence of 5 minutes for a pharmacist, less time than it takes for a restroom break, to a level of critical importance so crucial that the pharmacist is elevated over that of a physician or nurse. Yet, UH doesn't see fit to staff all of its facilities, 24/7, with a pharmacist on duty, as a cost-cutting strategy. None of the free-standing UH Emergency Care facilities has a pharmacist on staff. UH Geneva and UH Conneaut Hospitals only have a pharmacist on duty for 8 hours a day. If this cost-cutting strategy can be shown to cause injury or cost lives, as UH is stating that the Plaintiff might have caused by his 5 minute absence, then those affected may be able to take legal action against UH for not staffing with at least two pharmacists on each shift in each UH facility; that is if the pharmacist is the most critical member of the healthcare staff, as UH is portraying in terminating the Plaintiff.

- 6-3. On March 25, 2019, in *Urbaniak v. American Drug Stores, LLC*, 2019 IL App (1st) 180248, the Illinois First District Appellate Court held that pursuant to the learned intermediary doctrine a pharmacy has no duty to warn customers of prescription drug side effects that may occur in anyone who takes the drug. the First District Appellate Court affirmed on the basis of the learned intermediary doctrine. "In its most basic form, the learned intermediary doctrine obligates drug manufacturers to warn only physicians about the potential risks of a drug, and then physicians are required to use medical judgment to determine which warnings to provide to patients to whom the drug is prescribed. The doctor acts as an intermediary of the information for the benefit of and on behalf of the patient. The learned intermediary doctrine applies to pharmacists in the same way that it does drug manufacturers — the duty to warn of side effects is not placed on the pharmacist, it is placed on the prescribing physician."

*...on the morning of May 27, 2020, Mr. Dundee claimed that he left early to avoid coming into contact with in-coming co-workers he feared had COVID-19. An investigation revealed, however, that all employees were properly screened before returning to work and that there were numerous options available to Mr. Dundee – other than abruptly walking out of the Pharmacy without transitioning responsibility for pharmacy operations to another pharmacist that would not have endangered patients and staff*

- 6-4. UH Attorney Rachael Israel wrote that "all employees were properly screened before returning to work." Yet she never explained what methods were used to properly screen the employees confirmed to have been exposed to covid-positive immediate family; and could those methods be reliable? In fact, Attorney Israel, in an effort to absolve UH from responsibility to protect staff from covid-19 exposure, readily admits in a footnote that any and all information used for screening was the "best available" at the time: *"6 Throughout 2020, scientific understanding of COVID has grown exponentially. At each stage of development, University Hospitals has utilized the best-available information and adjusted its policies in step with the rapidly-changing landscape of COVID research and treatment."* Attorney Israel would absolve UH from blame because of the "rapidly changing landscape," and yet excoriate the Plaintiff for fearing for his life on the morning of May, 27, 2020. But Attorney Israel is correct that the available screening methods available in May of 2020 were fallible, from the incubation period to social distancing recommendations to testing. **THE ONLY CERTAIN MEASURE THAT UH COULD TAKE WAS TO ALLOW ANY STAFF MEMBER SUSPECTED TO HAVE BEEN EXPOSED TO COVID-19 TO QUARANTINE FOR 10 DAYS.** And yet, Supervisor Tumbush never permitted any member of pharmacy staff to quarantine during the pandemic; a reasonable person might conclude that Supervisor Tumbush placed controlling her budget over the safety of staff.
- 6-5. A negative test result means the test did not detect SARS-CoV-2 at the time of testing. However, a negative test does not mean the employee does not have any virus, or will not later get the virus. It means only that the virus causing SARS-CoV-2 was not detected by the test. Once again, the only certain measure was to allow the exposed individuals to quarantine.
- 6-6. That statement is patently absurd: Dundee would have needed to be in contact with the oncoming, covid-exposed, staff in order to transition.
- 6-7. The onus was not on Dundee to call Ms. Tumbush to express his fear of being exposed to covid-19 from staff members at shift-change who were not permitted to quarantine. The onus was on Ms. Tumbush, as supervisor, to inform pharmacy staff, who were incredulous that staff exposed to covid-19 were being ordered to report to work, against hospital policy, as to the steps that were taken to ensure that the staff members were cleared to return to work, as much as

anything could be certain during those months of the pandemic. The situation on the morning of May 27, 2020, was created when Ms. Tumbush where the unknowns about the coronavirus and it's transmissibility required an abundance of caution were cavalierly replaced by her concerns over budget. When Dundee arrived at work on the night of May 26th, the pharmacy employees were in an uproar over the fact that two members of staff were being told to report on the morning of May 27th. Keep in mind that Dundee worked 3rd shift and was the last to know departmental goings-on, so was thrown in the maelstrom unawares with only hours before being confronted with a possible deadly contagion. According to OSHA, the Plaintiff was within his rights to remove himself from the condition:

- *6-8. If the condition clearly presents a risk of death or serious physical harm, there is not sufficient time for OSHA to inspect, and, where possible, you have brought the condition to the attention of your employer, you may have a legal right to refuse to work in a situation in which you would be exposed to the hazard. (OSHA cannot enforce union contracts that give employees the right to refuse to work.) Your right to refuse to do a task is protected if **all** of the following conditions are met: Where possible, you have asked the employer to eliminate the danger, and the employer failed to do so; and You refused to work in "good faith." This means that you must genuinely believe that an imminent danger exists; and A reasonable person would agree that there is a real danger of death or serious injury; and There isn't enough time, due to the urgency of the hazard, to get it corrected through regular enforcement channels, such as requesting an OSHA inspection.*

7.  UH consistently responded, over a period of years, to Dundee's reasonable accommodation request for telework from home with outright refusal and no meaningful discussion. UH never even tried to claim undue hardship because they knew that for an organization of its size, telework was an economically feasible accommodation. Keep in mind that UH used telecommuting as part of its broad overall COVID-19 mitigation strategy; under those circumstances, especially, UH cannot defend their decision to deny a request to telecommute from an employee with a disability, based on the essential functions of the particular employee's position, when Dundee had been using telework for years to provide essential services to a half-dozen UH facilities. UH simply denied Dundee's request for telework from home, without offering Dundee a comparative, meaningful, accommodation.

8.  Due to the deteriorating progression of his disability, HSP, Dundee was compelled to use a wheeled-walker (rollator) in the workplace, to perform his duties as a staff pharmacist at UH

Geauga Community Hospital from March 12,2019.  Dundee informed his supervisor and the VP of Human Resources of the difficulty maneuvering the rollator in the confined spaces of the pharmacy department.  Dundee has photos and video illustrating this example.

9.     On January 2, 2018, based on the advice of a geneticist, Dundee sent a DNA test into the testing site, "23AndMe" in an effort to determine a definitive diagnosis of his condition.  Dundee had been to various neurologists and other practitioners over a 20-year period, only to come away with the general diagnosis of "Upper Motor Neuron Disease."  On March 18, 2018, Dundee received the results from 23AndMe and was confirmed, genetically, to have the rare disease, Hereditary Spastic Paraplegia.  Dundee informed his supervisor, Patricia Tumbush and the VP of Human Resources, Heather Harmon, within days of confirmation, in order to begin discussions of a reasonable accommodation of telework for his disability.

10.     Note that Dundee had extensive experience in telework, being the first full-time pharmacist hired by the Cleveland Clinic in 2007, for their very successful "Work-From-Home" program.  Dundee would have been the ideal candidate to have the reasonable accommodation of telework from home.

11.     In its 1999 Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (revised 10/17/02), the Equal Employment Opportunity Commission said that allowing an individual with a disability to work at home may be a form of reasonable accommodation.

12.     Once Dundee had a firm diagnosis of HSP, which has no cure and has continued to progress, he began discussions concerning a reasonable accommodation. with Heather Harmon and Patricia Tumbush, within days of March 21, 2018.

13.     UH violated the ADA's general remedial purposes of promoting full participation and equal opportunity in the workforce to disabled persons (Dundee).  UH refused, ignored, stone-walled and obfuscated its affirmative obligations to make reasonable accommodations, from March of 2018 onward.  The very few considerations shown to Dundee were not reasonable accommodations; they were mere meager efforts at delay, until Dundee either quit due to the unbearable working conditions or until UH could formulate a pretextual reason to take an adverse employment action, termination, which they did on June, 17, 2020.

