FILED

DEC 0 6 2022

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

## UNITED STATES DISTRICT COURT DISTRICT OF NORTHERN OHIO

FRANK DOMINIC DUNDEE,

PLAINTIFF

vs

UNIVERSITY HOSPITALS HEALTH SYSTEM, INC

DEFENDANT

CASE NO. **1:22CV01351**

JUDGE DAN AARON POLSTER

MAGISTRATE JUDGE

THOMAS M. PARKER

# PLAINTIFF'S BRIEF OF POINTS AND AUTHORITIES IN REPLY TO THE DEFENDANT'S ANSWER TO THE INITIAL COMPLAINT

## PREFACE

The attorney for the Defendant named in this complaint has advised the Plaintiff/Pro Se litigant that the Defendant has been misnamed.  The attorney states that she represents "University Hospitals" but would have the Pro Se litigant change the named Defendant in the complaint to "Geauga Community Hospital."  This request seems incongruent at best and incorrect at worst.

When businesses are being sued, it is not uncommon for the name of the defendant to be stated inexactly and is considered to be a "misnomer."  A misnomer does not destroy the effectiveness of a petition. The general rule is that the mere misnomer of a corporate defendant in words and syllables is immaterial provided there is no substantial mistake so as to indicate a different entity.  A misnomer is not fatal when it is sufficiently close to the corporation's true name as to distinguish it from other corporations, which is the petition presented to the Court.

1

With respect to corporations, such as University Hospitals the action is binding if the designation substantially conforms to the correct one and if notice of the proceeding is given to a person whose being apprised of the action is effective as notice to the entity.  The Pro Se Litigant has fulfilled this requirement and has made a good-faith effort at correctly naming the Defendant.

## Argument: Elements of the Res Ipsa Loquitur Doctrine

When reasonable persons hear of an instance where a party is so negligent, it makes those reasonable persons simply shake their heads and wonder what the negligent party was thinking, simply because the negligent act speaks for itself.

Although the case before the Court is a charge of discrimination and not a tort, there is correlation with the common law of negligence, in which the *res ipsa loquitur* doctrine indicates that a breach of a party's duty of care may be inferred from the events that occurred. In other words, the negligence is so obvious that reasonable persons, such as a jury in a trial, can tell that someone had a negligent hand in what happened.

Basic negligence principles require that to prove a case, a defendant must owe a duty of care and then breach the duty of care. In other words, if an employer, such as University Hospitals (UH), is responsible or controls something, such as the risks from infection in the workplace during a pandemic, that employer is responsible for providing a reasonable amount of care to make sure that the workplace is safe.

When employees are presented with workplace conditions that they reasonably believe present an immediate risk of serious physical harm or death, reasonable persons are likely to conclude that the employer breached its duty of care.  Considering the *res ipsa loquitur doctrine*,

the breach on the morning of May 27, 2020, is so apparent that there is a presumption of the breach of duty and the Plaintiff does not need to provide extensive evidence, if any, of the breach; the negligence and recklessness of the Defendant, University Hospitals, speaks for itself.

The facts presented in the discrimination charge before the Court contain the elements of *res ipsa loquitor* negligence; creating a rebuttable presumption of negligence by the Defendant, University Hospitals.  The imminent threat of harm would not ordinarily have occurred without the reckless behavior of the Department of Pharmacy Supervisor, Patricia Tumbush, with the approval of her reporting structure.  It is without question that the object that caused the threat of harm, threat of contagion from two members of staff not permitted to quarantine after positive covid-exposure, was under the Defendant's control, and that there are no other plausible explanations.

Consequently, it is more likely than not:

- The incident on May 27, 2020, was of a type that does not generally happen without negligence.
- It was caused by an instrumentality solely in Defendant's control.
- The Plaintiff did not contribute to the cause.


On the morning of May 27, 2020, the Plaintiff, pharmacist Frank Dundee, reasonably believed that his work conditions created an immediate risk of serious physical harm, potentially leading to death.  Dundee believed the nature of his employment on that morning increased the risk of his contracting the covid virus.  Neither Dundee, nor the co-workers who surrounded him, were given CDC recommended protective gear, nor did the narrow design/layout of the

3

pharmacy department at UH Geauga Hospital allow him to take recommended CDC social distancing measures in order to protect himself from oncoming staff who had been exposed to covid and should have been permitted to quarantine.

EEOC pandemic guidelines for the workplace state that an employer, such as UH, cannot fire an employee who has a preexisting condition that makes him more susceptible to serious illness and death from the covid virus; in fact the employer must make a reasonable accommodation such as allowing the employee to work remotely or moving his workspace away from others (the long and narrow pharmacy design/layout made social distancing impossible). Dundee was nearly 67, the oldest staff member which put him at high risk should he contract the covid virus:

- *Older adults are more likely to have long-term health problems that can put them at increased risk for severe effects from COVID-19.*

- *People's immune systems tend to weaken with age, making it more difficult to fight off infections.*

- *Lung tissue becomes less elastic over time, so respiratory diseases like COVID-19 are particular concerns for older people.*

- *Inflammation in older people can be more intense, causing organ damage.*

In addition, Dundee had a comorbidity that made him at high risk should he contract the covid virus: he had a neurologic condition, Hereditary Spastic Paraplegia. Based on preliminary U.S. data, persons are at high risk with underlying health conditions such as :

- *For neurologic disorder, neurodevelopmental, and intellectual disability, the following information was specified: dementia, memory loss, or Alzheimer's disease (17); seizure*

4

*disorder (5); Parkinson's disease (4); migraine/headache (4); stroke (3); autism (2);*
*aneurysm (2); multiple sclerosis (2); neuropathy (2); **hereditary spastic paraplegia (1);***
*myasthenia gravis (1); intracranial hemorrhage (1); and altered mental status*

It is generally recognized by reasonable persons that the coronavirus outbreak changed
employment conditions for millions of people across the United States.   A lack of PPE, an
employer's failure to enforce safety measures and to enforce social distancing in the workplace
were common concerns for many employees, including Dundee.

The ADA is based on a basic presumption that people with disabilities want to work and are
capable of working, want to be members of their communities and are capable of being members
of their communities and that exclusion and segregation cannot be tolerated. Accommodating a
person with a disability is no longer a matter of charity but instead a basic issue of civil rights.

The Plaintiff accepted the risks presented by the pandemic and performed his duties to the
highest level, despite his pleas for an accommodation of telework, pleas that only became more
desperate during the pandemic, from February 2020 through June, 2020.  The Plaintiff lived this
philosophy during his 44-year career in hospital pharmacy:  accept the challenge presented each
shift, with focus, fearlessness and empathy.  However, the Plaintiff did not accept if the risk
presented was man-made by the employer for purely budgetary reasons; that is, because of the
recklessness of supervisors who placed their concerns about the budget over the safety of the
staff.  The Plaintiff never accepted unfit managers who disregarded easily corrected dangers in
the workplace.  The Plaintiff spoke truth-to-power on the issue of exposing the staff to
unnecessary, and in some cases illegal, dangers in the workplace, contacting HR, CEO's and
government agencies such as OSHA, despite the fact that making those reports made Dundee a
target of retaliation.

