# EXHIBIT F
# TO DEFENDANT'S MOTION FOR
# SUMMARY JUDGMENT

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF OHIO
3  EASTERN DIVISION
4  ~~~~~~~~~~~~~~~~~~~~
5  FRANK DOMINIC DUNDEE,
6      Plaintiff,
7      vs.            Case No. 1:22-cv-01351
8  UNIVERSITY HOSPITALS
9  HEALTH SYSTEM, INC.,
10      Defendant.
11  ~~~~~~~~~~~~~~~~~~~~
12          Deposition of
13       FRANK DOMINIC DUNDEE
14
15
16
17
18         May 25, 2023
19          10:00 a.m.
20
21          Taken at:
22       7702 Amberwood Trail
23         Boardman, Ohio
24
25      Cynthia Sullivan, RPR

Page 2

1  APPEARANCES:
2
3      On behalf of the Plaintiff:
4          FRANK DOMINIC DUNDEE (Pro Se)
5          7707 Amberwood Trail
6          Boardman, Ohio  44512
7          (330) 398-8274
8          fdundee@gmail.com
9
10     On behalf of the Defendant:
11         Perez & Morris, by
12         KERIN LYN KAMINSKI, ESQ.
13         JO A. TATARKO, ESQ.
14         1300 East Ninth Street
15         Suite 1600
16         Cleveland, Ohio  44114
17         (216) 621-5161
18         kkaminski@perez-morris.com
19         jtatarko@perez-morris.com
20
21              ~ ~ ~ ~ ~
22
23
24
25

Page 3

1            TRANSCRIPT INDEX
2
3  APPEARANCES..............................   2
4
5  EXAMINATION OF FRANK DOMINIC DUNDEE:
6  By Ms. Kaminski...........................   4
7
8  REPORTER'S CERTIFICATE....................  88
9
10 EXHIBIT CUSTODY
11 NO EXHIBITS MARKED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      FRANK DOMINIC DUNDEE, of lawful age,
2  called for examination, as provided by the
3  Federal Rules of Civil Procedure, being by me
4  first duly sworn, as hereinafter certified,
5  deposed and said as follows:
6      EXAMINATION OF FRANK DOMINIC DUNDEE
7  BY MS. KAMINSKI:
8      Q.   Mr. Dundee, you've had your
9  deposition taken before, correct?
10     A.   Yes, I have.
11     Q.   And you know that you have to
12 answer verbally so that the court reporter can
13 take down your answers, right?
14     A.   Yes.  I know that.
15     Q.   If I ask you anything that you
16 don't understand, you'll let me know; won't
17 you?
18     A.   I will.
19     Q.   Now, you said that you have some
20 notes with you today.  You have a paper to your
21 right-hand side that you want to keep by you,
22 and I've agreed to let you keep that by you,
23 but would you read what's on that paper into
24 the record for us?
25     A.   Yes.  Sure.  You possess the

Page 5

1  documents that answer the question.  Anything
2  that I would say could only be used to
3  incriminate me.  Therefore, I assert my right
4  against self-incrimination, and I invoke the
5  Fifth Amendment.
6           Then the next note, it doesn't run
7  on from this, says same reason, same answer.  I
8  invoke the Fifth Amendment.
9      Q.   Okay.  Now, what about this
10 questioning today makes you think that you
11 might have to invoke your Fifth Amendment?
12     A.   I don't know until I hear the
13 questions.
14     Q.   Okay.  Are you concerned that you
15 at some point engaged in some criminal
16 activity?
17     A.   No, I'm not concerned about that.
18 What I'm concerned about is saying too much
19 when you both know my documentation was
20 overwhelming, and I've stated everything, and
21 you've got the documents.  That's the only
22 reason I have this (indicating).
23          I stated that to you in the email
24 when I said I don't know what else we can
25 discuss, I have no clue, but you have the

Page 6

1  documents, and that's what I, you know.
2      Q.   A lot of the story of this case can
3  be told through the emails that you had with
4  the different people at UH.  Would you agree
5  with that?
6      A.   I would agree with that.
7      Q.   That is how you communicated
8  frequently with them is through email?
9      A.   Yes, I did.
10     Q.   What we're here to discuss is
11 really you've had lots of different claims and
12 different arguments with UH, but this case, as
13 I understand it, is about your request for an
14 accommodation starting in 2018; is that right?
15     A.   Well, it -- the request for
16 accommodation started in 2018.  However, at the
17 case management conference we had in December
18 in which I was like really surprised, the court
19 made a statement that said the court would only
20 consider evidence from January 2020 through
21 June 2020, so that's what I'm basing my
22 argument on now, those months.
23     Q.   Okay.  So you're looking at your
24 request for accommodations, whatever that was,
25 from January of 2020 through June of 2020 when

Page 7

1  you lost your position; is that correct?
2      A.   That's correct.
3      Q.   As I understand your claims, it's,
4  one, for a failure to engage in the interactive
5  process about an accommodation, that that's
6  part of your claim; is that right?
7      A.   Yes.  Yes, it is.
8      Q.   And your secondary claim is the
9  termination of your employment in retaliation
10 for your seeking an accommodation?
11     A.   Yes.
12     Q.   Is there anything else that you're
13 claiming in this lawsuit other than those two
14 things?
15     A.   I cannot say at this moment.  I
16 cannot say.  Once again, you have those
17 documents, so you should be able to --
18     Q.   In your complaint, your complaint
19 is long and, if I might say, rambling.
20     A.   Yeah.  I'm a terrible writer.  I
21 wouldn't make a good attorney in that regard.
22     Q.   Right.  So I want to make sure I
23 understand what your claims are.  One of the
24 things you say in your complaint is that
25 Rachael Israel came out here and took your