14.     It must be recognized, once again, UH's failure-to-accommodate itself as a qualifying adverse employment action.

15.     UH refused Dundee's request for reasonable accommodation for telework from home, which did not present an undue hardship for a corporation the size of UH, which would allow Dundee to perform the essential functions of his position and which would have actually increased the efficiency of operations in the Department of Pharmacy, saving money and improving care.  In fact, telework was an integral part of pharmacy operations for over 6 years within the UH System.  During his career at UH, Dundee performed the essential functions of his job through telework for UH Ahuja Medical Center, UH Richmond Hospital, UH Geneva Hospital, UH Conneaut Hospital, UH Twinsburg Emergency Center, UH Ashtabula and UH Andover Emergency Center.  UH refused Dundee's accommodation for telework from home while at the same time allowing other pharmacy staff to perform telework from home, which is disparate treatment and discriminates against a person like Dundee with a disability.

16.     The Covid-19 Pandemic presented deadly threats to a person of Dundee's age, at nearly 67 the oldest staff member, and the most likely to succumb to covid-19, under CDC Guidelines. In addition, Dundee was at increased risk from covid-19 due to his disability, HSP, which is a comorbidity.  For these reasons, Dundee increased his requests for telework from home as an accommodation, from February 2020, onward.  UH ignored or outright rejected each request, without citing "undue hardship."

17.     Ironically, had UH granted the reasonable accommodation for telework during the pandemic, Dundee would not have been under what he in good faith believed to be a serious threat to his life from the workplace, on the morning of May 27, 2020, compelling his 5 minute absence from the pharmacy department, at shift-change (from 5:55 am to 6:00 am), which provided his supervisor and UH with the pretext to terminate Dundee weeks later, on June 17, 2020.  Dundee wrestled with how to best avoid exposure to two members of oncoming staff, confirmed to be exposed to immediate family members, positive for covid-19, (one of whom died weeks later from covid) and were not permitted to quarantine, in defiance of UH Covid Policy.

18.     Dundee, months before, reported his supervisor, Patricia Tumbush, for possible reckless endangerment during the pandemic, for preventing an employee who was quarantined on a cruise

ship in late March, 2020, from quarantining for 10 days upon her return to work, possibly exposing staff to covid-19. This was early in the pandemic when staff lacked PPE and testing and where caution should have informed every decision made by UH managers since nothing was certain and results from testing were not immediate. It was reported in front of witnesses, by the employee herself, that Ms. Tumbush requested that the employee not disclose the fact that she was quarantined aboard the cruise ship to the UH Covid return-to-work watchdog. Dundee sent the report on April 1, 2020, to the VP of Human Resources, Heather Harmon, to be relayed to the UH Compliance Department for investigation under their, "See Something-Say Something" policy. Within days, Dundee also sent his report of possible reckless endangerment during the pandemic to the Office of the Ohio Attorney General and to the Ohio State Board of Pharmacy. This incident informed Dundee's response on May 27, 2020, a 5 minute absence from the Pharmacy Department, in order not to be exposed to staff who should have been in quarantine under UH pandemic policy. One must be mindful of the deadliness associated with covid-19 during those early months of the pandemic. Dundee's forced 5 minute absence gave his supervisor and UH the pretext for terminating him, in order to avoid granting Dundee's request for the reasonable accommodation of telework from home, under the rules of Title I and V of the Americans with Disabilities Act of 1990.

- 18-1. For three years, Ms. Tumbush engaged in a pattern of reckless behavior that exposed the staff to infectious and possibly lethal disease prior and during the pandemic, in order to avoid paying overtime to replace the person who should have been at home or in quarantine (possibly due to incentives in her contract), in total disregard for the safety of staff. During the early stages of the covid pandemic, where information was rapidly changing and testing often unreliable, Ms. Tumbush acted in a rash manner, exhibiting her own hubris when she should have proceeded with an abundance of caution.

- 18-2. Rick Wise (flu) harassed by phone into coming to work by Ms. Tumbush went straight to ER and was diagnosed with the flu; Tina Creedon pneumonia harassed into working preparing chemotherapy thus endangering the lives of immune-compromise patients; Tina Creedon in March, 2020, forced to return to work after being quarantined on a cruise and possibly told to withhold information from the screeners at UH by Ms. Tumbush; Marylin Gibbs back at work with a terrible cough after spending 3 days in a covid unit; Glenn Johnson harassed at home to come to work when he thought he had

covid and was awaiting test results; Lisa Farah and Tina Creedon exposed to immediate family and told to report to work instead of quarantine (Ms. Creedon's subsequently died within weeks from covid); Ms. Tumbush mandating that contaminated meds that were inside covid-patient's rooms be returned to pharmacy to be wiped down with disinfectant and reused.

- 18-3.  The onus was not on Dundee to call Ms. Tumbusg and express his fear of being exposed to covid from staff members at shift-change who were not permitted to quarantine.  The onus was on Ms. Tumbush, as supervisor, to inform pharmacy staff, who were incredulous that staff exposed to covid were being ordered to report to work, against hospital policy, as to the steps that were taken to ensure that the staff members were cleared to return to work, as much as anything could be certain during those months of the pandemic, where an abundance of caution was replaced by concerns over budget.  When Dundee arrived at work on May 26th, the previous staff was in an uproar that two members of staff were being told to report on the morning of May 27th.  Keep in mind that Dundee worked 3rd shift and was the last to know departmental goings-on, so was often thrown in the maelstrom unawares.

19.    Plaintiff Dundee lost his job because of needless and unlawful inflexibility on the part of UH in refusing to make the workplace reasonably accommodating and by repeatedly rejecting requests for telework from home by Dundee, with his disability.   Instead of offering reasonable accommodation, UH made the physical layout of the workplace less accommodating to a person with Dundee's disability in February, 2020, and refused to recognize that fact.

20.    UH opened the relocated and redesigned Department of Pharmacy in February of 2020. Dundee wrote an email stating the new difficulties presented to a person with his disability by the new layout on February 28, 2020, to Heather Harmon:

*"I returned to work on Wednesday night in the new pharmacy.  I had not seen it before I arrived.  The bathroom is very welcome.  But the new pharmacy is spread out, causing me to ambulate longer distances to perform the same tasks.  Even using my walker I am more fatigued.  In addition, many more medications now are stocked on bottom shelves that are maybe 6 inches off the ground.  We also now have rolling shelves that are heavily loaded with stock that present issues for me as well.  The distance, combined with having to bend over far more*

*frequently, are a bad combination for me. I have great difficulty bending so low; it affects my ability to maintain balance. Wednesday's shift was slow, and I still noticed the muscle fatigue. Tonight, I was very busy early on and it has taken a toll already. I am concerned about how my legs will function on the drive home. I'm down to about 16 hours of PTO time, from leaving early and arriving later, to reduce my hours. I'm trying to make it until May in order to work part-time, if that will even be an option, then. I'm just reaching out."*

21.     If making the new pharmacy department accessible presented an undue hardship, UH remains under obligation of law in Title I of the ADA to provide a comparable facility that will enable a person with a disability, Dundee, to enjoy benefits and privileges of employment similar to those enjoyed by other employees. Dundee made it clear to both his supervisor, Ms. Tumbush and to the VP of Human Resources, Heather Harmon, that the new pharmacy department layout made the workplace unbearable. Yet Dundee's requests for reasonable accommodation, more desperate than ever, were ignored. By February 2020, Dundee's disability had worsened and now he found himself in a workplace that was even more inaccessible to a person with Hereditary Spastic Paraplegia.

22.     UH's consistent refusal to grant the accommodation of telework during the pandemic and after the move to the new pharmacy is the smoking gun that exposes the UH strategy of stonewalling until Dundee was forced to resign under constructive dismissal or be terminated under pretext. Reasonable people might agree that UH was playing a waiting game, taking advantage of the new obstacles presented by the workplace from February, 2020, on, in order to wear Dundee down, preventing his full participation and equal opportunity in the workforce.