The pandemic demonstrated the landscape for workplaces is changing towards telework just as Dundee had asked for in his reasonable request for accommodation since 2018. As technology evolves, so too does the way employees do their jobs, including hospital pharmacists, like the Plaintiff in this case.  Many people can (and do) work just as effectively at home as they do at work. And a recent court case said just that. It held that a telecommuting arrangement could be a reasonable accommodation for a person suffering from a disability: *E.E.O.C. v. Ford Motor Co.*, 12-2484, 2014 WL 1584674 (6th Cir. Apr. 22, 2014):

- o  In fact,  the United States District Court District Of Northern Ohio, in a ruling by United States District Judge Dan Aaron Polster, filed on **November 3, 2022**, denied the Plaintiff's Motion for a Change of Venue in this case, 1:22CV01351, since the technology available for telework has made the in-person appearance of relevant parties in Court unnecessary; the Plaintiff Dundee requested a change of venue from Federal District Court in Cleveland, 80 miles away, to Federal District Court in Youngstown, 8 miles from The Plaintiff's residence, in order to accommodate Dundee's disability of Hereditary Spastic Paraplegia and the hardship travel presents.  The 6TH Circuit Court in EEOC v. Ford Motor Co., stated, "Evolution in technology to support remote working may inform a court's assessment of this issue;"  coincidently, the United States District Judge Dan Aaron Poster, embraced the use of technology in the workplace in denying the need for Dundee's Motion for Change of Venue, by stating, "Due to Covid-19, the Court has been conducting most of its civil proceedings via Zoom," as Dundee can remain in his residence using the technology of telework for Court proceedings.  The use of telework being instituted by the Court in response to the

6

dangers of infection from covid during the pandemic from in-person contact. This ruling by Judge Dan Aaron Polster is significant since it touches on all aspects of Dundee's charge of failure to accommodate by University Hospitals and the dangers presented during the pandemic in the workplace. **[The Pro Se Litigant uses this example in two more instances in this brief, for emphasis, because of the relevance to the Plaintiff's reasonable request of telework from home.]**

The Court need look no further than the recent deadly hurricane, Ian, in Florida for a parallel to the scenario that caused the threat to his life, faced by the Plaintiff on the morning of May 27, 2020 from the covid virus, wholly caused by a pharmacy manager trying to maintain "business as usual" and keep costs down:

*As Hurricane Ian neared on Monday, employees of a Clearwater, Fla., marketing firm gathered in a conference room to watch their CEO on a large screen.*

*The storm, then a Category 1 that was expected to grow, was a "nothingburger" that was overplayed by the media, said PostcardMania CEO Joy Gendusa, who addressed workers remotely from the passenger seat of a car. Then she asked those who were afraid to raise their hands.*

*"It's not going to be that bad," Gendusa said in a video recording of the meeting obtained by The Washington Post.*

*"Obviously, you feeling safe and comfortable is of the utmost importance, but I honestly want to continue to deliver and I want to have a good end of quarter," Gendusa said. "And when it turns into nothing I don't want it to be like, 'Great, we all stopped producing because of the media and [thought] maybe that it was going to be terrible.'"*

*Several PostcardMania employees, who spoke to The Post on the condition of anonymity*

7

*because they feared retaliation, said Gendusa's comments made them feel underappreciated and exploited.*

*"There is no company worth sacrificing for," said one worker. "I wouldn't give my life [or my belongings] for any company."*

*Gendusa's remarks come as the pandemic and burnout have led many to reevaluate their work conditions, giving rise to conversations about the Great Resignation and quiet quitting.*

The court should keep the deadly comparisons between the deadly hurricane and the pandemic top of mind. Supervisor Patricia Tumbush exhibited the same attitude and mindset as the CEO in the above story. Supervisor Tumbush was more concerned about her budget and expressed similar sentiments that the pandemic is "not going to be that bad;" Ms. Tumbush wanted to continue to deliver and to have a good end of quarter, because in her mind, when the pandemic turns into nothing, Tumbush didn't want it to be that she ruined her budget by following CDC and HR guidelines, by allowing exposed staff to quarantine for 10 days, paying overtime to cover the situation, just because "the staff" surmised that it was going to be terrible. This attitude, in spite of the fact that University Hospitals took government money to cover losses due to employee absence due to the pandemic.

The Plaintiff's life was recklessly endangered, being over age 65 and with a comorbidity of Hereditary Spastic Paraplegia, just as much as if it was by Hurricane Ian; by Supervisor Tumbush's reckless behavior trying to keep things under budget to keep the business going just like the CEO in the Florida example. The Plaintiff felt the exact same way as the employee in the quote, "There is no company worth sacrificing for," especially if the company is a healthcare institution; an institution that accepted government monies to keep staff safe during the pandemic, which was at its height during the Spring and Summer of 2020.

8

That is why, when placed into an emergent situation, being informed less than nine hours before shift-change on the morning of May, 27, 2020, faced with direct and possibly deadly, exposure to two covid-exposed oncoming employees, the Plaintiff made the difficult decision to punch out five minutes before covid-exposed, oncoming staff arrived at 6:00 am, following OSHA and CDC guidelines for imminent danger to an employee in the workplace.

It is the height of hypocrisy for Supervisor Tumbush to recklessly endanger the Plaintiff's life, causing the entire emergent situation over budgetary concerns, and blame the Plaintiff for taking prompt and necessary action, and not acquiescing to her recklessness by staying those de minimis, five minutes, at risk to his life.  In fact, the Plaintiff had urgently requested, over the previous months, that his reasonable accommodation of remote work from home be granted, at least as a trial period, during the pandemic.

University Hospitals allowed many other employees to work remotely during the pandemic, and yet the Plaintiff was repeatedly refused such an accommodation and forced to confront the imminent danger to his life on the morning of May, 27, 2020, giving Supervisor Tumbush, her reporting structure, UH legal, HR and others within University Hospitals the pretextual reason they had been waiting for to terminate the Plaintiff, over a magnified offense that most reasonable jurors would find de minimis, punching out 5 minutes before shift change, and thus be rid of the need to offer a reasonable accommodation.

Since not making reasonable accommodations is listed in the ADA's definition of disability discrimination, claims premised upon an employer's failure to offer reasonable accommodation necessarily, involve direct evidence, which the Plaintiff Dundee has provided in the original complaint filed with The Court.

Under the direct evidence framework, the Plaintiff Dundee has the burden of establishing: 1) he is a person with a disability; and 2) that he is qualified/otherwise qualified for the position despite his or her disability: A) without accommodation from the employer; B) with an "alleged" essential job requirement eliminated; or C) with a proposed reasonable accommodation.  Dundee meets the burden of the direct evidence framework.

In order to prove a prima facie failure to accommodate case, the Plaintiff Dundee has demonstrated that he is disabled; is otherwise qualified; and requested a plausibly reasonable accommodation. (See *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012).)

The Plaintiff's ADA claim involves the nexus between the disability, Hereditary Spastic Paraplegia, and the adverse employment action, termination under pretext.   As in most types of ADA cases, the Plaintiff proves discriminatory intent through direct or circumstantial evidence. If circumstantial, courts use the *McDonnell Douglas* framework to infer motive.  However, failure to accommodate claims do not require any evidence of discriminatory intent, whether direct or circumstantial because the failure to provide a reasonable accommodation for a known disability is inherently "on the basis" of the disability.

The Plaintiff Dundee has shown the employer's knowledge of the disability, associated limitations, and the desired accommodation; University Hospitals' failure to provide a reasonable accommodation establishes the necessary nexus.   The Plaintiff Dundee followed the framework set out in *Punt v. Kelly Services* for analyzing his failure to accommodate claims under the ADA.

The Defendant University Hospitals cannot refuse to provide Dundee with a reasonable accommodation and then argue Dundee did not qualify for his position because he cannot meet his job's requirements without an accommodation.; or discharge Dundee over a de

minimis action of punching out 5 minutes early to avoid being exposed to two employees exposed to immediate family who contracted covid.

The Plaintiff feared, in his own mind and circumstances for his life on the morning of May, 27, 2020. The guidelines from the CDC stated that with his age greater than 65 and his co-morbidity of HSP that Dundee was at high risk if infected with covid. The Plaintiff repeatedly asked for an accommodation of telework that would have removed him from the imminent danger of being infected with covid, that presented on the morning of May 27, 2020. The Plaintiff was terminated several weeks later, under pretext and in retaliation for the protected activities the Plaintiff had filed against the employer over a period of years and in order to prevent the Plaintiff from achieving an accommodation of telework which would have extended the Plaintiff's career.