Page 8

1  deposition, and she somehow or other asked you
2  some questions, and, therefore, it was an
3  abusive process, that deposition was an abusive
4  process.
5           Do you have some claim about the
6  deposition that was previously taken?
7      A.   I'm going to use my notes right
8  now.  You possess the documents that answer
9  that question.  Anything that I would say could
10 only be used to incriminate me.  Therefore, I
11 assert my right against self-incrimination, and
12 I invoke the Fifth Amendment.
13     Q.   Let me make sure you understand
14 what I'm asking you.  Do you have a claim for
15 abuse of process in this?
16     A.   I do not have a claim, no.  That's
17 a tort, and I do not have that, and I didn't
18 have that at the time.
19     Q.   Okay.  Do you have a lawyer in your
20 family?
21     A.   No.
22     Q.   Do you have a friend that's a
23 lawyer?
24     A.   No.
25     Q.   You just read about legal matters

Page 9

1  because you're well-versed in the law?
2      A.   No.  Let me just tell you, Google
3  is great.  I would be nowhere without it, okay?
4  Wait until IA comes along.  It's going to
5  really be something.
6           However, I graduated from college
7  in 1976 as a registered pharmacist, and I went
8  to work at Northside Hospital in Youngstown
9  which was part of the Youngstown Hospital
10 Association which was the largest employer in
11 the area.  So I was only there -- I was there
12 from '76.
13          In '79 it was a unionized
14 establishment.  The pharmacists weren't
15 unionized, but it was a unionized
16 establishment.  The medical technologists at
17 the time numbered around 140 in number.  They
18 wanted a union, okay?
19          When they went to the NLRB, the
20 NLRB said the vote has to include all these
21 non-nursing professionals which is what they
22 were.  The hospital gave up the pharmacists.
23 They gave us up.  They protected the
24 dieticians, I don't know how they managed that,
25 but they gave us up.

Page 14

1 who were loyal to them and who were there, and
2 nobody understands that better than me, the
3 concept of seniority and stuff like that, but
4 this was an opportunity I had to take.
5           I remember the very first five
6 minutes I was there and the person who was
7 training me, she's giving me like the cold
8 shoulder and this and that, and I just said,
9 Look, you may never like me, and that's okay
10 and I understand your resentment completely,
11 completely. It's not fair that I got to come
12 in here and get a job, but I came in with 32
13 years in pharmacy.
14           So, I mean, I was -- I had pretty
15 much in there, and I came in on third shift
16 which most people don't want to work,
17 but -- and it was -- it was a lot of suffering
18 at first, too, because the people who were
19 resentful downtown, they tried to pile it on
20 us. They tried to pile it on us.
21      Q.    Are you talking about at the Clinic
22 or at UH?
23      A.    At the Clinic. At the Clinic.
24      Q.    So when you got your work from
25 home, it was tough?

Page 15

1      A.    It was tough. It was tough. It
2 wasn't an easy thing. That's why it wasn't so
3 tough when I gave it up at the time.
4      Q.    So then when you gave it up, what
5 did you do?
6      A.    I went to MVI HomeCare, and I was
7 there for about nine months when the rumor
8 was -- when the rumor was they were closing
9 down. They didn't have money. I thought dog
10 gone it, and as -- I'm a very lucky man. As
11 good luck would have it, I got an email blast
12 from University Hospitals saying come work
13 nights. Nights are great at University
14 Hospitals. It was on an email right at the
15 time when they were talking about it closing
16 about nine months after I started. So I
17 applied, and they hired me.
18      Q.    So let's talk about that position
19 you were hired into. What was it?
20      A.    Well, the position I was hired
21 into, they had just opened up third shift
22 within a year or so, and Lisa Wojtowicz, I
23 never could pronounce her last name, she was my
24 counterpart on the other seven. Terrific
25 pharmacist, terrific person. She wanted to get

Page 16

1 away from the drama of being around everybody
2 on day turn.
3           So when she and I worked -- the
4 first nine years that I worked, I worked alone.
5 There was no technician on the shift or
6 anything which I preferred. But when I said I
7 accepted the position, I went to UH Geauga.
8 That's where the recruiter told me. Jason
9 Glowczewski was the boss there, nice guy. He
10 hired me in right away because I had all that
11 experience, and I was used to working
12 midnights, and I wasn't afraid to work alone.
13           Most pharmacists, that's the kiss
14 of death. They do not want to work alone
15 because they are not sure of themselves. I
16 wanted to work alone. So I accepted the
17 position. Then the recruiter calls me back and
18 says you have to go downtown and interview,
19 too. They wanted to interview me for Rainbow
20 because I had pediatric experience which is
21 kind of rare and because they knew about my
22 business that I opened which was a pediatric
23 pharmacy.
24           So I didn't want to go down there
25 because Geauga looked -- for my age and

Page 17

1 everything looked like a nice job. I mean, it
2 wasn't glamorous or anything, but it's just a
3 nice, small hospital that looked like they had
4 a good crew and everything.
5           So I went downtown. The first time
6 in my life I felt that somebody really wanted
7 me. The head honcho took me around to every
8 floor, took me up to the neonatal intensive
9 care unit because that's what he was trying to
10 get me to do on midnights, I was going to be
11 the neonatal intensive care unit.
12           Then he brought me downstairs in a
13 conference room, and every department head was
14 in there. There had to be 10 or 15 people in
15 there sitting around a table trying to coax me
16 to come in there. I actually felt wanted for
17 the first time in my life. They all
18 kept -- the one guy asked me, Working at
19 Geauga, he goes, that ain't going to be a
20 challenge for a guy like you. And I said,
21 Bingo. Yes, you're right, and at this stage in
22 my career, I'm not looking for a huge
23 challenge.
24           So I came home, and I bought a
25 whole bunch of cards, and I sent them to