23.     In contrast to the UH inflexibility at even considering a reasonable accommodation, was Dundee's flexibility in structuring his requests for telework from home, as demonstrated in his many email correspondences. An example from an early email dated August 18, 2018, from Dundee to supervisor Tumbush:

*I don't know if you ever considered my proposal for a workplace accommodation for my motor-neuron disease. The proposal was to work from home, on a swing shift, overlapping 1st and 2nd shift, where I would be in total charge of the verification que for my hours on duty, as well as handle phone calls. I'm sure you might be wondering how I, alone, could handle the que. I assure you that I can handle it, all alone, plus the phone calls. We could trial it over a week or*

*so to prove it. I have the most experience of all the pharmacy staff, as well as the most varied experience. I have the best chance of satisfying any questions from physicians and nursing staff, as well. This isn't bragging. It is just I know what I can do because I did for the Cleveland Clinic that was far busier and had an exponentially more complex patient mix than we deal with at Geauga. At a time when the Clinic pharmacy staff was averaging 47 orders per hour I was near 100. My only concern is that as the orders print out in the main pharmacy, that they would either languish being filled or being checked. I want my efforts to improve turnaround time. I think working from 11:00 A.M. to 7:00 P.M. is probably the best, Mon thru Fri, but I will do whatever, sign on as needed at a moment's notice to fill holes or work any shift(s) that you feel is more valuable. Thanks for your consideration of my proposal.*

23-1.  Another example from July, from July 9, 2019, from Dundee to supervisor Tumbush:

*On the topic of my request for a workplace accommodation to work from home, I feel an obligation to help you get this changeover up and running smoothly. Ideally, I would like to begin working from home by November 1, 2019. I'm too tired right now to write much more except to suggest, as I have in the past, working five, eight-hour days, from 4:00 pm to 12:am, Monday thru Friday, taking advantage of my skill-set for timely and efficient order verification during the busiest time of day. I can handle the queue, alone, and never fall behind. It would benefit both the patient and the department. It is 2019 and telework is part and parcel of workplace accommodation, so my request is more than reasonable and doable.*

*My body is broken, but my skills in pharmacy have never been better. I don't want to quit and I don't want to be forced to quit. I hope you are able to discuss the matter with Heather Harmon. If the door is shut on my request for accommodation to work from home, please let me know by the end of this month.*

24.  At the time of his termination under the pretext of being absent from the Pharmacy Department for 5 minutes, on May, 27, 2020, Dundee had a son who was only 24 years old and who had health insurance through the UH family health plan. The son would be on the family health plan until age 26. In addition, Dundee's wife was age 61 at the time of termination and needed to be on Dundee's health insurance through UH until she reached age 65. Dundee planned on working reduced hours with full-time health benefits for UH until age 70; with the

reasonable accommodation of telework from home being the only possible way for Dundee to have meaningful employment with his disability of HSP.

25.    On the morning of May 27, 2020, Dundee had a reasonable and good faith belief that a condition in the workplace posed an immediate and substantial risk of serious physical injury or death from covid-19. The employer, UH, not only did not fix the dangerous condition, but also caused the danger, knowingly, when the pharmacy supervisor refused to allow covid-exposed-staff to quarantine, as policy required. The immediacy of the danger did not allow Dundee enough time to report the condition to OSHA or the appropriate State agency, nor did Dundee have a reasonable alternative other than remove himself from the situation. Dundee's 5 minute absence from the pharmacy department served as the pretext for UH's adverse action, termination, weeks later on June 17, 2020.

26.    Pretext is established in the Catch-22: the employer, UH, is responsible for creating the problem that is supposedly the basis of the employer's disqualification of the employee, Dundee. The proffered reason for Dundee's termination, over a 5 minute absence, is the definition of a lack of proportionality. UH's facially proper reasons given for its action against Dundee were not the real reasons for that action.

27.    Dundee's 5 minute absence is essentially the false reason given for the adverse employment action, termination, that masked UH's true motive for the action. Dundee's retaliation/discrimination charge before the court will show the proffered reason for the adverse employment action at issue is false, phony or a sham. Dundee's goal in demonstrating pretext means showing a factfinder that UH's stated reason for the adverse employment action is not the real reason for the action, and was intended to cover up or camouflage UH's discriminatory intent in order to avoid granting Dundee's request for a reasonable accommodation of telework, sought and denied over a period of years.

28.    Dundee will challenge the veracity or reasonableness of UH's business judgment for taking the adverse action in question. The reasonableness of UH's reasons may be probative of whether they are pretexts. Terminating the most broadly experienced over a 44 year career, most highly regarded pharmacist by nursing staff (especially the ICU staff), least absent over a 10 year period, despite his disability, the pharmacist with the quickest response time for processing patient orders in the work queue (proven by data), most efficient and most innovative pharmacist

on staff, for an absence of 5 minutes, exposes the blatant, idiosyncratic and questionable reason for termination as a pretext. UH's bad business judgement provides Dundee with a meaningful opportunity to evaluate the reasonableness of the decision and to put forth evidence allowing for an inference of unlawful employment discrimination to be drawn.

29. Comparative evidence will show that similarly situated employees not in the plaintiff's protected class under the ADA, were treated more favorably. Dundee will also use indirect evidence in proving discrimination through pretext. The pretextual explanation is evidence indicating consciousness of guilt; which is evidence of illegal conduct. Dundee's evidence of pretext, through email correspondences, audio, video, data, witnesses and depositions is enough to get the matter to a jury, and then it is up to the jury to decide whether UH violated the law. Emails alone will demonstrate statistical proof that a pattern of discrimination existed in the refusal to grant reasonable accommodation.

30. Dundee filed charges with the OCRC, CLE B4 (44821) 08222018, Andrea Herrmann investigator, for UH's failure to accommodate in October of 2018:

*Ms. Kara Ladaika convened a meeting prior to August 14, 2018, with the "ADA team" in order to review signed ADA documents from my personal physician, that were a requirement stipulated by UH policy before any discussions of a reasonable accommodation could take place, despite the fact that my impairment was obvious. It is critical to my charge that UH not only release the names of the members of the "ADA team" but also release any minutes/notes from that meeting(s).*

*The composition of a letter that rejected the proposal to work-from-home as a reasonable accommodation, out of hand and prior to any discussions with me, that was faxed to my physician on August 21, 2018, from Ms. Debora Templin, was a direct result of those discussions from the "ADA team."*

31. An email to Ms. Herrmann, dated October 16, 2018, serves as a framework demonstrating how UH and its agents tried to weaponize the formal application for a reasonable accommodation for telework from home:

*Ms. Herrmann, I am not able to respond to the UH position statement, fully, if a critical part of my response is not made available.  As you well know, a claim of retaliation has a high burden of proof in any charge, let alone when the charging party is denied critical information.*

*The human part of my charge is being overlooked completely by your puzzling refusal to use your power as investigator to request information prior to my submitting a response.  I have worked with what was diagnosed under the general term of "upper motor neuron disease" (MS is upper motor neuron disease, but I do not have MS) for at least 15 years of my life.  The last four years has seen my disease progress to a point where my leg movements and my balance has deteriorated, making locomotion much more difficult.  Combine that with the fact that I work 3rd shift, which is physically demanding for anyone.*

*Over the last 5 years I also been subjected to  a series of harassing attacks by my former supervisor, Rachael Lerman, and the head of HR at Geauga, Danialle Lynce, and Shawn Osborne, VP of Pharmacy Services, that are so blatant that I have been forced to file charges with the EEOC.  These attacks and the anxiety response they provoked have caused my impairment to deteriorate over that time period.  Please note that it was Ms. Lynce who wrote the position statement.  Ms. Lerman has been promoted over that time period and is now directly over my immediate supervisor in the line of authority.*

*Since I never had a definite diagnosis and since I was wary of giving UH an opportunity to find me unfit, I was reluctant to ask for any accommodation.  However, I met who I felt was an honest broker in the UH hierarchy, Ms. Heather Harmon, who is the head of all HR for UH and I felt comfortable with discussing the harassing attacks as well as my impairment.*