The retaliation claim gets analyzed under the indirect evidence test. To establish retaliation the plaintiff has to show: 1) plaintiff engaged in activity protected under the ADA; 2) the employer knew of that activity; 3) the employer took an adverse action against plaintiff; and 4) a causal connection existed between the protected activity and the adverse action (Rachael Lerman, Danialle Lynce and Shawn Osborne comprised the ADA Team that refused the Plaintiff Dundee's reasonable accommodation request for telework. All three were involved in Dundee's EEOC Filing (22A-2018-02065, filed on 05/01/2018, resulting in a Federal discrimination lawsuit that was ongoing when Dundee was terminated in June 2020).

Can the Defendant refuse to provide the Plaintiff Dundee with a reasonable accommodation and then argue he should be discharged for punching out 5 minutes early, a pretextual infraction reasonable persons would find de minimis?

## Argument: The De Minimis Doctrine

The Plaintiff recognizes that applying the De Minimis doctrine to a case that revolves around retaliation for failure to provide a reasonable accommodation is unusual and possibly irregular. However, termination of an employee with the implication that the employee violated the law, and hospital policy, over a 5 minute absence, which occurs thousands of times a day in the normal course of business in both hospital and retail pharmacies across the country, demonstrates pretext, because the offense is de minimis, at best.

De Minimis abbreviated form of the Latin Maxim de minimis non curat lex, "law is not concerned with small things." A legal doctrine by which a court refuses to consider trifling things. The de minimis legal history dates to the fifteenth century.

It is a principle of common law that stipulates that judges will not sit in judgment or take notice of extremely minor violations of the law. In the charge before The Court, reasonable persons would consider a 5 minute absence an extremely minor violation, or no violation at all; since there is a material dispute between the Defendant and the Plaintiff as to the question over a technician being left alone in the pharmacy department, during that 5 minute absence. The technician in question, Tracey Thoms, was NOT in the pharmacy department as she was restocking Omnicell machines on the nursing units; a fact that is easily proven by the Omnicell Restocking Logs, which have the exact time that Ms. Thoms would have been on the nursing units and NOT within the pharmacy department.

In accordance with this Maxim, the De Minimis Doctrine, reasonable citizens would consider charges for trivial matters to be a complete waste of time and resources. And in the unique

12

application of the "general principle" of De Minimis to the pretextual reasons given by UH for the Plaintiff's termination, it is hoped that The Court will consider the pretextual reasons as too small to be meaningful or considered.

### The Burden of Proof

When a party, such as the Plaintiff Dundee, has satisfied its burden of production, it has produced enough evidence on an issue to have the issue decided by the fact-finder rather than decided against the party in a directed verdict, motion for judgment as a matter of law or motion for summary judgment.

The burden of persuasion is the requisite degree of belief a party must convince a jury that a particular proposition of fact is true. Combined with the burden of production, the burden of persuasion makes up one half of the burden of proof.

In civil cases, a party's burden is usually "by a preponderance of the evidence." In criminal cases, the prosecution's burden is "beyond a reasonable doubt." In practice, the given burden of persuasion is often dispositive in close cases or cases where evidence is limited. As a result, courts often utilize burden shifting to place the burden of persuasion upon the party best capable of producing relevant evidence.

Unlike the burden of production, the burden of persuasion is an issue of fact, not an issue of law. As a result, a judge cannot dismiss a case before it reaches the jury for failing to meet the burden of persuasion.

The Plaintiff Dundee believes he has presented enough contemporaneous evidence in his filing against University Hospitals to satisfy the burden of proof for most reasonable persons to find, more likely than not, in his favor that University Hospitals did retaliate against him and

13

terminate him in violation of EEOC law concerning ADA discrimination; much in the same manner as set out in : *E.E.O.C. v. Ford Motor Co.*, 12-2484, 2014 WL 1584674 (6th Cir. Apr. 22, 2014).

### *E.E.O.C. v. Ford Motor Co.*, **12-2484, 2014 WL 1584674 (6th Cir. Apr. 22, 2014)**

Importantly, the court said it was not enough that Ford showed it was inconvenienced by the accommodation. In any case, **the employer must show that the accommodation is an *undue hardship* and that the employee's attendance is essential to the job. *The most noteworthy portion of the case might be where the court recognized that "given the state of modern technology, it is no longer the case that jobs suitable for telecommuting are 'extraordinary' or 'unusual.'"***

The essential functions of the hospital pharmacist are physician order review and validation, via computer and to act as a resource for nursing staff and physician staff real-time questions, via telephone, instant messaging via, smartphone or computer; all of which "essential functions" can be handled via telecommuting. This is a fact exemplified by the pharmacists in the work-from-home program with The Cleveland Clinic, from 2007 to the present. Essential functions which the Plaintiff Dundee demonstrated working for the Cleveland Clinic in the work-from-home program, from 2007 to 2009, and then with University Hospitals; by using telecommuting to verify and release physician orders via computer and to activate Omnicell Dispensing Machines on the nursing units of Geauga Hospital, Geneva Hospital, Conneaut Hospital, Andover Emergency Room and Ashtabula Outpatient, nightly. Occasionally extending this service to Ahuja Medical Center, Bedford Hospital, Richmond Hospital and Twinsburg Emergency Room.

In EEOC v. Ford Motor Co., the US Court of Appeals for the Sixth Circuit reversed the district court's grant of summary judgment for Ford on the plaintiff's claims that it failed to accommodate her request to telecommute to work and then retaliated against her in violation of the Americans with Disabilities Act (ADA). The Sixth Circuit found that, given the advances in technology.

There is a genuine issue of material fact whether the plaintiff's physical presence at work was essential to her job as a resale buyer, and a reasonable jury could find that Ford retaliated against her when it disciplined and terminated her shortly after she filed her EEOC charge. The same genuine issue of material fact exists as to whether the Plaintiff Dundee's physical presence at work was essential to his job as hospital pharmacist, and a reasonable jury could find that University Hospitals retaliated against him when it terminated him under pretext for punching out 5 minutes early:

- o In fact,  the United States District Court District Of Northern Ohio, in a ruling by United States District Judge Dan Aaron Polster, filed on **November 3, 2022**, denied the Plaintiff's Motion for a Change of Venue in this case, 1:22CV01351, since the technology available for telework has made the in-person appearance of relevant parties in Court unnecessary; the Plaintiff Dundee requested a change of venue from Federal District Court in Cleveland, 80 miles away, to Federal District Court in Youngstown, 8 miles from The Plaintiff's residence, in order to accommodate Dundee's disability of Hereditary Spastic Paraplegia and the hardship travel presents.  The 6TH Circuit Court in EEOC v. Ford Motor Co., stated, "Evolution in technology to support remote working may inform a court's assessment of this issue," coincidently, the United States District Judge Dan

Aaron Poster, embraced the use of technology in the workplace as the reason for denying the need for Dundee's Motion for Change of Venue, by stating, "Due to Covid-19, the Court has been conducting most of its civil proceedings via Zoom," as Dundee can remain in his residence using the technology of telework for Court proceedings. The use of telework being instituted by the Court in response to the dangers of infection from covid during the pandemic from in-person contact. This ruling by Judge Dan Aaron Polster is significant since it touches on all aspects of Dundee's charge of failure to accommodate by University Hospitals and the dangers presented during the pandemic in the workplace.

In the charge before the Court, the Plaintiff, Frank Dundee, claims that University Hospitals (UH), failed to accommodate his request to telecommute to work and then retaliated against him in violation of the Americans with Disabilities Act (ADA). Using direct evidence that makes it more likely than not that University Hospitals (UH) retaliated by terminating the Plaintiff in violation of the ADA when it failed to accommodate the Plaintiff's repeated requests for telework from home, despite the advances in technology, despite UH never claiming undue hardship and despite the Covid-19 pandemic which posed increased danger of death to a person of the Plaintiff's age and comorbidity of Hereditary Spastic Paraplegia. This occurred during which time UH accepted Federal funds to compensate for employee absence and quarantine during the pandemic. Furthermore, as stated in the Plaintiff's initial filing, UH allowed many other employees, including pharmacists in Dundee's own department, to telecommute, while refusing Dundee's request.