Page 18

1 everybody that was in that room. The one girl
2 even went to college with me. I said, I
3 apologize. I appreciated everything, I didn't
4 want to offend anyone, but I was going to
5 Geauga.
6    Q.  So when you come into Geauga, what
7 is your title? You're a clinical pharmacist?
8    A.  No. At that time it was staff
9 pharmacist. Somewhere along the line they
10 changed it all to clinical pharmacist. I don't
11 know when they did that. It wasn't -- I don't
12 have any idea when they made that change. I
13 remember seeing it maybe in my lawsuit or
14 something maybe for the first time.
15    Q.  What were your duties? Tell me
16 what you did.
17    A.  All right. When I first came in,
18 the primary duty was order entry, and at that
19 time we did not have CPOE which is computerized
20 physician order entry. At that time all we had
21 was a fax machine. The physician would fax a
22 copy of what he wrote, or the ward clerk would
23 of what the physician wrote into the patient's
24 chart. Then we would have to pick out the
25 order on there, interpret it, and then enter

Page 19

1 it. So I had that was my main duty.
2         At that time I think, if I can
3 remember back that far, I might have been
4 checking the cart. They might have filled it
5 on afternoons and then had me check it before
6 they made the morning cart exchange, but that
7 was always an in-and-out thing. That wasn't
8 always in my tenure. Sometimes they would move
9 it to day turn or whatever. But primarily
10 that. Answering the phone calls was a huge
11 thing and filling the orders, because I didn't
12 have a tech, so I had to fill the orders as
13 well.
14         I wanted to make a very good first
15 impression. When I went to the Cleveland
16 Clinic, because I lived so far away, when I was
17 being trained, they put me up in a hotel, not
18 that nice one where Oprah Winfrey goes to, but
19 the one across the street there. Because I
20 said I didn't want to be going back and forth
21 every day, I says, I'll stay up here. Put me
22 on like three on and two off and three on.
23         But they weren't training me. I
24 had like two days of training, and then they
25 put me into what they called the pit. They

Page 20

1 were in terrible straits then in 2007 when I
2 got hired, and it was the pit. They would have
3 like ten pharmacists back to back entering
4 orders non-stop off of the fax machine, too,
5 but they would put it on a screen. They would
6 fill it in. So you would have two monitors.
7 On your right you would have the monitor with
8 the order coming in, and then they would have
9 your computer that you could do your order
10 entry on.
11        So I don't know where I was at with
12 that. I'm sorry.
13    Q.  You were talking about your
14 training, and it wasn't actually much of a
15 training. They put you in the pit most of the
16 time.
17    A.  No, it wasn't much of a training,
18 and I wanted to get home and get started on
19 this. In the middle of it, there was some
20 question as to whether it was state board
21 approved. Here I quit my job and I come up
22 there, what? It's not state board approved?
23 Are you kidding me? Well, we've got this and
24 that, and you have to stay up here. I was up
25 there for eight weeks, and it was terrible.

Page 21

1         So when I came to University
2 Hospital, they at -- I think now they have the
3 Epic system same as the Cleveland Clinic. I
4 forget what the system is now. You know what?
5 I put everything out of my mind when I was
6 gone. Every job, I forget it as soon as I
7 leave it.
8         But they had a system that was
9 easy. I could tell. Like they had me on day
10 turn for two days working with somebody, and I
11 could tell order entry was easy. I understood
12 what to do. I understood everything. I did
13 not want to stay on day turn anymore because I
14 didn't like getting up in the morning, and I
15 was having an hour drive there and an hour
16 drive back.
17        So I told Jason, I go, Look, Jason,
18 the only way I'm coming in here is you don't
19 pull a Cleveland Clinic on me and keep me on
20 training for eight weeks. I was on days for
21 like three days or four days, and then I went
22 by myself to third shift. I just got dipped
23 into the water, a cold drink of water.
24        The one thing that I wanted to
25 demonstrate early, and the opportunity came,

Page 22

1  and it only came that one time, in ten years
2  nothing as bad ever came. I was the sole
3  pharmacist there, and the sprinkler system in a
4  local nursing home failed, and they had to get
5  everybody out of the hospital after 10:30 at
6  night. So ambulances were going back and forth
7  transporting about 30 to 40 patients, and our
8  census at that time only ran about 90.
9      So they are doing 30 to 40 patients
10 coming in, and I'm pharmacy. I'm the only
11 pharmacist. Now, most people would have got on
12 the horn and called their supervisor and said,
13 hey, all hands on deck. I said, I think I can
14 handle it, and I did. It was a rough night,
15 but I did.
16     The next morning Steve Jones sent
17 Jason Glowczewski a congratulatory message
18 congratulating pharmacy on their performance
19 because they called on all kinds of people, and
20 I was pharmacy. So I thought that that was a
21 good thing for me to show them, that no matter
22 what, I'm not going to call you guys. I'm not
23 going to wake you up at 4:00 in the morning.
24     First off, they were all younger
25 than me, and I have way more experience than

Page 23

1  them, so what were they going to tell me? You
2  know, I was stuck there, you know. Besides, I
3  guess my pride wouldn't allow it, either.
4      I'm a pharmacist by career, but my
5  claim to fame is I'm a good problem solver, and
6  that's all pharmacy is is solving problems, and
7  that's all I was is I was a problem solver.
8  I'm an iconoclast by nature, and
9  neuroscientists say iconoclasts think and see
10 things differently than other people. Our
11 perception is different. Our brain doesn't
12 short circuit from past experience. Our brain
13 is always open to creative and innovative
14 things, and I always have a system, and it's
15 always the best system when I'm doing it
16 because it has to be efficient or else the
17 nurses will be complaining, and I'll be out on
18 my ear.
19    Q.  So now let's fast forward to 2018.
20    A.  Okay.
21    Q.  Tell me what you did on a nightly
22 basis. What were your job duties?
23    A.  In 2018 cart fill was on day turn.
24 They made the cart exchange at around 4:00 or
25 4:30, and that was actually on my suggestion