*Coinciding with my discussions with Ms. Harmon, with the help of genetic testing, I was able to determine a definitive diagnosis for my impairment, WHICH IS OBVIOUS TO MY SUPERVISOR OR ANYONE WHO SEES ME WALK, that diagnosis being a rare disease called Hereditary Spastic Paraplegia (HSP).  Note the last work, "paraplegia."  Once I had the diagnosis in hand, I felt more comfortable asking for an accommodation.*

*However, my fears were realized during the process in which I could not get UH to engage in discussions as impediments and preconditions to the discussions, which are illegal under Title 1 of the ADA when the impairment is obvious, culminating with the tenor of the first page of the*

*fax from Ms. Debra Templin that was sent to my physician, that obviously was trying to weaponize my request for accommodation into a reason to prove me unfit.*

*My request for the names of those on the ADA Team and for minutes/notes of the meeting are critical in proving retaliation in my accommodation charge as there are three people who I have named in my EEOC charges, that are being reviewed by the director of the Cleveland Office, Ms. Cheryl Mabry; those three people are Shawn Osborne, VP of Pharmacy Services, Rachael Lerman and Danialle Lynce. Those three people retaliated against me for filing a protected activity in my EEOC charge.*

*I have two adult sons who are just starting out in their careers. I have a high paying job that I wish to keep for a few years more so that my income can be an insurance policy of sorts if they need my intervention. I would love to retire, but I feel it would be selfish at this time. My wife is 6 years younger than I and needs health insurance for a few more years. And, lastly, I feel that I am at the top of my game as a pharmacist. The job is easier, mentally, than it ever was due to my experience and skill-set, making me possibly the most productive pharmacist in the entire UH system. I continue to work 3rd shift, alone, taking care of 4 hospitals, despite my impairment. But my impairment is significant, causing discomfort, wear and tear on my joints from compensating by limping, pain and most significantly on my endurance, causing significant fatigue by the end of my shift/week. I also have a 1 hour commute each way, and the spasms from my HSP affect my reaction time while driving a car. Add to that issues with my excretory functions caused by HSP.*

32.     Problems of relevancy call for an answer to the question whether an item of evidence, when tested by the processes of legal reasoning, possesses enough probative value to justify receiving it in evidence. The following information in emails, from January 8, 2020 to June 13, 2020 possess enough probative value to allow a factfinder to reasonably conclude that University Hospitals violated Title I of the ADA in this prima facia charge of wrongful termination and discrimination. These are only emails from January 8, 2020 to June 13, 2020; the Plaintiff has many more emails that he can introduce from the period before January 8, 2020:

32-1.   From: Frank Dundee <fdundee@gmail.com> Date: Wed, Jan 8, 2020 at 3:51 AM

To: Harmon, Heather (HR) <heather.harmon@uhhospitals.org>

Hi Heather, Happy New Year! May this one be the best for you and your family. I am contemplating a request for part-time in May, 2020, as part of my need for an accommodation. I'm thinking 20 hours a week, Fri-Sat-Sun-Monday, 10 hours each, on 3rd shift. That would be 4-10 hour days in a row, instead of 7 days. Right around day 5, my legs are pretty much shot. This gives us a few months to figure out. Thanks.

32-2.   Frank Dundee <fdundee@gmail.com>  Fri, Feb 28, 2020 1:26 AM   to Heather

Hi Heather I returned to work on Wednesday night in the new pharmacy. I had not seen it before I arrived. The bathroom is very welcome. But the new pharmacy is spread out, causing me to ambulate longer distances to perform the same tasks. Even using my walker I am more fatigued. In addition, many more medications now are stocked on bottom shelves that are maybe 6 inches off the ground. We also now have rolling shelves that are heavily loaded with stock that present issues for me as well. The distance, combined with having to bend over far more frequently, are a bad combination for me. I have great difficulty bending so low; it affects my ability to maintain balance. Wednesday's shift was slow and I still noticed the muscle fatigue. Tonight I was very busy early on and it has taken a toll already. I am concerned about how my legs will function on the drive home. I'm down to about 16 hours of PTO time, from leaving early and arriving later, to reduce my hours. I'm trying to make it until May in order to work part-time, if that will even be an option, then. I'm just reaching out.

32-3.   Subject: Reasonable accommodation request in response to the ergonomic impediments of the new pharmacy

From: Frank Dundee <fdundee@gmail.com>  Date: Sun, Mar 1, 2020 at 3:41 AM

35

To: Harmon, Heather (HR) <heather.harmon@uhhospitals.org>, Tumbush, Patricia
<Patricia.Tumbush@uhhospitals.org>

Hi Heather and Patty,  My upper-motor-neuron disease, Hereditary Spastic Paraplegia (HSP), is
a progressive disease.  My initial request for a reasonable accommodation was sent in July, 2018.
It is about 20 months later and my condition, as predicted with a progressive disease, has
worsened.  Month to month I notice a difference in my ability to walk from point to point.  The
distances that I could handle without too much difficulty have shortened considerably.  It is with
great regret that I say the new pharmacy design and set-up is at cross-purposes my disease.  So I
am faced with a perfect storm: my condition has worsened and my workplace is less
accommodating to a person with my disease.  The new pharmacy is stunning.  If I didn't have
HSP, I would simply be ecstatic to work in such a nice environment.  However, with HSP, I
dread coming to work.  The design and set-up could not be less ergonomically welcoming to
person with HSP.  The floor-plan is long and wide, increasing the distance I must walk
significantly.  But worse still, now at least 1/3 of the inventory is located below my waist, with a
significant number of regularly used items mere inches from the floor, forcing me to bend over
all night long.  The action of bending over, more than the distance I walk, aggravates my
condition by sending my muscles into spasms; which further impairs my ability to walk from
that point forward on my shift.  My HSP is like having a wide rubber band wrapped around my
belt-line; I am constantly aware of the tightness at all times.  Bending over, even one time,
causes that band of muscles to spasm and tighten, affecting muscles all the way to my toes for
the rest of my shift.  In fact, it causes my toes to curl under, making the toes of my shoes scrape
the floor, causing me to catch on the numerous mats near the work stations.  In short, the new
pharmacy is a nightmare scenario for a person suffering with HSP.  I am only on day 4 of my 7-
day rotation and the cumulative effect of the distance and bending have me limping along with
great effort.  The workload on the shifts has been less than usual, and yet I am fatigued.  I fear a
busy shift.  In addition, mental acuity is a known problem for shift-workers, because of the
unnatural sleep rhythms required to stay awake all night.  Not only do I have to contend with the
degree-of-difficulty inherent to 3rd shift, now I am challenged by being physically exhausted.
That is a bad combination when a clear head is needed at all times.  Co-workers have noticed my
difficulty walking.  I return to my past request to work-from-home.  I have never agreed that
work-from-home imposes a hardship on UH.  I have noted that UH pharmacists have access to

the work-queue from home right now; so having me work from home does not introduce some new impediment.  However, I have paired down my original request from full-time work-from-home, to work part-time work-from-home; 20 hours a per week, five 4-hour days a week.  I can be scheduled to help 2nd shift during peak times, from 5 pm to 9 pm, 6 pm to 10 pm or 7 pm to 11 pm.  I can also be available for staffing short-falls to cover call-offs, LOA's and vacations by managing the work queue.  I have no problem with the time of day or with the specific day of the week.  I can be flexible, despite having muscles that are anything but flexible.  Although the new pharmacy is amazing, the present situation with the design and logistics is the exact opposite of a design and logistics that could accommodate my impairment.   I need short walking distances and inventory at heights above the counter.  In light of the immediacy of my situation, I hope that we can discuss my proposal sooner than later.  Thank you both for your consideration.

32-4.   From: Frank Dundee <fdundee@gmail.com>

Date: Tue, Mar 3, 2020 at 12:12 AM

To: Harmon, Heather (HR) <heather.harmon@uhhospitals.org>, Tumbush, Patricia <Patricia.Tumbush@uhhospitals.org>

I saw this headline before I came into work tonight:  Twitter CEO urges employees to stay home amid coronavirus  Jack Dorsey, the chief executive of Twitter and Square, indicated in tweets Monday night that both his companies would enforce the work-from-home policy.