The district court in EEOC v. Ford Motor Co. had granted Ford's motion for summary judgment on both claims, holding that the plaintiff could not prevail on her failure to

accommodate claim because, due to her excessive absenteeism, she was not a qualified individual under the ADA.

- In contrast, over the ten-year period, from May 2010 to June 2020, the Plaintiff, Dundee, had the best attendance record in the Pharmacy Department, despite the worsening condition of his disability, HSP.  Furthermore, the Plaintiff, Dundee, was arguably the most productive pharmacist from May 2010 to June 2020, as proven by recorded data.

The district court in EEOC v. Ford Motor Co., the plaintiff's request to telecommute up to four days per week was not a reasonable accommodation based on Ford's business judgment that her physical presence at work was essential to her job.

- University Hospitals never claimed "undue hardship" as the reason it refused Dundee's repeated requests for telework from home.

Regarding the district court in EEOC v. Ford Motor Co., the EEOC could not prove that the alleged adverse employment actions were retaliatory because they were caused by her poor work performance, which was unrelated to her attendance issues caused by her disability.

- Repeating, over the ten-year period, from May, 2010 to June, 2020, the Plaintiff Dundee, had the best attendance record in the Pharmacy Department, despite the worsening condition of his disability, HSP.  In fact, Dundee, arguably, had the best work performance of any pharmacist in the department for the period of his employment with University Hospitals, from May 2010 to June 2020, verifiable from metrics.

In EEOC v. Ford Motor Co., The Sixth Circuit reversed the district court's decision granting summary judgment to Ford on both claims, holding that there was a genuine issue of material fact whether the plaintiff's physical presence at work was essential to performing her job.

17

- In 1976, and for nearly the next 30 years, proximity to the workplace was a necessity for most workers, including pharmacists. The Plaintiff spent most of his career an environment that required a physical presence at the workplace; this was before computerization and the Plaintiff readily admits that a pharmacist's physical presence was a requirement, having lived the experience.  With the available technology, at least beginning in the year 2007 for hospital pharmacists, telework from home became easily possible, cost effective and available.  In fact Dundee worked remotely for over six years prior to being terminated in service to Geneva Hospital, Conneaut Hospital, Andover Emergency Room, Ahuja Hospital, Richmond Hospital, Twinsburg Emergency Room and Ashtabula Hospital, all facilities serviced EXCLUSIVELY via telework, by Dundee, alone, for each shift he worked.  There is a genuine issue of material fact as to Dundee's physical presence being essential to performing his job.

The 6ᵀᴴ Circuit Court in EEOC v. Ford Motor Co., stated that a reasonable jury could find that Ford retaliated against the plaintiff for filing an EEOC charge.

- Similarly, a reasonable jury could find it is more likely than not UH retaliated against Dundee for speaking truth to power, over a period of years, by filing charges with the EEOC (twice), the OCRC, OSHA, a discrimination charge in Federal Court, and for reporting to UH Compliance Department (April 2020) and the Ohio Attorney General's Office (April 2020) to report possible reckless endangerment committed by a pharmacy supervisor during the pandemic.

In EEOC v. Ford Motor Co., for the plaintiff's failure to accommodate claim, the Sixth Circuit found that the plaintiff presented sufficient evidence showing that she was otherwise

qualified for her position despite her disability If Ford eliminated the requirement that she be physically present at work, with a telecommuting accommodation.

- In contrast, Dundee demonstrated to UH that he was otherwise qualified for his position despite his disability and at the top of his game when he was terminated under pretext in June 2020. However, UH understood (through email correspondence) Dundee was fast approaching a point (within a few couple months) in which he would be forced into quitting and filing a claim of constructive discharge for UH's failure to grant a reasonable accommodation.

Specifically, the 6TH Circuit Court in EEOC v. Ford Motor Co., held that Ford could not show that the plaintiff's physical presence at work was essential to performing her job because:

- The assumption that attendance in the workplace is essential for most jobs no longer applies due to technological advances that allow employees to work remotely.

- Positions that involve a lot of teamwork are not inherently unsuitable for telecommuting arrangements. (From May 2010 to June 2019, the Plaintiff worked alone on 3rd shift in the pharmacy department of UH Geauga Medical Center. Dundee, himself, WAS the team.)

- The district court should have considered all relevant factors when determining the essential functions of her job instead of merely deferring to Ford's business judgment.

- When the plaintiff was physically present at work, the majority of her interactions were done via conference call, not in-person. **(The majority of Dundee's duties at UH Geauga Medical Center were performed via telework and 99% of Dundee's interactions with nurses and doctors were done via phone)**

- Ford has allowed other resale buyers to telecommute, albeit on a more limited basis. **(For years prior to the pandemic, University Hospitals allowed co-worker pharmacists to work from home via telework; allowed doctors to work from home via telework, and during the pandemic, allowed a multitude of employees the ability to do telework from home)**

The 6TH Circuit Court in EEOC v. Ford Motor Co., also held that the plaintiff's request for a telecommuting accommodation was reasonable because:

- Unlike flex-time scheduling, she would be available during regular business hours. **(Dundee, in his request for telework, told UH that he could be flexible/available to work any schedule, 24/7 and at a moment's notice to fill in for absence or emergency.)**

- The performance issues she had during her flex-time arrangement would not be a problem because they were caused by her inability to work during core business hours rather than her physical absence from work. **(Dundee could no longer safely drive the 1 hour commute to UH Geauga and the 1 hour commute home in the morning, safely, not did he have enough stamina to ambulate, even with the assistance of a wheeled-walker, once he arrived at work and through the night shift in the new pharmacy (since February 2020) layout that was longer, narrow and had most of the medications placed below waste-level, posing major difficulties for a person with Hereditary Spastic Paraplegia.)**

The 6TH Circuit Court in EEOC v. Ford Motor Co., stated that if Ford objected to the plaintiff telecommuting for four days a week, it should have engaged in an interactive process to find a more reasonable telecommuting arrangement.

- The Supreme Court's burden-shifting framework does not affect the interactive process triggered by Dundee's request for accommodation. University Hospitals should still engage in a informal dialogue to obtain relevant information needed to make an informed decision; and the decision-makers for UH were members of the UH "ADA Team." According to UH Policy, the process to consider Dundee's request for telework began when Ms. Kara Ladaika convened a meeting prior to August 14, 2018, with the "ADA Team," in order to review signed medical documents from Dundee's personal physician, that were a requirement stipulated by UH policy and not compliant with Title I of the ADA. Dundee was never invited by the "ADA Team" to take part in collaborative discussions, on the reasonable accommodation of telework, as proscribed by Title I of the ADA, despite the fact that Dundee had far more experience with telework from home in relation to hospital pharmacy, as Dundee was a pioneer in developing the work-from-home program for The Cleveland Clinic, from 2007 to 2009 and could contribute mightily yo inform the UH "ADA Team." In fact, Dundee was even refused his request to ascertain the name of the members of the "ADA Team," because it may have revealed that the members included persons sited in Dundee's ongoing discrimination lawsuit, Ms. Danialle Lynce, Ms. Rachael Lerman, and Mr. Shawn Osborne (Case No. 1:19 CV 01141), who a reasonable person on a jury could conclude had animus towards Dundee and might never agree to his request for reasonable accommodation under any circumstances.

21

- In 6ᵀᴴ Circuit Court in EEOC v. Ford Motor Co., her past attendance issues could not be used as a basis to deny her accommodation because her absences were related to her disability.