Page 24

1  because that's how the Cleveland Clinic did it,
2  and the reason being is most of the meds are
3  passed on the nursing unit between 6:00 and
4  9:00 in the morning. So to have cart exchange
5  then and they are waiting for their first dose,
6  and sometimes the first dose wouldn't be in
7  there, they would double up or do something or
8  give somebody something, and then starting
9  about 6:00 to about 9:00 the phone is
10 constantly ringing. She's missing her blah
11 blah. She's missing her blah blah.
12     So I had talked to Jason about it,
13 and I go, Jason, the deal is most places just
14 fill and do it on day turn. See, their problem
15 was there was too big of a gap when they were
16 doing the -- you have to coordinate it. When
17 you're filling the cart, all new orders have to
18 also go on the cart, and if you're not
19 coordinating it well, there is going to be
20 missing doses, and you're going to get tons of
21 phone calls.
22     The biggest thing in pharmacy is
23 interruptions. Interruptions will cause you to
24 make a mistake. Distractions will cause you to
25 make a mistake. Nothing is a bigger

Page 25

1  interruption than phone calls, so keeping those
2  to a minimum is a big thing.
3      The third shift is nothing but a
4  shift of interruptions. I mean, that's all it
5  is. Figure it out. When people are coming in
6  in the middle of the night, they are sick.
7  They need immediate care. You know, they are
8  not deciding, well, I think I'll go take a ride
9  up there. You know, if you're coming there in
10 the middle of the night, you're sick. So
11 anyhow --
12    Q.  So let's go back to in 2018 what
13 were your job duties?
14    A.  In 2018 my job duties were
15 verifying orders and answering the phone calls
16 for and filling the orders. I had to fill the
17 orders, too. I didn't have a tech. So
18 verifying, filling the orders, and answering
19 all the phone calls. That was my job duties.
20     At that time I was covering -- I
21 was the pharmacist covering Geauga, Geneva
22 Hospital, Conneaut Hospital. I don't know in
23 2018 if Andover Emergency Room was open yet,
24 but I would soon be doing Andover Emergency
25 Room, and then I never quite figured out what

7 (Pages 22 - 25)

Page 26

1 the facility was in Ashtabula. It very rarely
2 required anything those other ones did. So
3 that's what I did.
4    Q.  So let me ask you this, for Geneva,
5 you weren't on site at Geneva?
6    A.  No.
7    Q.  How did you fill orders in Geneva?
8    A.  It's all remote. It's all remote.
9 You see, there are dispensing machines now.
10 The field has evolved. There are dispensing
11 machines on every nursing unit that have at
12 least our top 100 to 150 used medications. So
13 when I verify the order, I don't have to send
14 everything upstairs. It just unlocks the
15 machine and allows the nurse to get the dose.
16        So that's what happens over
17 at -- over at the other places. It happens at
18 Geauga, and it happens at the other place.
19    Q.  So what if you had a request for
20 medications that are not loaded in the
21 dispensing machine. Would you then have to
22 actually fill that physically?
23    A.  No, I would not have to fill that
24 physically. They had -- before I was hired and
25 they didn't have a third shift, they had a room

Page 27

1 in pharmacy that had all of our medications
2 that the nursing supervisor, the nighttime
3 nursing supervisor, could come into and fill
4 prescriptions, okay?
5        Now, they didn't fill as many
6 prescriptions as we filled once we opened the
7 shift up, you know, and, in fact, before we got
8 a tube system, the nurses didn't come down to
9 the pharmacy very often to get the middle of
10 the night meds, you know, that people were
11 going to be on the next morning. They would
12 wait for a delivery. But once we got the tube
13 system, they all wanted everything right now.
14        So, you know, I was filling remote
15 for Geauga, and I was filling remote for the
16 other things, and they had the nurses could
17 come down to pharmacy and get things and fill
18 them. Many times I would have to walk them
19 through it over the phone. If it was something
20 they never mixed before or had done anything
21 like that, I would have to walk them through it
22 and tell them, you know, these are the steps
23 that you have to do, you know, and -- what else
24 did I do?
25        If the rare, rare occurrence

Page 28

1 happened where they absolutely needed a
2 pharmacist to come in, they had pharmacists on
3 call. It never happened much, but, in a
4 certain situation, they might need the
5 expertise of that pharmacist. But I emphasize
6 again, it was very, very rare that they would
7 call them out.
8        Here's the other thing, too, about
9 the machines, the Omnicell machines, the nurse
10 can override. The nurse, he or she doesn't
11 have to -- I'm an old guy. I still say she for
12 nurse, and I shouldn't. But, anyhow, they will
13 override and give the medications before I've
14 even looked at them oftentimes because the
15 order has to be entered, especially in the
16 emergency room, and computerized physician
17 order entry is just that, it's based on the
18 physician.
19        That poor person is really busy in
20 the ER at night, so they don't prioritize
21 putting in the order right away. They might
22 tell the nurse give so-and-so over there, you
23 know, a shot of erythropoietin, you know, or
24 20 units of insulin or something like that, and
25 it might be done an hour before that physician

Page 29

1 ever enters the order in no matter how fast I
2 do it.
3        Because I was supposed to have them
4 entered in on average of 7 minutes. So I had
5 to keep an eye on the queue, and I for sure,
6 and if you want any data on it, just look it
7 up, I for sure met that. I was always -- I
8 think I was always the quickest pharmacist to
9 get to the orders because, once again, I had a
10 system.
11    Q.  Now, I remember that at one point
12 you were concerned with the new pharmacy that
13 was built that there was a lot of leaning over.
14    A.  Oh, God.
15    Q.  What was that? Why would you have
16 to lean over in the pharmacy that caused you an
17 issue?
18    A.  Well, I think I showed you on that
19 video, and I think it illustrates it the most.
20 When we were in the old pharmacy, it was
21 smaller, more compact. It was sort of like
22 this room here (indicating). You could reach
23 out and grab and do everything, and things were
24 up higher off the ground.
25        I don't know who designed the new