UH would do well to look at work-from-home in light of this possible pandemic...specifically to pharmacy operations...UH has no other pharmacist, across all campuses, who can handle the verification queue like I can.  That isn't bragging, that's just knowing how I stack up against my peers.  I could be invaluable, across all campuses, working from home in order to maintain operations if and when the virus hits...and because our country hasn't tested many people, as we should have, the cases could be sudden and overwhelming...I can handle the work-queue 24/7 in an emergency situation, covering staffing shortfalls at each campus...once the emergency is is over,

I can go down to 20 hours a week at Geauga...despite HSP, I am still capable of working long stretches at any hour of the day, if I don't have to walk, bend or drive...I can be an insurance policy for UH...best get me home before I catch the virus!

32-5.    From: Frank Dundee <fdundee@gmail.com> Date: Tue, Mar 3, 2020 at 9:14 AM

To: Harmon, Heather (HR) <Heather.Harmon@uhhospitals.org>

Hi Heather  Thank you for your reply.  I feel like Moses and the Promised Land...the new pharmacy is amazing, I lived to see it built, but it is all wrong for me...I can't work there...I'm pretty tough, but the layout has me crippled this morning.

32-6.    Frank Dundee <fdundee@gmail.com>  Fri, Mar 6, 2020 8:57 AM

to Heather

https://www.washingtonpost.com/world/asia_pacific/coming-to-a-couch-near-you-a-brave-new-world-of-teleworking-in-the-coronavirus-era/2020/03/06/86e82754-5e0c-11ea-ac50-18701e14e06d_story.html

Hi Heather...There is probably no one else employed by UH who extensive has experience with telework, working from home...I was the 1st full-time pharmacist hired into the Cleveland Clinic's work-from-home pharmacy staff.  I helped make the program a success that is still working well 14 years later.  Why did they take a chance on me?  Because of my breadth of experience.  I don't walk well anymore, but I am at the top of my game for processing patient orders...no one else is close.  I mention the words, win-win, once again...especially with a pandemic on the way.  I am a valuable asset for the patients of UH.

32-7.  Frank Dundee <fdundee@gmail.com>  Mon, Mar 16, 2020 8:03 AM

to Heather

Hi Heather,  As I was leaving at 6:00 am this morning a tech came in because another called off and this tech's daughter is home and exhibiting all the signs of the coronavirus...and the tech sounded a bit hoarse...the tech sounded frantic, as well  Now this may be neither here nor there, but the real possibility exists that everyone who is staffing today could be exposed to the virus and be quarantined...and that could replicate at all UH pharmacy departments...UH needs some pharmacists working from home during this pandemic...and I should be number one, not only because of my previous experience and my skill-set, but also because of my request for reasonable accommodation, I should be first in line.  One other thing, my son sent me a notice this morning that the governor from California wants all people 65 and older to stay inside their homes for the duration of this pandemic...I'm 65 & ½  [Sic.,66 & ½]...he wants me to resign and never come back...I told him to relax, that I was working on a win/win solution

32-8.  Frank Dundee <fdundee@gmail.com>  Wed, Mar 18, 2020 8:36 AM

to Heather

Hi Heather,  I just finished my 7-day rotation this morning.  I won't go into dramatics about the new degree of difficulty imposed on my HSP by the new pharmacy design.  The reason I'm getting touch is that I received a voicemail from Patty Tumbush this morning around 6:40 am. She said she had hoped to catch me before I left.  She must have forgotten that she OK'd me

arriving at 10:00 pm and leaving at 6:00 am as a bridge to allow the two of you to discuss my proposal to work from home. You have the specifics so I won't repeat them here.

However, Patty wanted me to call her to discuss going to part-time, on-site, in May. She completely ignored the work-from-home issue. I could have made onsite, part-time, work in the old pharmacy. The new pharmacy presents too many challenges to me to even safely work a shift onsite, especially with my HSP progressively worsening.

I request an honest answer to my proposal, and then we can all move on from there. I had hoped to get the OK to work from home now, so that I did not have to return. Besides the risk presented by the pharmacy layout, the risks of covid-19, to a 66 & 1/2 year old are well known. I will say this again: allowing me to work from home, with my considerable skill-set, is a win-win, especially during this pandemic.

Julie Novak came around to the department this morning. I gave her some valuable suggestions that might need to be implemented during the pandemic. One was a having a small group of experienced pharmacists processing physician orders and answering phone inquires from physicians and nurses, from home during this pandemic. I included some email exchanges between you, I and Patty about my working from home.

32-9. From: Frank Dundee <fdundee@gmail.com> Date: Thu, Mar 5, 2020 at 1:24 AM

To: Harmon, Heather (HR) <heather.harmon@uhhospitals.org>

Hi Heather, I ran into Patty Tumbush in the parking lot as I was loading my walker into my car yesterday morning. We had a conversation about the obstacles that the new pharmacy design and layout presents to a person with HSP. I asked Patty, as an emergency measure, to officially allow me to change my shift to 10:00 pm to 6:00 am, eight hours a night, starting 3/11/20. She agreed. Eight hours in that environment isn't going to improve things much, but I am trying to

soldier-on for the time being. It was concerning to me that Patty deflected questions about my request to work from home, 20 hours a week. When I mentioned that AT LEAST 1/3 of necessary and regularly used inventory are now positioned on shelves from counter-level to mere inches from the floor, she said, "Oh, it wasn't that way in the old pharmacy?" That's a major deflection and really makes her look unaware as the department manager, if she truly believes that statement. Although the new pharmacy wasn't designed with the purpose of placing major obstacles to my upper-motor neuron impairment in my way, that's how it ended up. It is a beautiful pharmacy that was poorly set-up, ergonomically, for any of the staff. I can imagine many of the staff employees having issues, going forward, having to bend and reach, constantly. Pharmacists right now, in our department, have the ability to sign into the pharmacy system from home and verify orders during peak times or if there is an inexperienced pharmacist on the job, especially on 2nd shift. There is absolutely no reason why I am being refused the accommodation I requested as there is no major infrastructure changes that would be necessary on the part of UH. I could work-from-home as of this moment. My impairment is serious. The impediments exacerbating my ability to move my legs and maintain balance in the new pharmacy, and drive myself safely home, aren't going away. The increased fatigue caused by the layout, that affects my mental acuity, is real and manifested itself numerous times this past 7-day shift. As I said, I never agreed with the reasons presented in our past discussions that blocked me from working from home. I know Patty is on vacation next week, but I would like a yes or no answer, by March 24, 2020, addressing my reasonable request to work-from-home, 20 hours per week, 5 days a week, on 2nd shift. As I said, there is an immediacy to my request, for all of the reasons I have stated. There is a need on 2nd shift at Geauga for a pharmacist to take over the work-queue in order to free-up the on-site pharmacist to perform other necessary duties. The exact time that I would sign onto 2nd-shift can be determined by Patty, from the range of times I presented. I will also be available to sign onto the pharmacy work-queue for any staffing shortfall due to the coronavirus or any other staffing emergency situation. My request for a reasonable accommodation presents no hardship on UH and in fact will help with work-flow and improve patient care. I don't want to be forced to resign my position by the changes in my working conditions. My concession to going part-time, work-from-home, instead of full-time, is significant. As always, I thank you for your consideration.

32-10. From: Frank Dundee <fdundee@gmail.com>  Date: Wed, Mar 11, 2020 at 12:47 PM

To: Harmon, Heather (HR) <Heather.Harmon@uhhospitals.org>

Hi Heather, just sitting here watching CNN and the WHO has just declared the coronanvirus outbreak a pandemic.   I'm not trying to be dramatic, but my skill-set makes me a very valuable commodity for both UH and community health if I am set up to work from home soon...I'd suggest before my next 7-shift rotation the week of the 25th...it is possible for the coronavirus to decimate hospital staff overnight...it may get to a point that 3rd shift at Geauga and other UH facilities is staffed with nursing supervisors and not pharmacist, just like Geneva and Conneaut right now...I can cover all UH facilities over 3rd shift during this emergency...

32-11. From: Frank Dundee <fdundee@gmail.com>  Date: Thu, Mar 19, 2020 at 6:17 PM

To: Harmon, Heather (HR) <Heather.Harmon@uhhospitals.org>

Hi Heather, Thanks for the reply, but the elephant in the room is work-from-home.