- Although employers ordinarily have the option of choosing an accommodation from reasonable options, Ford could not force the plaintiff to choose from their suggested alternative arrangements because her telecommuting request was reasonable.

- Ford could not show that her request created an undue hardship because:

    - the cost of the accommodation would be *de minimis* given Ford's size and financial resources; and (the cost would also be de minimis for a corporation with the resources of University Hospitals.)

    - Ford had a written policy promising to absorb these costs for employees allowed to telecommute.

Additionally, the Sixth Circuit reversed the district court's grant of summary judgment on the retaliation claim, holding that a reasonable jury could find that Ford retaliated against the plaintiff after she filed her EEOC charge because:

- She was terminated four months later.  (Dundee was engaged, in Federal Court, in a discrimination lawsuit [ Case No. 1:19 CV 01141] that arose from a charge placed with the EEOC [22A-2018-02065] concerning retaliation against a protected activity, AT THE VERY MOMENT HE WAS TERMINATED, which in and of itself IS a protected activity.  Additionally, Dundee, on April 1, 2020, reported his supervisor, Ms. Tumbush, to the UH Compliance Department; under their "See Something Say Something" initiative, The Ohio State Attorney General's Office and the Ohio State Board of

Pharmacy, for possible reckless endangerment of pharmacy staff during the covid pandemic.)

- The alleged adverse employment actions occurred after she filed her charge, including giving her a negative performance review that addressed work issues that were allegedly ongoing from before she filed her claim.  (Once again, Dundee was engaged, in Federal Court, in a discrimination lawsuit [ Case No. 1:19 CV 01141] that arose from a charge placed with the EEOC [22A-2018-02065] concerning retaliation against a protected activity, AT THE VERY MOMENT HE WAS TERMINATED, which in and of itself IS a protected activity.  Additionally, Dundee, on April 1, 2020, reported his supervisor, Ms. Tumbush, to the UH Compliance Department; under their "See Something Say Something" initiative, The Ohio State Attorney General's Office and the Ohio State Board of Pharmacy, for possible reckless endangerment of pharmacy staff during the covid pandemic.)

### Practical Implications

This case, 6TH Circuit Court in EEOC v. Ford Motor Co., highlights an important shift against employers in ADA failure to accommodate claims, that has direct implications for the Plaintiff Dundee in his charge against University Hospitals, specifically that in the Sixth Circuit and other circuits looking to the Sixth Circuit for guidance. For example:

- Physical presence in the workplace may no longer be an inherently essential function of many jobs. Evolution in technology to support remote working may inform a court's assessment of this issue:

23

- In fact, the United States District Court District Of Northern Ohio, in a ruling by United States District Judge Dan Aaron Polster, filed on **November 3, 2022**, denied the Plaintiff's Motion for a Change of Venue in this case, 1:22CV01351, since the technology available for telework has made the in-person appearance of relevant parties in Court unnecessary; the Plaintiff Dundee requested a change of venue from Federal District Court in Cleveland, 80 miles away, to Federal District Court in Youngstown, 8 miles from The Plaintiff's residence, in order to accommodate Dundee's disability of Hereditary Spastic Paraplegia and the hardship travel presents. The 6TH Circuit Court in EEOC v. Ford Motor Co., stated, "Evolution in technology to support remote working may inform a court's assessment of this issue;" coincidently, the United States District Judge Dan Aaron Poster, embraced the use of technology in the workplace in denying the need for Dundee's Motion for Change of Venue, by stating, "Due to Covid-19, the Court has been conducting most of its civil proceedings via Zoom," as Dundee can remain in his residence using the technology of telework for Court proceedings. The use of telework being instituted by the Court in response to the dangers of infection from covid during the pandemic from in-person contact. This ruling by Judge Dan Aaron Polster is significant since it touches on all aspects of Dundee's charge of failure to accommodate by University Hospitals and the dangers presented during the pandemic in the workplace.

- Courts may be less willing to defer to an employer's business judgment about a job's suitability for telecommuting.

- Although employers are typically allowed to choose an accommodation for its employees, employers may be required to accept an employee's accommodation request if it is reasonable, particularly when it comes to a remote working arrangement.

24

The duty to consider reassignment as a form of reasonable accommodation is clearly articulated in the ADA regulations and enforcement guidance. The Title I regulations of the ADA specifically include reassignment as an accommodation, and the Equal Employment Opportunity Commission (EEOC) formal enforcement guidance on Reasonable Accommodation and Undue Hardship Under the ADA notes that this form of accommodation must be considered and provided, when reasonable. Interestingly, even the courts mostly agree with the EEOC position on this accommodation issue.

Reassignment is commonly known as the accommodation of last resort. This is because accommodations that will enable an employee to remain in their current position should, under ordinary circumstances, be considered first. However, this accommodation strategy should not be misinterpreted to mean that it's only possible to consider reassignment when the search for accommodations in the original position is exhausted. Reassignment can be considered when:

- there is no reasonable accommodation that will enable an employee with a disability to perform the essential functions of their current position.

- both the employee and employer agree that an alternative position is a more preferable accommodation solution, in light of the employee's limitations and ability to perform essential functions, with or without accommodation.

- the location where work is performed causes a work-related barrier due to limitations affecting an employee's commute, or the need to access specialized healthcare, and there is a vacant position at a different location that meets the employee's disability-related needs.

25

The UH "ADA Team" never discussed reassignment as an accommodation. They may have expected Dundee to formally apply for vacant positions, or to interview for jobs that he selected. The answer to this question is why the employer wants to require this of someone who is not expected to compete for the job. For example, if the objective of asking the individual interview questions, or to complete an application, is simply to gather information to assess their qualifications and interest in the job, this may be possible. But, if the individual, like Dundee, is minimally qualified for the position, he gets the job regardless of the interview outcome. This did not occur in the two vacancies cited by the Plaintiff in his opening complaint: the two positions that were filled by new graduates, in the ICU and the Emergency Department, that could have been easily adapted to telework from home.

### Argument:  Pharmacy Regulations and Desuetude in the Fourth Industrial Revolution

Amazon's endeavors into the pharmacy business caused a lot of consternation for pharmacists in the retail arena. After all, Amazon is known for their use of technology to overcome logistical issues to get consumers a product in days, or even the same day. One pharmacist opined:

*"Could the dispensing of medications be usurped rather quickly? No, at least not right away, I think. For one, even if automation would make the 'counting' of medications faster, you still need a pharmacist to check the medication. It's the law."*

But laws and regulations to protect the sanctimonious role of pharmacists as the gatekeepers of getting medications to patients can't be safeguarded forever. There is a saying, "the Law is an ass"? It is derived from an English proverb which likens the law's stubbornness and stupidity to the supposed innate nature of a donkey.  The law is an ass is said when the application of the

26

law is contrary to common sense. The phrase "law as an ass" is normally used to <u>condemn</u> rigid and strict <u>application</u> of legal rules, but it can also be applied to regulations, when examined against the new realities presented by technology.

Many of the laws on the books governing the regulation of pharmacy in the State of Ohio, especially in regard to the "physical presence" of a pharmacist, are being rendered as contrary to common sense and customary practice in respect to the technology available in the Fourth Industrial Revolution.; common practices that lead to desuetude, not merely out of neglect, but a contrary usage of such a character as practically to infer such completely established habit of the community as to set up a counter law or establish a quasi-repeal.

All medical professions (in fact all professions, including the legal profession) are seeking to understand what innovations can either undermine or replace current roles, such as in the case of radiology where there are thoughts that AI or data analytics could replace a lot of the work done there.