Veritext Legal Solutions
www.veritext.com                                888-391-3376

Page 30

1 pharmacy, and I know there is always critics
2 when there is change and stuff, but I think
3 universally it could have been done better, and
4 for a person like myself, it was just the
5 opposite of what I needed, long -- it was a
6 long distance for me to go answer the window.
7 It was a long distance for me between
8 telephones. If I wasn't at my desk, I had to
9 really traverse a long way.
10           Then when I had to get medications,
11 most of them were below waist level. Where
12 before they used to be up higher, they were
13 below waist level, and there was no lighting
14 down there, either. For me with my condition,
15 bending is the worst thing that I could do, and
16 that wears my legs out and wears me out more
17 than anything, the bending and trying to get
18 the medication from way down on a shelf or
19 bending down on my hands and knees because they
20 were inches off the ground, and then I'm
21 calling for a tech because I've got to grab her
22 shoulder to get back up or I've got to grab
23 onto something to get back up. So --
24    Q.   So but what that tells me is you
25 were actually physically filling prescriptions

Page 31

1 or getting medications.
2    A.   Absolutely. Let me just say this,
3 okay? Let me just say this. Patty Tumbush,
4 when we were having the discussions about my
5 accommodation -- and that was always the
6 elephant in the room, the telework, I never
7 gave up on that no matter what happened. It
8 was always the elephant in the room, and we
9 never actually ever sat down and had my input
10 on all my experience with it and the benefits.
11           But, anyhow, Patty Tumbush assured
12 me at the time, I'm hiring in techs on each
13 shift, and they are going to help you. Well,
14 that wasn't the case at all. Those techs came
15 on, and I had to shield them from -- they had
16 so many jobs to accomplish. They had to cart
17 fill. They had two major Omnicell fills, one
18 right around 10:00 at night and one right
19 around 5:30 in the morning for every nursing
20 unit in every department in the hospital, and
21 they were busy.
22           So I told them, John Long and
23 Tracey Thoms, when they came in, I said,
24 Listen, I don't want you guys -- you don't have
25 to do new orders and you don't have to answer

Page 32

1 any phone calls and you don't have to fill
2 those new orders, okay? All I need you to do
3 is concentrate on the jobs that they gave you,
4 because if they didn't and they fell behind, we
5 weren't going to get that cart up there in the
6 morning for that exchange at 5:30 in the
7 morning, and that comes very quickly, and they
8 were busy.
9           I sent many an email to Patty
10 saying that you have shifted too much work onto
11 third shift. Third shift should be a caretaker
12 shift. It should be for immediate needs, and
13 that's it. It would have been -- it would have
14 been nice to have a tech with me just, you
15 know, freed up, but they were not freed up.
16 They were so busy, and the one, Tracey, she
17 left. She left before or right exactly when
18 her year was up. She couldn't take it there
19 anymore.
20           So I continued always doing what I
21 had always done for ten years, and with my
22 condition deteriorating, that was harder and
23 harder, but I feared -- I feared from the
24 moment that I even told anybody in 2018 about
25 my condition, named it, I always was limping,

Page 33

1 they could always see that, I always feared
2 FFD.
3    Q.   What is FFD?
4    A.   I can never remember. Something
5 for duty, fit for duty.
6    Q.   Okay.
7    A.   Fit for duty. I always was
8 concerned about them finding a way to say I was
9 not fit for duty. So everything is measured
10 there on the computers. So I could always rely
11 on those measurements to show that, hey, I'm
12 doing more than anybody, and I can't even walk.
13 So I was never -- I was concerned with fit for
14 duty.
15           But when I left there, I think I
16 was very much at the top of my game, and I
17 really could have transitioned into work from
18 home. You know, when I did work from home for
19 the Cleveland Clinic, once CPOE came in,
20 computerized physician order entry, I was
21 averaging 105 prescriptions an hour. The
22 pharmacist average was 47. I was averaging
23 1,050 prescriptions every ten-hour shift. We
24 were on ten-hour shifts there.
25           So I knew from knowing Geauga and

Page 34

1  knowing their workflow, I knew the things that
2  I could take on at home, and it really, and I
3  stressed it all the time, it could have been a
4  win-win situation for everybody.  It could have
5  been a win-win situation for everybody.
6      Q.   Why did you fear the fit for duty?
7      A.   Well, when I had to file formal
8  papers in 2018, okay, the first thing that came
9  out was I asked for work from home, and the
10 first thing that came from that committee, I
11 can't remember right now what the committee is
12 called, the first thing that came from that
13 committee was they wanted to put in a request
14 to my doctor asking if I was fit for duty.
15          That was like, you know, I had
16 been, you may differ, but I had been subject to
17 a hostile work environment for years before
18 2018 as evidenced in my previous lawsuit which
19 Cindy was here for.  Welcome back, Cindy.
20          Anyhow, when I saw that and they
21 were going to ask my physician if I was fit for
22 duty, how the heck would she know if I was fit
23 for duty, you know?  Being in a hostile work
24 situation, I knew any little excuse -- I had a
25 target on my back, and any little excuse would

Page 35

1  be a reason to get rid of me, and I had two
2  young sons who depended on me, and I was
3  fearful of that.
4      Q.   In 2018 when you put in your
5  request for an accommodation for the first
6  time, could you perform all of the essential
7  functions of your job?
8      A.   Absolutely.  I could perform all
9  the essential functions of my job the day I was
10 let go.  I was.
11     Q.   So was there ever a time when you
12 could not perform the essential functions?
13     A.   There was never any time.
14     Q.   And could you fulfill the essential
15 functions of your job without an accommodation
16 even?
17     A.   Yes.  Oh, yeah.  I was -- I was
18 still fit for duty, yes, of course, and you
19 have data that shows that I was.  You know,
20 there was no fall off.  There was not a bit of
21 fall off.  Like I said, I stressed, I was at
22 the top of my game when I was terminated.
23     Q.   So essentially you were looking for
24 an accommodation not because you needed it to
25 do the essential functions of your job, but to