32-12. From: Frank Dundee <fdundee@gmail.com>  Date: Fri, Mar 20, 2020 at 9:25 AM

To: Harmon, Heather (HR) <Heather.Harmon@uhhospitals.org>

Hi Heather,  I sent Patty a couple options for trying part-time, onsite, since there is no progress on work-from-home.  I would hope that the powers-that-be realize how valuable having several experienced pharmacists working from home could be during this pandemic.

42

Regardless, you wrote:

*In additional, Patty is reviewing the work flow of the techs to see if it can be adjusted so you are not moving as much to pull drugs as you are presently.  She will follow up with you directly on both of those items.*

I had to shake my head at this.  The technicians that I work with are busy from the first minute they enter the pharmacy.  That suggestion by Patty demonstrates a lack of awareness.  On top of that, it shows a lack of awareness of the role that I play on the shift.

Patty shifted three huge responsibilities onto 3rd shift last year: at 2100, cath lab and surgery Omnicell restock; at 01:30 the 24 hour patient cart-fill; at 0400 the daily Omni fill for the floors and once a week a huge Omni fill for Andover.  And I have to check all of it.  Patty seems to have this idea that she added techs to the shift to help the 3rd shift pharmacist, when in reality, she added a lot more work on the 3rd shift pharmacist, which has also had a deleterious affect on my impairment.  It is my job to keep the technicians free to perform their duties.  They can't be interrupted to be fetching things off the low shelves for me.  It isn't their job to make up for a poor design. The 3rd-shift techs are 2 of the best techs I've ever worked with and they never take a break most nights for 10 hours straight.  If Patty wants to help, she can remove the 0400 Omn-fill and the once a week Andover Omni-fill **[note Tumbush NEVER removed either]**. Neither needs to be filled on 3rd shift.  Patty has plenty of staff that is underused on 1st shift in the 3 residents, in the retail pharmacy and in the extra oncology pharmacist position.  Taking the 0400 Omni-fill away would be a tangible accommodation that would help me to cope with my impairment, especially in light of the increased workload the pandemic will caus  Thanks as always.  Stay safe.

32-13. Frank Dundee <fdundee@gmail.com>  Wed, Apr 15, 4:34 PM

to Heather,  This is an interesting article.  Especially in light of my "See Something/Say Something" report.

https://www.washingtonpost.com/local/do-health-care-workers-know-if-their-colleagues-have-covid-19-depends-where-they-work/2020/04/14/c83b906e-7a00-11ea-a130-df573469f094_story.html

32-14. Subject: phones and my accomodation

---------------------------

From: Frank Dundee <fdundee@gmail.com>

Date: Wed, Apr 15, 2020 at 3:42 AM

To: Tumbush, Patricia <Patricia.Tumbush@uhhospitals.org>

Cc: Harmon, Heather (HR) <heather.harmon@uhhospitals.org>

Hi Patty, I'm puzzled why my request for more phones seems to be an issue. Regardless, I need the phones as part of my reasonable request for accommodation. The lack of phones in key areas of the department has a significant effect on my legs. Even a distance of six feet can be treacherous for me. And most often, the distance I need to travel is much further than six feet. A personal cordless phone would not have the same utility, as I often have field two calls at once on 3rd shift (That only makes sense since I get calls from Geauga, Conneaut, Geneva, Ashtabula and Andover on 3rd shift). I need Cisco phones; wired phones.

Again, I ask for 2 phones on each end of the long unit dose counter; 1 phone on the tech Omnicell restock counter; 1 phone on the wall near the narcotic dispensing counter; 1 phone on the wall next to the tube station. I showed you all of this.

That's 5 phones total. It doesn't have to be 5 new phones. You have 8 phones in the clinical/resident offices and 4 phones in the oncology office (and only 2 people to use them). I think the residents can share phones and if not they can walk out and use the phones in the main

pharmacy.  So you could run the lines from 5 of those office phones into the main pharmacy to lessen any expense.

Any reasonable person observing the fact that there are a total of twelve phones in offices that are not even in use for at least 16 hours a day, and never on the weekends, are misappropriated away from direct patient care services.  There are rarely, if ever, eight people in the clinical/resident office at the same time.

Once again, this is a request tied to my accommodation, even though all inpatient staff will benefit, as well, 24/7.

In addition, I have asked to go part-time in May, 2020, as part of my accommodation, due to so many medications being stocked below waist level and the longer travelling distances, both in the new pharmacy configuration.  I will postpone that request until July, 2020, out of concern for the pandemic.  Thanks.

32-15. From: Frank Dundee <fdundee@gmail.com>  Date: Wed, Apr 15, 2020 at 4:18 PM

To: Harmon, Heather (HR) Heather.Harmon@uhhospitals.org

Hi Heather,  I think the mobile phone is fine, in addition.  That can come in handy.  Once again, I take calls from Geauga, Conneaut, Geneva, Andover, and occasionally, Ashtabula.  Just before I left this morning, I had two calls at once. Also just this morning when I was filling stock narcotics for the floors, a daily activity, I had two calls in which I have to pivot, turn and go to a phone.  When I pivot, one foot often stays in place and the act itself is chance for me to fall or twist a joint.  I need the ability to put a call on hold and pick-up the other call.  I don't think the mobile  phone can do that.  And, without being over dramatic, one or both calls need  immediate attention.  After all, this is a hospital!  And I still am often the only person in the department on third shift for stretches at a time, when the technician is restocking Omnicells and when the

technician is delivering daily meds to each floor. Also, the technician spends most of the time on a long counter that has no phones (the one in which I requested two phones).

I always go back to what a reasonable person would observe. The department has 8 phones in one OFFICE area and 4 phones in another OFFICE area with only two people in the office; those phones are rarely used. A reasonable person could look at the phone logs for proof of lack of use. Yet I make a request that has implications for my accommodation and for improved patient care, and I get such push-back. It is surprising in some ways and not surprising in others. Once again, "reasonable" is the key word. I am making a "reasonable" request. The reasonable response would be to add the phones. It is in my best interest and the patients' best interest. Thanks.

32-16. From: Frank Dundee [mailto:fdundee@gmail.com] Sent: Wednesday, May 13, 2020 8:26 AM

To: Harmon, Heather (HR) <Heather.Harmon@UHhospitals.org>

Subject: accomodation to part-time

Hi Heather, I hope you and your family are staying safe and healthy. I saw Patty this morning and I expressed my desire to go part-time by the middle of July, 2020. She gave off a vibe that said, "no." I just finished 7 in a row, 8 hours each shift. I may be able to continue that until July.

The encumbrances in the new pharmacy design are many and significant for a person with HSP. I would like to go part-time, 8-hour shifts, 10:00 pm to 6:00 am, Thursday, Friday, Saturday and Sunday, 32 hours per pay period.

I cannot continue working 7 days. There are plenty of options for Patty to consider and she has plenty of pharmacists currently at Geauga, in "non-essential" positions, that she can slide in to work my other 3 days. By "non-essential" these pharmacists are not replaced when they are off, or on leave. These "non-essential" positions are also not staffed for 2/3rds of the workday and

46

not staffed at all on weekends. So they can easily slide in to cover my 3 shifts until a permanent replacement can be hired without a detrimental effect on operations.

I hope that you can discuss things with Patty, look at those options and grant me that reasonable accommodation. I do not want to be forced by UH to resign. Thank you and stay safe!

32-17. From: Frank Dundee [mailto:fdundee@gmail.com] Sent: Thursday, May 14, 2020 6:05 AM

To: Harmon, Heather (HR) <Heather.Harmon@UHhospitals.org>

Subject: Re: accomodation to part-time

This virus has us spinning in circles. We thought we'd be short on workers, and now we have too many. Anyhow, I'm wary because of Patty's evasive response yesterday. There is no issue with me going down to 4 days a pay period. She has myriad options that do not increase the budget. In fact, anyone she replaces me with will make less money than I make. I want to begin part-time by the 2nd week in July. Sooner if she's able. Keep safe!

- NOTE THE DATE OF THE EMAIL: MAY 27, 2020, THE EVENING AFTER THE PLAINTIFF WAS COMPELLED TO LEAVE THE PHARMACY DEPARTMENT FOR FIVE MINUTES, FROM 5:55AM TO 6:00AM IN FEAR OF HIS LIFE FROM DANGEROUS WORK CONDITIONS.