By claiming that physical presence is an "essential" role of the hospital pharmacist, in denying a reasonable accommodation request, University Hospitals is ignoring the role of technology, such as barcoding at the bedside. That position makes as much sense as having the cashier at a grocery store manually ring up each item on an old NCR cash register first and then run each item over a barcode reader into a modern cash register. Human eyes are not a reliable check; being a pharmacist does not endow a person with super-abilities, to prevent medication errors; any person can check widgets as reliably as any other person. In many States, pharmacy technicians can check pharmacy technicians as reliably. But in no case can a person, pharmacist or tech, exhibit anything near the accuracy of a barcode scanner at the bedside, which has

become the new "gatekeeper." The regulations promulgated by the Ohio State Board of Pharmacy and the policies of University Hospitals should reflect that reality.

A barcode is a square or rectangular image consisting of a series of parallel black lines and white spaces of varying widths that can be read by a scanner. Barcodes are applied to products as a means of quick identification. They are used in retail stores as part of the purchase process, in warehouses to track inventory, and on invoices to assist in accounting, among many other uses; with monitoring the safe dispensing and utilization of medications in hospitals, bypassing the human frailty of fallible and often understaffed healthcare workers (such as hospital pharmacists).

A report from 2006, sixteen years ago, states errors occur most frequently during the prescribing and administering stages and estimates that upward of 450,000 preventable adverse drug events occur in hospitals each year—a total that many believe is on the low side. When all types of errors are considered, the committee behind the study suggests that a hospital patient can expect, on average, to be subjected to more than one medication error each day, with substantial variations in error rates across facilities. And without the intervention of barcode technology, these errors occur under the watchful eye of the onsite pharmacist, alone.

In 2006 many healthcare experts were encouraging hospitals to adopt bedside bar coding to address the problem of medication errors, a shift away from what was a previously long-standing choice of computerized physician order entry (CPOE).

"It [bedside bar coding] addresses the wrong drug, the wrong dosage, and the wrong patient," said Diane D. Cousins, RPh, vice president of healthcare quality and information with U.S. Pharmacopeia.

Mark Neuenschwander, cofounder of the Washington-based TerraPharma Project, a movement urging healthcare organizations to adopt bar coding, said, "It's really important that people understand that bar coding goes beyond medication errors—it prevents medical errors."

In addition, hospitals in the last decade also use automated dispensing cabinets, such as Omnicell and Pyxis cabinets, order scanning technology, and other technology, that remove the possibility of error from human hands (pharmacist's hands) as much as possible. This use of technology dovetails perfectly into allowing pharmacists to perform effective, essential services via telework, despite what the University Hospitals "ADA Team" would have a reasonable person believe.

During the 44 year career working as a hospital pharmacist, in a range of different hospitals, the Plaintiff has observed that the situation has never been the case that a pharmacist monitor's the activities of the pharmacy technician as closely as the regulations of the State of Ohio would have a reasonable person believe. At least ninety-five percent of the daily activities of a pharmacy technician in the hospital setting are unmonitored by a pharmacist. Pharmacy technicians handle the manufacture intravenous medication, dangerous drugs, including opioids, unmonitored by a pharmacist in real-time. The pharmacist rarely, if ever, witnesses the technician make an IV admixture, in real time. The checking comes at the end of the process and is more an article of faith than a concrete observation. Telework technology, such as Facetime and Zoom, give a hospital pharmacist the capability of monitoring dispensing activities by a technician not only within the department of pharmacy, but anywhere else within the hospital, such as on the nursing units, where a "physically present" pharmacist has zero chance of monitoring.

The Pro Se Litigant/Plaintiff hopes that he has persuasively addressed the topics of desuetude and obsolescence, of both pharmacy regulations as well as University Hospital policy, concerning reasonable accommodation in the workplace, in the age of technology, where laws and regulations need to be reviewed, revised or dismissed long before they stop having any legal relevance to real-time, common activities.

### The Pandemic Changes the EEOC Rules Regarding the ADA

The EEOC stated there may be reasonable accommodations that could offer protection to an individual whose disability puts that person at greater risk from COVID-19 and who therefore requests such actions to eliminate possible exposure. Even with the constraints imposed by a pandemic, some accommodations may meet an employee's needs on a temporary basis without causing undue hardship on the employer.

Low-cost solutions achieved with materials already on hand or easily obtained may be effective. If not already implemented for all employees, accommodations for those who request reduced contact with others due to a disability may include changes to the work environment such as designating one-way aisles; using plexiglass, tables, or other barriers to ensure minimum distances between customers and coworkers whenever feasible per CDC guidance or other accommodations that reduce chances of exposure.

Flexibility by employers and employees is important in determining if some accommodation is possible in the circumstances. Temporary job restructuring of marginal job duties, temporary transfers to a different position, or modifying a work schedule or shift assignment may also permit an individual with a disability to perform safely the essential functions of the job while reducing exposure to others in the workplace or while commuting.

The EEOC also states that assuming all the requirements for such a reasonable accommodation are satisfied, the temporary telework experience could be relevant to considering the renewed request. In this situation, for example, the period of providing telework because of the COVID-19 pandemic could serve as a trial period that showed whether or not this employee with a disability could satisfactorily perform all essential functions while working remotely, and the employer should consider any new requests in light of this information. As with all accommodation requests, the employee and the employer should engage in a flexible, cooperative interactive process going forward if this issue does arise:

- o In fact,  the United States District Court District Of Northern Ohio, in a ruling by United States District Judge Dan Aaron Polster, filed on **November 3, 2022**, denied the Plaintiff's Motion for a Change of Venue in this case, 1:22CV01351, since the technology available for telework has made the in-person appearance of relevant parties in Court unnecessary; the Plaintiff Dundee requested a change of venue from Federal District Court in Cleveland, 80 miles away, to Federal District Court in Youngstown, 8 miles from The Plaintiff's residence, in order to accommodate Dundee's disability of Hereditary Spastic Paraplegia and the hardship travel presents.  The 6TH Circuit Court in EEOC v. Ford Motor Co., stated, "Evolution in technology to support remote working may inform a court's assessment of this issue;" coincidently, the United States District Judge Dan Aaron Poster embraced the use of technology in the workplace in denying the need for Dundee's Motion for Change of Venue, by stating,  "Due to Covid-19, the Court has been conducting most of its civil proceedings via Zoom,"  as Dundee can remain in his residence using the technology of telework for Court

proceedings.  The use of telework being instituted by the Court in response to the dangers of infection from covid during the pandemic from in-person contact. This ruling by Judge Dan Aaron Polster is significant since it touches on all aspects of Dundee's charge of failure to accommodate by University Hospitals and the dangers presented during the pandemic in the workplace.

Older workers, like the Plaintiff Dundee, also may have medical conditions that bring them under the protection of the ADA as individuals with disabilities.  As such, they may request reasonable accommodation for their disability.

The EEOC has guideline for persons, like the Plaintiff Dundee, who are **"high-risk" and need extra protection from getting sick:**

*If you have a medical condition that makes you "high risk," or a mental health condition that makes it difficult to come to work, you may be able to work from home as a "reasonable accommodation." However, to be eligible you must be able to do your regular job from home and your medical condition must be a "disability" under the Americans with Disabilities Act.*

*If you face an "imminent danger," you're allowed to refuse to work, but this is a difficult standard to satisfy. **You must reasonably believe that your work conditions create an immediate risk of death or serious physical harm.** Whether your belief is reasonable will depend on the nature of your employment and the risk of contracting the virus. An emergency room nurse who is given no protective gear, for example, would have a better argument than an office worker who can take social distancing measures.*

There are many examples that it was cost effective during the pandemic for an employer, such as University Hospitals, to send its employees into the workplace with inadequate safety

32

protection, knowing that serious, long term injury and even death will likely result, than to provide adequate safety protection or to follow CDC guidelines for quarantine. Pandemic exposure to the covid-19 raises issues that the various worker protection schemes, such as the "official" UH Policy on worker exposure to the virus, did not adequately address; as demonstrated by the actions of Pharmacy Supervisor Patricia Tumbush, on the morning of May 27, 2020, by not allowing two staff members to quarantine after being exposed to their immediate family members who contracted covid, one of whom died weeks later from corvid, in violation of CDC policy .