Page 36

1  make it easier on you?
2      A.   I don't know if I would say that.
3  I don't know what I would say.  But I wanted it
4  because I needed to have a job where I could
5  sit or stand as I could and not have to walk
6  and not have to bend and not have to lift heavy
7  loads, not have to do things like that.  I did
8  them all, you know.
9           The other thing was the commute was
10 an hour there and back, and it was getting
11 dangerous for me in the morning.  Because
12 dragging two dead legs around all night besides
13 the challenges of shift work, working third
14 shift -- you know, working third shift I would
15 tell people all the time is like what they used
16 to say about Ginger Rogers and Fred Astaire.
17 Yeah, everybody thought Fred was a great
18 dancer, but Ginger did everything backwards and
19 in heels.  And that's what third shift is.  You
20 know, you're under the weather all the time as
21 far as sleep and awareness goes.  So to be
22 dragging these legs around with me and having
23 to drive home, it became dangerous.
24     Q.   Did you ever look into a
25 hand-operated car?

Page 37

1      A.   No.  I never looked into it, a
2  hand -- it never got to that point.  But what
3  would happen would be especially since we moved
4  into that new place and I was walking longer
5  distances, my legs were more fatigued.  I was
6  more fatigued.  So in the morning -- my left
7  leg is worse than my right.  So the one good
8  thing was my right --
9      Q.   But it wasn't to a point where you
10 needed to look into having a car that was
11 operated by hand?
12     A.   I could have, but I never did.  I
13 never even thought of that.  That was never
14 suggested, and I never even thought of it.
15     Q.   Did you ever have any discussions
16 with your doctor about what you needed at work?
17 You know, I've looked through her medical
18 records, and I didn't see that you did, but
19 maybe you did.
20     A.   No, no, no, because I was -- I was
21 doing okay.
22     Q.   Okay.
23     A.   The big change was as soon as we
24 moved into that new facility, it was a
25 watershed event.  It was set up just the

Page 38

1  opposite of the type of environment that I
2  needed with my disability.
3      Q.   But even after the new facility,
4  you did not talk to your doctor about any --
5      A.   Well, she might not -- my doctor is
6  my friend.  I worked with her up at Northside
7  Hospital.  She was a resident for years, Denise
8  Bobovnyk.  You know, I knew about her from high
9  school on and everything like that.
10         Yes, I cannot recall a specific
11 thing, but we did discuss things, and I
12 remember the one time her saying to me, Why
13 won't they give you an accommodation?  I go, I
14 don't know.  I says, I don't know.  I said,
15 They don't want to -- they are dead set against
16 work from home, I said, because -- I didn't
17 know if it was because -- it could have been
18 because of me, or it could have been because it
19 was something they didn't quite understand, and
20 I think the discussions would have been very
21 enlightening.
22     Q.   Let's be clear about something.
23 They did give you an accommodation.  They just
24 didn't give you the work from home
25 accommodation, right?

Page 39

1      A.   No, I wouldn't call that an
2  accommodation.  What I would say is they gave
3  me a parking place.
4      Q.   Right.  They give you a special
5  parking place.
6      A.   However, that went away when we
7  moved into the new facility.  So when we moved
8  into the new facility, the distance was
9  greater, the travel distance to the pharmacy,
10 and the handicap spot where you would go up
11 with the walker was way far away.
12         So I had to go up over a curb every
13 night, come to the back door, ring the door, go
14 down a long hallway, and then I was at the
15 thing.  So it went away as soon as we moved.  I
16 credit Heather Harmon.  She was terrific, and
17 she got me that space.  I just think that I'm
18 very appreciative of it.
19         But that never, that space or
20 anything else they ever did, the elephant in
21 the room was always work from home.
22     Q.   Well, they did do some other
23 things, right, besides the space?
24     A.   Well, you're going to have to
25 refresh my memory.

Page 40

1      Q.   They allowed you to use PTO for
2  shorter periods of time than would normally be
3  used.
4      A.   Well, it was all PTO I had
5  accumulated.
6      Q.   But they allowed you to use it in
7  small increments on a regular basis; didn't
8  they?
9      A.   I think they would allow just
10 anybody to do that.  I don't think that was
11 anything special.  It cost me.  You know, I was
12 down to zero practically when I left.  No, that
13 wasn't really an accommodation I don't feel.
14     Q.   They made sure that you had
15 bathrooms available that you could use that
16 were -- that you had several choices, right?
17     A.   No.  Let me say this about
18 bathrooms.  I'm so happy you brought it up.
19 Once again, you have the documents on this.
20 You have the emails between me and Heather and
21 me and Patty.  When we were in the old
22 pharmacy, there was a mens room right down the
23 hallway from the pharmacy, just steps from it,
24 a female and a male separate, okay?  That was
25 in the lab area which was right outside the

Page 41

1  pharmacy door.
2          For about two years, I think it was
3  about two years, I could be wrong, don't hold
4  me to that, they were renovating the
5  laboratory, and they took out those two
6  close-by restrooms.
7          So now I had to either take an
8  elevator up to the first floor and go down the
9  hall to a small bathroom on the left down the
10 hall, I think that was One South if I can
11 remember, or they renovated finally a bathroom
12 that this office was using into a co-ed
13 bathroom that was way down a hall and around
14 the bend.
15         So going to the restroom, which is
16 a frequent occurrence with the disease that I
17 have because you tend to urinate a lot, and I
18 urinated a lot, you don't know -- I would -- I
19 got -- there weren't like any rest areas or
20 anything in my commute past Warren.  One time a
21 cop caught me right after I had to pull off the
22 road and urinate, and I was honest with him.  I
23 said, Hey, I got caught short.  There is no
24 place to go here.
25         But those restrooms, so it might