32-18. From: Frank Dundee [mailto:fdundee@gmail.com] Sent: Wednesday, May 27, 2020 6:23 PM

To: Harmon, Heather (HR) <Heather.Harmon@UHhospitals.org>

Cc: Tumbush, Patricia <Patricia.Tumbush@UHhospitals.org>

47

Subject: Re: accomodation to part-time

Hi Heather,  Thank you.  I guess what I don't understand is how "financial challenges" are a factor?  My wage is at the highest step for pharmacists; any replacement has to cost the hospital less.  The department is not adding a pharmacist.

I cannot continue on 7 days.  **This morning I had to stop at a BP Gas Station in Parkman, about 1/4 of the way to my home, and call my wife and tell her that I could not continue because my body was in spasms from the waist on down.  I could not negotiate the pedals in the car.  She had to wake her sister and the two of them drove to Parkman, over 90 minutes later, and she drove our car home.  She then helped me up the steps to bed.**

Every part of the new pharmacy.design aggravates my HSP.  Furthermore, demonstrating a total lack of awareness, stock from faulty shelving was moved last week and piled all around, randomly, making it impossible for me to use my walker, blocking the way. It was the holiday weekend and no one was working, so the moving of the stock was premature and posed another huge impediment. So I had to negotiate without my walker, bend, keep my balance for 6 of the nights I worked.

In addition, I have worked for years following a 2nd shift pharmacist who lacks the attention span or the skills to keep up with the flow of orders.  She, in fact, by her continual missteps, causes me far more work up front and throughout my shift, from a backlog of orders and from the multitude or orders that are missed.  I have spoken to supervisors continuously over 10 years about the problem.  I was able to overcome it when my condition wasn't as bad as it is now.

Also, for some reason 1st year residents are placed with this pharmacist on an evening, once a week.  The combination is additive in their ineptness.  My technician, Tracey Thoms, will attest that the first phone call I took last evening was from a veteran ICU nurse working the covid ICU; the first words out of her mouth when I answered the phone was, "Thank God it's you!"  The nurse was extremely upset with the service from 2nd shift and especially upset with the 1st year resident who was phoning them constantly over issues that were of little consequence, except in the mind of this overzealous and inexperienced young man (I hope I don't get written up for violating UH diversity policy, by calling this young man, a young man).

In light of the above, I request the following days off, without pay, so that I don't have to endure two more shifts such as I had last night, especially at the end of my rotation.  The shifts are all Monday and Tuesday.  We have staff that can easily fill in: June 8-9 June 22-23  July 6-7  July 20-21  Aug 3-4

As a testimonial, not that it's necessary, but both of the pharmacy technicians who I now work with, Tracey Thoms and John Long, both with at least 20 years seniority each, have called me the best pharmacist that either has worked with over their long careers at UH.  I have a cult following among the staff at UH Geauga, on 3rd shift.  No one, from my friends in environmental services to the ICU nurses, wants me to retire or resign.  That, I'm sure, is neither here nor there, as far as UH is concerned.

Thank you for your consideration of my request for days off.  I would hope that by August, my position is changed to permanent part-time, Thur-Fri-Sat-Sun, 8 hours each, on 3rd shift.

Frank Dundee


- BELOW IS A CRITICAL PIECE OF EVIDENCE:


32-19. From: Frank Dundee [mailto:fdundee@gmail.com]  Sent: Monday, June 08, 2020 7:50 AM

To: Harmon, Heather (HR) <Heather.Harmon@UHhospitals.org>

Subject: Re: accomodation to part-time

Hi Heather,  Patty made an interesting comment in front of pharmacist Phil Synder.  A staff member was remarking how long the dispensing counter is in the new pharmacy, compared to the old pharmacy.  Patty's retort was quick.  She said that the longer travelling distance helps her get her steps that she tracks everyday.  More less implying that it's good to travel those longer distances. I find that quite revealing, in light of my request for such reasonable accommodations

as extra phones on the counters that has been refused and my request for part-time is being slow walked. Possibly Patty thinks I am counting my steps as I move about with a walker? Maybe she thinks it is good for my health? Heather, this article on employer mistakes regarding accommodations in the workplace has some good advice:

- The Mistake of Permitting a Supervisor to Evaluate the Request

*Some employers are unaware that the Human Resources department or the employer himself or herself must evaluate the reasonable accommodation that the qualified disabled employee requests. A frontline supervisor or manager should not become involved in these processes without the employer or HR department. The request needs special handling from a trained professional that understands the request or how to proceed with the information given by the employee. Otherwise, the company may face legal compliance violations for this action. Facing a lawyer that explains how the company failed to ensure any reasonable accommodation could affect the company through fines, compensation to the disabled employee or other legal action.* https://www.hg.org/legal-articles/employer-mistakes-regarding-accommodations-in-the-workplace-47861

Frank

- THE EMAIL BELOW IS MOST RELEVANT. NOTE THE TIMING TWO DAYS BEFORE TUMBUSH INFIRMED THE PLAITIFF HE HAD COMMITTED SOME UNNAMED INFRACTION.

32-20. On Tue, Jun 9, 2020 at 12:41 AM Frank Dundee <fdundee@gmail.com> wrote: Heather, I need the accommodation now. I have put in requests to take days off without pay during the search for a part-time candidate. I requested my 6th and 7th days off while the search is on, as a bridge. Patty has available staff, four pharmacists, Abbey, Ashley, Patrick and Amanda, who are not in essential positions, that she can use without any disruption to cover my shifts; yet, for reasons all her own, she refuses to use them to cover 3rd shift. Time and attendance records wcan clearly show how others, without any need for an accommodation due to a disability, are granted days off without any advance notice. Especially in the cases of Abbey, Ashley, Patrick and Amanda, since their positions are not essential to the delivery of patient care services on a

daily basis. A reasonable person looking at the situation might say that everything is being done NOT to accommodate a person with a serious neuromuscular disorder. I mean, my goodness, I get a stone wall put up just for requesting phones! Keep in mind that since I now have two co-workers, in Tracey Thoms and John Long, that I have real-time witnesses to my struggles. They will be invaluable going forward should things reach a point where you leave me no choice but to offer my resignation and take this matter to law.

I want reassurance, going forward, that until the part-time position is filled, that I work no more than 5, 8-hour shifts, Wed-Thur-Fri-Sat-Sun. Once the part-time position is filled, I can go down to 4, 8-hour shifts or even 3 shifts, if needed. Thanks and you enjoy the sunshine!! Frank


32-21. From: Tumbush, Patricia <Patricia.Tumbush@uhhospitals.org> Date: Thu, Jun 11, 2020 at 3:56 PM

To: Dundee, Frank <Frank.Dundee@uhhospitals.org>, Frank Dundee <fdundee@gmail.com>

Hi Frank, I have an urgent matter that requires discussion with you and the HR Manager and we would like to meet with you face to face tomorrow at 1pm at Geauga to discuss. **[NOTE: THIS URGENT MATTER WAS THE 5 MINUTE ABSENCE ON MAY 27, 2020, FROM 5:55AM TO 6:00 AM, AND THIS WAS THE FIRST TIME HE WAS MADE AWARE OF THE ALLEGED INFRACTION, OVER TWO WEEKS LATER AND AFTER THE PLAINTIFF WORKED 7 STRAIGHT SHIFTS FROM JUNE, 2020 TO JUNE 10, 2020]** I would prefer to discuss in person, but if it is a hardship for you to come in when you are not scheduled, we can schedule a call for that time and speak over the phone instead. Again, this is an urgent matter that cannot wait until your regularly scheduled shift next week. Please contact me today by 4:30pm to confirm tomorrow's discussion. Thanks, Patty Tumbush R.ph, BCPS MHSPA | Pharmacy Manager