At the peak of pandemic shutdowns (which occurred months before and months after May 27, 2020), about two-thirds of work was done remotely. It is unlikely that workers are going to revert to the mind-set of 2019 and the usual ways of doing business

The process of accommodation is about collaboration, yet the Plaintiff was excluded from EVER meeting with the Task Force, not even receiving the minutes from the meeting in which they flatly rejected remote work from home out of hand. They made decisions based on their less than cursory understanding of how remote work can be done successfully and productively from home in the pharmacy department. Mostly because of the animosity 3 members of the task force bore toward the Plaintiff over a period of years.

Don't forget the effect of "long covid," especially on those, like the Plaintiff. "We didn't know what we didn't know" about covid on May 27, 2020, nor do we know to this very moment. Each day brings new revelations and new warnings about the virus. All that was know on May, 27, 2020, was those over age 65, with a comorbidity were especially at risk and that QUARANTINE of those exposed was CERTAIN to protect the workforce; negative covid test results, as UH would propose, that were NOT certain in pronouncing a person covid-free. UH

being a hospital knew the risks full-well and accepted government money specifically to be used to allow workplace accommodation and quarantine during the pandemic.

The EEOC spoke and recognized that the pandemic changed the rules: no longer could **an employer, like UH, fire a person with a preexisting condition that makes him more susceptible to the virus. The employer MUST make a reasonable accommodation, such as allowing the Plaintiff Dundee to work remotely or moving his workspace away from others. The narrow design of the new pharmacy department made social distancing by moving Dundee's workspace away from others impossible. In addition, Supervisor Tumbush had never instituted social distancing requirements.**

The CDC states that the goals of Health Care Worker (HCW) risk assessment, work restriction, and monitoring are to:

- *Allow for early identification of HCWs at high risk of exposure to COVID-19;*

- *Reinforce the need for HCWs to self-monitor for fever and other symptoms, and avoid work when ill;*

- *Limit introduction and spread of COVID-19 within healthcare facilities by healthcare personnel;*

Healthcare worker – all paid and unpaid persons serving in healthcare settings who have the potential for direct or indirect exposure to patients or their infectious secretions and materials (e.g., doctors, nurses, laboratory workers, facility or maintenance workers, clinical trainees, volunteers).

During the first six months of the covid-pandemic the CDC categorized **"high risk exposure"** as:

- *Close contact for a total of 15 minutes or more with a person with COVID-19 in the community*

Most reasonable people would consider contact with an immediate family member, who is subsequently discovered to have been infected with the covid virus, is "high risk exposure" by definition.   The CDC further stated that HCWs who had a ***high-risk exposure*** should be restricted from work and remain quarantined with active monitoring for COVID-19 symptoms for 14 days after the date of last exposure.  Decidedly this was not done in the instance of Lisa Farah and Tina Creedon, both of whom were not permitted to quarantine and were reporting to work by 6:00 am on the morning of May 27, 2020, according to staff from 2nd-shift on the evening of May 26, 2020, to Frank Dundee.

CDC and WHO recommended all HCWs wear a "medical mask" for universal source control if there is SARS-CoV-2 transmission in the community.   Unfortunately, from February 1, 2020 thru June 18th, 2020, during the height of the pandemic, staff in the Pharmacy Department at UH Geauga Community Hospital did not have access to "medical masks."  The two staff members, Lisa Farah and Tina Creedon, who were exposed to immediate family members, could not wear a medical mask on the morning of May 27, 2020, in compliance with WHO and CDC recommendations.  Furthermore, a negative test result was not valid confirmation that the person was covid-virus-free.  There were to many false negatives in the early tests that were available at that time to be reliable indicators that a person could not transmit the virus after exposure to immediate family members.  So the UH argument that the two staff members tested negative is not an indicator that they could not transmit the virus to other staff on May, 27, 2020.  In

addition, many of the covid positive patients needing hospitalization in April, May and June of 2020 were from the Amish community, who didn't practice isolation and social distancing, celebrating Easter at church and in large community gatherings and as such, the infections among the Amish spiked considerably. The staff member who was exposed to her stepfather, who died from covid weeks later, both drove courtesy vehicles for the Amish during this time period.

### Argument: Covid Testing Early in the Pandemic

A **negative** test result means the test did not detect SARS-CoV-2 at the time of testing. However, a negative test does not mean the employee does not have any virus or will not later get the virus. It means only that the virus causing SARS-CoV-2 was not detected by the test. A reasonable person on a jury could conclude that refusing to allow staff exposed to immediate family members, who were positive for covid the virus, to quarantine, because a covid test was negative, is not a reliable assurance that the staff members, Lisa Farah and Tina Creedon, were incapable of transmitting covid to the Plaintiff on the morning of May, 27, 2020. The only certain solution available was quarantine.

### Retaliation

**Participating in an EEO complaint process is protected from retaliation under all circumstances.**

Acts by a current (the Plaintiff Dundee), prospective, or former employee to oppose discrimination are protected as long as the employee is acting on a reasonable good faith belief that something in the workplace may violate <u>EEO laws</u>, and expresses those beliefs in a reasonable manner. An employee is still protected from retaliation for making a complaint about

workplace discrimination even if the employee does not use legal terminology to describe the situation.

Retaliation includes any employer action in response to EEO activity that could deter a reasonable person from engaging in protected EEO activity. Depending on the facts, this might include actions such as denial of promotion or job benefits, non-hire, suspension, discharge, work-related threats, warnings, negative or lowered evaluations, or transfers to less desirable work or work locations

## Abuse of Process Demonstrating Pretext

Abuse of process is a common law tort that involves the misuse of legal process(es) for an ulterior purpose. A jury of reasonable persons might conclude that abuse of process may have been used for an ulterior purpose in order to terminate the Plaintiff, thus establishing pretext, as discussed in the Plaintiffs initial filing in this claim.

Generally, the elements for abuse of process are: (1) the use of an illegal or improper use of process; (2) an ulterior motive or improper purpose; and in some jurisdictions (3) harm to a litigant. For the purposes of abuse of process, an arbitration proceeding is a judicial proceeding. Abuse of process has been described as misusing a "criminal or civil process against another party for a purpose different than the proceeding's intended purposes" and thereby causing the party damages (e.g., arrest, seizure of property, or economic injury).

In the initial filing with The Court, #1:22CV01351, the Pro Se Litigant presented the case for the possible tort of Abuse of Process committed by UH Attorney Rachael Israel, for using the answer to a question in a deposition for an unrelated lawsuit, as evidence in the UH Position Statement to the EEOC. It is hoped that The Court will look at the facts surrounding this action

by the UH attorney as evidence, more likely than not, of planning and lying in wait for the right

opportunity to present itself, giving UH the incident/excuse it was more likely than not waiting

for to terminate the Plaintiff Dundee, rather than grant his reasonable accommodation of

telework from home.

## Argument:  Pretext and Undue Influence

Although University Hospitals claimed that the Plaintiff Dundee violated State Board of

Pharmacy laws, by punching out a di minimis 5 minutes early on May 27, 2020, in a transparent

attempt to manufacture the pretext for his termination, Dundee firmly refuted all claims that he

violated any pharmacy laws in his initial filing with The Court.  Reasonable persons on a jury,

more likely than not, can see the pretext.  It should be noted by the Court: the Plaintiff Dundee

was a Registered  Pharmacist in the State of Ohio, in good standing, during his entire career,

from April, 1977, up to September 15, 2021,  when Dundee, himself and unilaterally, chose NOT

to renew his pharmacy license pending the resolution of his charge of discrimination for

retaliation and failure to accommodate with the EEOC, filed on 8/15/2020, #532-2020-02558;

that charge of discrimination transitioned into the charge now before The Court, CASE NO.