Page 54

1  see how things were going.
2      Then more toward April and May, I
3  found that she was coming in to tell me about
4  write-ups or something, and I fully expected
5  her to always come in before 6:00 before I left
6  at on the last day of my rotation, whenever
7  that was, if it could have been a Tuesday or it
8  could have been a Wednesday.
9      Q.  Because she had been coming to see
10 you near the end of your shift with various
11 write-ups or issues that she wanted to talk to
12 you about your performance, right?
13     A.  Yes.
14     Q.  Do you need a break, or you're
15 good?
16     A.  Well, I may start resorting to this
17 (indicating) because I think we're just
18 rehashing old stuff, and you have all those
19 documents.  You have all the play-by-play in
20 real time, so me saying something is
21 really -- you know, it's just incriminating
22 myself.
23     Q.  You're just saying again that you
24 would rely more heavily on the writings that we
25 have than your testimony here today because the

Page 55

1  writings you think tell the story?
2      A.  They absolutely do.
3      Q.  Okay.
4      A.  In real time.
5      Q.  Is there anything you think is
6  important to your case that isn't in the
7  writings?
8      A.  I can't think of anything.
9      Q.  So if I were to go to the judge
10 with just what we have in written form, you
11 would say that is an accurate portrayal of what
12 happened?
13     A.  I'm going to just have to do this
14 right now because that's just such a --
15     Q.  I'm asking you if there is anything
16 other than the writings because I'm giving you
17 your chance to fill in any gaps you think there
18 are in the writings.
19     A.  You possess the documents that
20 answer the question.  Anything that I would say
21 could only be used to incriminate me.
22 Therefore, I assert my right against
23 self-incrimination, and I invoke the Fifth
24 Amendment.
25         MS. KAMINSKI:  All right.  Let's

Page 56

1  take a break for a moment.
2          (Brief recess.)
3          MS. KAMINSKI:  We can go back on
4  the record.
5      Q.  Let's go back to May 27th, 2020.
6  You worked your normal night shift that night,
7  right?
8      A.  Same reason, same answer.  I invoke
9  the Fifth Amendment.
10     Q.  Okay.  And when you -- and your
11 shift was due to end at 6:00, right?
12     A.  Correct.
13     Q.  And that was your usual end time,
14 the 6:00 a.m.?
15     A.  Let me just say this, it's never a
16 hard and fast time.  It's all dependent on
17 whatever is happening, whatever the action is.
18     Q.  Who was supposed to be the next
19 pharmacist to come on duty that day?
20     A.  Same reason, same answer.  I invoke
21 the Fifth Amendment.
22     Q.  Did you have some concern that that
23 pharmacist that was going to relieve you had
24 been exposed to COVID?
25     A.  The pharmacist that was going to

Page 57

1  relieve me, no.  I was concerned that the two
2  pharmacists who showed up between -- usually
3  they came in before 6:00, Lisa Farah, the one
4  pharmacist, Lisa Farah, and the pharmacy tech,
5  Tina Creedon, were going to expose me to COVID.
6      Q.  Who was the pharmacist who was
7  supposed to relieve you?
8      A.  Same reason, same answer.  I invoke
9  the Fifth Amendment.
10     Q.  I'm just looking for the name.
11     A.  Same reason, same answer.  I invoke
12 the Fifth Amendment.
13     Q.  Had you talked to the pharmacist
14 that was going to relieve you, had you talked
15 to them on the night of 5-26 or the morning of
16 5-27?
17     A.  Same reason, same answer.  I invoke
18 the Fifth Amendment.
19     Q.  Did you know what time they were
20 actually going to be there?
21     A.  Same reason, same answer.  I invoke
22 the Fifth Amendment.
23     Q.  Why were you concerned that Lisa
24 Farah had been exposed to COVID?
25     A.  Same reason, same answer.  I invoke

Page 62

1   Q.   It was dismissed without any
2  findings, correct?
3   A.   Same reason, same answer. I invoke
4  the Fifth Amendment. Can I say one thing on
5  the record?
6   Q.   Sure.
7   A.   I may revisit that OSHA complaint
8  with the things that have been revealed during
9  this case.
10  Q.   What do you use as support for your
11 allegation that the reason you were terminated
12 was in retaliation for your request for an
13 accommodation?
14  A.   Same reason, same answer. I invoke
15 the Fifth Amendment.
16       Oh, one of the other documents came
17 to mind. You have the emails with which I have
18 gone back and forth, so those are the three
19 things; EEOC, the court filings, and the
20 emails.
21  Q.   Now, you don't dispute that prior
22 to your termination for the actions on the
23 morning of 5-27-2020 that you had had various
24 discipline with UH throughout your career?
25  A.   Same reason, same answer. I invoke

Page 63

1  the Fifth Amendment.
2   Q.   You're not going to answer any
3  questions about your prior discipline; is that
4  what I understand?
5   A.   Same reason, same answer. I invoke
6  the Fifth Amendment.
7   Q.   So you would refer me to UH's
8  corrective actions and various disciplinary
9  documents to tell the story as to what happened
10 with your prior discipline; is that correct?
11  A.   Same reason, same answer. I invoke
12 the Fifth Amendment.
13  Q.   Did you ever have a discussion with
14 Patty about the issues surrounding vancomycin?
15  A.   Same reason, same answer. I invoke
16 the Fifth Amendment.
17  Q.   Do you dispute that you entered
18 incomplete documentation in the patient's
19 medical record regarding the vancomycin doses?
20  A.   Same reason, same answer. I invoke
21 the Fifth Amendment.
22  Q.   Do you dispute that there was ever
23 any issue with your dispensing of vancomycin
24 for patients at Geauga Community Hospital?
25  A.   Same reason, same answer. I invoke