32-22. From: Frank Dundee <fdundee@gmail.com> Date: Thu, Jun 11, 2020 at 6:26 PM

To: Tumbush, Patricia <Patricia.Tumbush@uhhospitals.org>

Cc: Harmon, Heather (HR) <heather.harmon@uhhospitals.org>

Hi Patty,  This is quite a coincidence because I just got out of bed to tell you that I have had covid symptoms the last two days and I am going to be tested tomorrow.  I wanted to let you know in order to give you time to find a replacement for me for the next rotation.  I also wanted to ask the procedure for reporting.  I pray that I don't have the virus because I don't want to give it to my wife, but the symptoms are clear.  The only place I've been in weeks, other than home, is work.  I feel that if I have contracted the virus, I contracted it at work.  I have expressed my concerns to you, in fact, when you allowed two staff members to return to work on my last rotation. I punched out 5 minutes early in order not to be exposed to their physical presence, since I am the oldest staff member and most susceptible.  In my opinion, and in the opinion of any reasonable person examining the practices that you have allowed and ordered in our department since the pandemic began, I and my co-workers have been recklessly exposed to the virus.  In fact, reasonable persons might conclude that a crime of reckless endangerment may have occurred and should be investigated by law enforcement.  Whatever your "immediate" concern is with me, it will have to wait until I see the course of my illness.  If you mean to terminate me for whatever the concern is, know that I will vigorously defend myself.  I have had a target on my back for most of my career at UH for no other reason than I have had the temerity to speak up about dangerous practices and workplace injustice and harassment.  I view your latest threat as the continuation of that harassment.  I will not be physically able to meet face to face any time in the near future.

32-23. From: Frank Dundee <fdundee@gmail.com>  Date: Thu, Jun 11, 2020 at 7:38 PM

To: Tumbush, Patricia <Patricia.Tumbush@uhhospitals.org>

Patty,  As I said, I have a fever so I'm out of sorts.  I didn't notice the option about calling.  I cannot call and communicate cogently as long as I am this ill.  But don't hesitate to do whatever you need to do.  If I am suspended or terminated, just email me.  Please do not phone my house as it will upset my wife.  She is already upset that I may have the virus.  As I said, no matter what, you probably need to find someone to cover my next rotation due to my illness.

32-24. From: Frank Dundee [mailto:fdundee@gmail.com]  Sent: Thursday, June 11, 2020 2:47 AM

To: Harmon, Heather (HR) <Heather.Harmon@UHhospitals.org>

Subject: Re: accommodation to part-time

Hi Heather,  I was informed this evening that yet another co-worker, a male technician who works 2nd shift, a very good friend of mine, is out for the rest of the week.  I really think the entire pharmacy department should be tested for covid-19 and tested for the antibodies and sanitized.  People should not be allowed back to work if a family member has covid (one tech's stepfather has been hospitalized today with covid and one pharmacist's son has covid) or if they are coughing, which one tech was doing quite regularly after returning on Monday (after release from a covid unti at Hillcrest).  I think our department may be akin to the "meat processing" plant for the hospital community.  I have a temp, scratchy throat and chest tightness.  Someone needs to act.

32-25. From: Tumbush, Patricia <Patricia.Tumbush@uhhospitals.org>  Date: Fri, Jun 12, 2020 at 11:01 AM

To: Frank Dundee <fdundee@gmail.com>

Hi Frank,

I am so sorry you are not feeling well. Your health is very important, so let's postpone the discussion until you are well.  The procedure at UH is if an employee becomes symptomatic they are to call the UH hotline for direction about testing and return to work. I copied the number for you from the COVID website FAQ's below:

*9. Under what circumstances might caregivers be quarantined and how will they be paid?*

*If you or a member of your household are symptomatic or believe that you may have been exposed to COVID-19, contact the UH COVID-19 Hotline, 216-767-8228 or send them an email*

*at UHCOVIDHOTLINE@UHhospitals.org, and notify your manager before returning to work. If you are medically directed to be quarantined, you will be paid during this time without reducing your PTO.* **[NOTE THAT LISA FARAH AND TINA CREEDON WERE NOT PERMITTED TO QUARANTINE ON MAY 27, 2020, AGAINST UH POLICY]**

Please call today, if you have not already. The hotline will direct you to testing and notify when you are clear to return to work. Get some rest and hope you are feeling better soon. I will work on getting coverage for your upcoming shifts. Patty Tumbush R.ph, BCPS MHSPA | Pharmacy

32-26. From: Frank Dundee <fdundee@gmail.com> Date: Sat, Jun 13, 2020 at 12:25 PM

To: Harmon, Heather (HR) <Heather.Harmon@uhhospitals.org>

Hi Heather, I was in bed, sequestered yesterday. I couldn't go for testing feeling that badly. I feel a bit of improvement today. I have been taking ibuprofen for aches/fever. I need to let it wear off to take my temp; may try to go for testing this afternoon.

Heather, I have no idea why Patty Tumbush would blindside me with such an email? Appear before her and HR imediately?! A reasonable person might ask, "Who does she think she is?" I have not opened her second email, the reason being stress affects my motor neuron (HSP) disease; so not only might I have covid, but on top of it she added the stress of being blindsided. The trauma I've suffered from her email has caused spasms that are not just in my legs, but have affected my ability to urinate and defecate. I don't have the energy to write anymore. If you could be so kind, can you explain what I have done to warrant such a threatening attack from Patty Tumbush? I cannot read anything from her. Thank you.

33.    According to the EEOC, there may be reasonable accommodations that <u>could offer protection to an individual, like the Plaintiff, whose disability puts that person at greater risk from COVID-19</u> and who therefore requests such actions to eliminate possible exposure, evidenced by the Plaintiff's pleas in the above email stream. Even with the constraints

imposed by a pandemic, some accommodations may meet an employee's needs on a temporary basis without causing undue hardship on the employer.

In the situation that presented itself during the pandemic, from February 2020, through May, 2020, for example, providing telework as an accommodation for the Plaintiff, because of the COVID-19 pandemic, could serve as a trial period that showed whether or not the Plaintiff with his disability could satisfactorily perform all essential functions while working remotely from home; however, UH demonstrated over a period of years, that it was not interested in any trial period nor any in-depth discussions that would present telework from home as a reasonable accommodation.

**34.  General Prayer for Relief with a Prayer for Relief from the Signaling Effect**

Based on the argument canvased and the judicial authorities cited so far from the pleadings, it can be seen that the pleadings support an award of damages.  Relying strongly on the foregoing, the plaintiff prays that this court award to the plaintiff an award of damages:  a judgment in favor of the Plaintiff on all of the causes of action in the complaint.

The Signaling Effect:  Statistics demonstrate that when claimants press their claims without counsel, they fail at virtually every stage of civil litigation and overwhelmingly fail to obtain meaningful access to justice.

Experiments reveal that pro se status influences stereotypes of claimants and settlement awards received. Moreover, the "signaling effect" of pro se status is exacerbated by socialization in the legal profession. Among law-trained individuals (i.e., law students and lawyers), a claimant's pro se status generates negative stereotypes about the claimant and these negative stereotypes explain the adverse effect of pro se status on decision making about settlement awards.

Each year, millions of middle-income Americans, like the Plaintiff in this claim, encounter the civil justice system pro se, without legal representation.  For many Americans, supply-side barriers to obtaining counsel prevent access to justice—in practice, many attorneys are financially unable or unwilling to represent individuals with potentially meritorious legal claims.

In addition, demand-side barriers also prevent access to justice—many Americans are financially unable to pay for legal representation.

Academics draw on psychological science and experimental methods to investigate the vexing problem of why pro se claimants fare so poorly within the civil justice system. Specifically, they harness social psychological theories and methods to investigate these pressing access to justice questions:

- Does a claimant's pro se status, itself, have a signaling effect on lawyers and legal officials, even after controlling for case quality and merit?
- Do lawyers and legal officials hold negative stereotypes about pro se claimants?
- Do these stereotypes help explain the adverse treatment of pro se parties? And finally, if so, is the signaling effect of pro se status a function of socialization within the legal profession?
- That is, do law-trained individuals (i.e., law students and lawyers) perceive and treat pro se claimants differently than members of the lay public?

Research has demonstrated a "signaling effect" in the legal system. It is the prayer of this pro se litigant that the court may dampen "the signaling effect" and reduce bias against the pro se Plaintiff in this claim. The Plaintiffs hope is that evidence-based understanding may inform the court about the "signaling effect" in each step of the legal process, from law clerks, factfinders, magistrates, and judges.