1:22CV01351.  Should The Court reach a decision in favor of the Plaintiff, Dundee may consider

applying to renew his pharmacy license in Ohio and if there are any issues that need to be

resolved with the Ohio Board of Pharmacy, Dundee may address those issues at that time, before

the Board of Pharmacy or in a court of law.

There are several ways through which interest groups, such as companies, try to influence the

decision-making process at government agencies, such as the Ohio State Board of Pharmacy.

Interest group influence, commonly known as lobbying, encompasses any direct or indirect

communication with public officials, political decision-makers or representatives for the purposes of influencing public decision-making.

Interest group influence is not a corrupt or illegitimate activity per se, but when opaque and disproportionate it may lead to undue influence. Undue influence is a more subtle form of corruption as interest groups often make use of legal mechanisms to influence the decision-making process

Reasonable, knowing persons, are aware that the Ohio Board of Pharmacy is political entity, and as such can be susceptible to lobbying and outside influence in its decisions.  A prime example is the off-label use of hydroxychloroquine and chloroquine for use for the treatment of covid in Ohio, in 2020.  The pressure to use a very dangerous drug as an anti-viral, was not the result of scientific proof of effectiveness or proper testing.  The decision was one hundred percent political in nature, emanating for the wishful thinking of President Donald Trump. Efforts by the Trump administration to control the release of COVID-19 guidance and install political operatives at public health agencies, like the FDA, have been well documented.

The political pressure to use hydroxychloroquine and chloroquine for covid, despite any scientific evidence, rolled down from Washington, to the State level, where on March 22, 2020, Governor Mike DeWine authorized the State of Ohio Board of Pharmacy to file emergency rule 4729-5-30.2 of the Administrative Code, in effect greenlighting the use of this dangerous drug under the guise of "regulating" it's use for covid treatment; this when the Board should have strictly prohibited it's use for covid.  But by June, FDA officials had concluded the drug was likely ineffective and could cause potentially dangerous heart complications, revoking its emergency use.

Reasonable persons could conclude that permitting the use of hydroxychloroquine and chloroquine in 2020, more likely than not, demonstrated that the Ohio State Board of Pharmacy is susceptible to political/corporate interests; failing in its duty when it counted the most, during a pandemic. The Board more likely than not failed to fulfill their mission statement by not acting impartially, nor in the public interest:

- *The State of Ohio Board of Pharmacy shall act efficiently, consistently, and <u>impartially in the public interest</u> to pursue optimal standards of practice through communication, education, legislation, licensing, and enforcement.*

That is why reasonable persons and factfinders should be aware of the possibility that undue influence with the Ohio State Board of Pharmacy may have played a role in providing University Hospitals with a pretextual reason to justify terminating the Plaintiff. In fact, UH Attorney Rachael Israel worked closely with the Ohio State Board of Pharmacy; advising the Board on administrative and regulatory matters, as such having both access to and familiarity with the Board.

It is important that regulatory decisions and functions are conducted with the upmost integrity to ensure that there is confidence in the regulatory regime. This is even more important for ensuring the rule of law. A high degree of regulatory integrity helps achieve decision making, which is objective, impartial, consistent, and avoids the risks of conflict, bias or improper influence. In this complaint before the Court, can reasonable persons establish the regulator, the Ohio State Board of Pharmacy, with a degree of independence and trust that regulatory decisions are made with integrity and not due to pressures from the affected interests?

40

## Conclusion

In this matter before the Court, there are material facts in dispute, so this case does NOT come down to a question of law for the judge to decide, in a motion for summary judgment. The Pro Se Litigant has demonstrated that there is, at least, one dispute over a fact that is important to this case, both in the initial filing and in this reply brief:

- That Pharmacy technician Tracey Thoms was on her morning rounds on the nursing units at UH Geauga Community Hospital and NOT left alone in the pharmacy department from 5:55 am to 6:00 am on the morning of May 27, 2020;

- That Plaintiff Dundee did not break any laws by ending his shift five minutes early on the morning of May 27, 2020, when he was faced with what he perceived as an imminent danger in the workplace.

- That UH Attorney Rachael Israel may have tipped her hand, demonstrating pretext and lying in wait, by the tort of abuse of process during a deposition for an unrelated case, weeks before Dundee was terminated.

- That two members of staff, Lisa Farah and Tina Creedon, should have been permitted to quarantine after being exposed to immediate family members; a son positive for covid and a stepfather positive for covid, respectively. The stepfather died within a few weeks, succumbing to covid.

- That a negative covid test is NOT definitive proof that a person is covid-free and not contagious.

41

The Americans with Disabilities Act (ADA) sets a high standard for employers to attempt to accommodate a disabled employee. In the interactive process, the employer is expected to accept restrictions and recommendations from the employee and their health care professional and then determine if an accommodation can be made.

The tone was set by the UH "ADA Team" in August 2018, when they unilaterally drew a line in the sand against ever affording Dundee the reasonable accommodation of telework from home. The prohibition from telework from home became elephant in the room for all discussion of accommodation between Dundee, Patricia Tumbush and Heather Harmon; the discussions were fruitless because they, Tumbush and Harmon, had no authorization to grant telework from home as the reasonable accommodation and so nibbled around the edges in an effort at illusion, to seem like UH was following Title I of the ADA:

- Collaboration is the key to identifying effective accommodations. Effective accommodations are a match between the needs of the employee and the requirements of the job. Yet the UH "ADA Team" never invited Dundee, with all of his diverse experience, to collaborate and provide valuable insight.
  Creativity and investment of time are important in the provision of accommodations. Among pharmacy staff, nurses and physicians, Dundee was recognized as a creative and innovative employee. The UH "ADA Team" never invested the time to speak or contact Dundee in any way that would have allowed him use his skills and experience in collaboration with the "ADA Team" to reach a reasonable accommodation that would have been a win-win; as Dundee had more knowledge of the productivity benefits of pharmacy telework from home than anyone on the UH "ADA Team."

Accommodations come in "units of one;" each reasonable accommodation request should be considered on an individual basis and requires ongoing communication and collaboration between the employee and the employer. There was NEVER any communication nor collaboration between Dundee and the UH "ADA Team."

Optimizing the value of employees to the organization is the desirable outcome of the accommodation process. Accommodations are tools to enhance job productivity. Dundee knew by experience that telework from home would increase job productivity but was never invited to discuss this with the UH "ADA Team."

The Plaintiff in this complaint before the Court has established direct evidence, as well as circumstantial evidence, occurring over a period of years, that Defendant, University Hospitals, obfuscated, stone-walled and refused to follow the law under Title I of the ADA; pointedly, the members of the so-called University Hospitals "ADA Team" that wields the power to decide accommodation requests, never discussed possible accommodations, how telework could be implemented or collaborated with the Plaintiff in any way to reach a solution, as intended by Title I of the ADA. The UH "ADA Team" played a waiting game intended to wear the Plaintiff down as his disability worsened, while at the same time looking for any pretext in order to discharge the Plaintiff prior to ever granting the reasonable accommodation of telework from home, violating the Plaintiff's civil rights.

Respectfully submitted,

_____

Frank D. Dundee

Pro Se Litigant

7707 Amberwood Trail

Boardman, Ohio 44512

330-398-8274

fdundee@gmail.com

11-4-22  Date

Frank Dundee
7707 Amberwood Trail
Boardman, Ohio 44512



U.S. POSTAGE
$6.16
FCM
44514
Date of sale
12/04/22
06        25 SSK
11486464

**USPS FIRST-CLASS MAIL®**

CLERK COURT
125 MARKET ST
YOUNGSTOWN OH 44503-1780

4.20 oz

**RDC 99**

C056

SHIP TO:
CLERK O COURTS
125 MARKET ST
YOUNGSTOWN OH 44503-1780

**USPS CERTIFIED MAIL®**

9507 1066 7851 2338 2503 30

Clerk of Courts Office
Thomas D. Lambros Courthouse
125 Market Street
Youngstown, Ohio 44503