Page 64

1  the Fifth Amendment.
2   Q.   Other than in the course of this
3  litigation, the discussions you've had with the
4  lawyers and the judge, have you had any
5  discussions with third parties that aren't part
6  of the litigation about the litigation?
7   A.   Could you define "about the
8  litigation"?
9   Q.   Any discussions about what your
10 claims are.
11  A.   I may have generally discussed some
12 things -- not discussed some things, just
13 informed people. When I was terminated, okay,
14 I left all my friends. I didn't get a chance
15 to say good-bye and, believe it or not, I was a
16 pretty popular guy there. Not especially
17 within the pharmacy department, I was okay
18 popular there, but I was really popular with
19 the nurses and doctors who worked third shift.
20 We're like a tribe together. I provided very
21 good service.
22       But I wanted to let people know
23 what had occurred and how I disputed it, you
24 know. We haven't -- you know, we didn't get
25 into the EEOC and stuff yet like that, but I

Page 65

1  just wanted to let them know, look, this has
2  happened, you know, and I'm going to be okay,
3  and I enjoyed working with you, and, you know,
4  stay in touch.
5   Q.   Okay. And other than those types
6  of general notice to somebody that you're not
7  going to be working there anymore and why, did
8  you have any discussions with anybody where you
9  were asking them if they would be a witness for
10 you?
11  A.   Absolutely not.
12  Q.   Okay.
13  A.   Absolutely not. That's why I'm not
14 deposing anybody, because I do not want to
15 involve anybody else. I don't need anybody
16 else. I said that from the CMC on. I know the
17 court can't understand how I can win not
18 deposing anybody because that's the standard
19 practice.
20       I did not want to involve anyone in
21 this. I don't need their testimony, and I
22 don't want them to whether or not they would
23 feel like they are vulnerable. So, no,
24 absolutely not.
25  Q.   Who do you think it is that

Page 70
1  a remote work site that I have my name on
2  there.  It's sort of like an Indeed-type thing
3  but for remote work, so if you consider that
4  looking for a job.  I mean, when it comes up, I
5  read it, but unless it's remote, I couldn't do
6  it.
7       Q.   Your Social Security has continued
8  to this day, correct?
9       A.   Yes, it has.
10      Q.   Now, you're not on any social
11 media?
12      A.   No.  I had a -- I bought Twitter
13 stock when it first came out on the -- on the
14 recommendation of my son who was a, you know, a
15 teenager at the time.  I figured he would know,
16 and he thought Twitter was going to be for sure
17 bigger than Facebook.
18           So I sold all my Facebook stock at
19 about $60 a share, and I piled into Twitter
20 around 30-some dollars.  Then it went up to 55
21 or 56.  On the luckiest day of my life, I was
22 down in the basement, and I just go I'm getting
23 rid of that Twitter stock, and I got rid of it.
24 By the time I came up, on CNBC Twitter had
25 taken a big dip.  It lost 20-some points or

Page 71
1  something.  I go, Oh, my God.  I just sold it,
2  I go, for $56.
3            I had Facebook.  What's it at now?
4  Oh, my God.  I wouldn't have had to do this if
5  I kept Facebook.  So blame my son for all this.
6       Q.   Okay.  I will do that.
7       A.   The only social media I was on, and
8  it's still on there because I don't know how to
9  take it down, was Twitter because I wanted to
10 see how it worked or something, but I never
11 really figured out how to make it work or
12 anything like that.  I mean, this guy Larry I
13 tweeted something to about sports or something.
14 I'm not on Facebook.  I'm not on any of that
15 stuff.
16           Listen, I've got too many people in
17 my past.  I don't want them to know what I'm
18 doing or where I'm at, you know?  I don't want
19 them to know, especially my ex-wife.  She was a
20 good person.
21           THE WITNESS:  This is off the
22 record, right?
23           MS. KAMINSKI:  You can go off the
24 record if you want.
25           (Brief recess.)

Page 72
1            MS. KAMINSKI:  We'll go back on.
2       Q.   Now, during your shift on the third
3  shift, was one of the things you would have to
4  do is compound sterile products in the IV room?
5       A.   Yes.  Not -- no, no, no, wait.  No,
6  I didn't do it in the IV room.  I was told to
7  do it on the counter.
8       Q.   Okay.
9       A.   Okay?  So it wasn't technically
10 sterile because I was doing it out in the open
11 air.
12      Q.   But that is one of the things you
13 had to do is compound --
14      A.   Absolutely, because -- because,
15 once again, I had to keep that workload off of
16 my two techs.  I had to keep them freed up, or
17 I'd have been really behind the eight ball.
18      Q.   Now, let's assume that an emergency
19 comes in to Geauga Hospital, a car accident
20 with severe injuries.  Would you play any role
21 in providing the recommended pain medication or
22 any of the treatments that the emergency room
23 docs might need?
24      A.   I verified the orders that the
25 doctor would decide on 99 percent of the time.

Page 73
1  I played no role in his decision-making unless
2  he asked me to play a role.  So I was like a
3  catcher.  I caught everything that people threw
4  at me.  So it might get more intense at certain
5  times, boom, boom, boom, boom, boom.
6            But, like I told you, as far as the
7  emergency room goes, when it's an emergency
8  like an accident and stuff, I could end up
9  verifying orders that are a half hour to an
10 hour old.  They gave it already, and they just
11 got around to entering it, and that was
12 especially true in emergencies like you
13 described.  We had a lot of emergencies with
14 Amish where they hit into a buggy or hit a
15 horse or something.
16      Q.   Now, would you need to be present
17 at the pharmacy in order to remove controlled
18 medications, or could they be --
19      A.   No.  They -- they have controlled
20 medications on each Omnicell.  Each floor has
21 everything.
22      Q.   Let's assume a floor uses up all of
23 their medications.
24      A.   We would have got a readout.  We're
25 always ahead of the game.  We're always