FILED

AUG 0 9 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

# UNITED STATES DISTRICT COURT DISTRICT OF NORTHERN OHIO

FRANK DOMINIC DUNDEE,

PLAINTIFF

vs

UNIVERSITY HOSPITALS HEALTH SYSTEM, INC

DEFENDANT

CASE NO. **1:22CV01351**

JUDGE DAN AARON POLSTER

MAGISTRATE JUDGE

THOMAS M. PARKER

## PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

The Plaintiff/Pro Se moves that the Defendant, University Hospitals Health System, Inc. (UH), be denied in their Motion for Summary Judgement in the instant case.  The Plaintiff/Pro Se has demonstrated that there is a genuine dispute as to material facts and that UH is not entitled to judgment as a matter of law on the claims or defenses raised in their Motion.   The Plaintiff/Pro Se instead asks the Court to grant the Plaintiff's Motion for Summary Judgement in Case No. 1:22CV01351.

Under the ADA, an employer may use a qualification standard that protects an individual with a disability if they pose a "direct threat" to themselves in the workplace. That term "means a significant risk of substantial harm."  Under EEOC guidance for the "direct threat standard," the

1

employer has an obligation to both assess the employee's disability and discuss with the employee how the "direct threat" of substantial harm could be eliminated or reduced by reasonable accommodation.

Whether an employee poses a direct threat to themselves requires this individualized assessment that is based on a reasonable medical judgment relying on the most current medical knowledge and/or on the best available objective evidence. The assessment must consider: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.

Based on guidance of the CDC and public health authorities as of March 2020, the COVID-19 pandemic meets the "direct threat standard."  The CDC and other public health authorities acknowledged that COVID-19 is highly contagious and potentially fatal; especially to high risk individuals like the Plaintiff/Pro Se, Dundee.

The duration of the Direct Threat during the pandemic began in March 2020.  The risk was for a definite period of time.  The nature and severity of the harm weighed in favor of a "direct threat" finding, given the potentially catastrophic consequences of the covid infection.

Representatives for University Hospitals never performed the required individual assessment under the "direct threat" standard; an assessment would have revealed that Dundee, recognized as disabled, was a "direct threat" to himself and should have been removed from the workplace, even if only temporarily, months before the morning of May 27, 2020.

University Hospitals failed in their obligations to its employees "recognized as disabled" under the "direct threat standard."  University Hospitals failed to engage with Dundee in meaningful and detailed discussions exploring the possibility of remote work from home, under the "direct threat standard."  This fact is especially egregious since Dundee was already

2

performing the essential functions of the job of hospital pharmacist 100% remotely, while nightly servicing UH Geneva Hospital, UH Conneaut Hospital, UH Andover Emergency Room and UH Ashtabula Urgent Care; the Court should note that Dundee argued for years that he also could provide all the essential functions of the job, remotely, servicing UH Geauga Hospital or any of the hospitals or health facilities within University Hospitals Health System, Inc.

University Hospitals had the flexibility to provide an accommodation of remote work temporarily; it would have removed Dundee from the workplace months before the morning of May 27, 2020.  The months from February 2020 through June 2020 were months where the nature and severity of the potential harm from covid transmission were the highest with the likelihood that the potential harm would occur with the imminence of the potential harm:

- The pharmacy staff were not provided with N-95 masks, the most effective/protective masks during the pandemic;

- There was no social distancing policy within the pharmacy department;

- There were no staggered shifts nor start times to reduce crowding and staff to staff transmission at shift-change;

- The geographic/demographic area surrounding UH Geauga Medical Center provided a steady stream of covid patients, such as the Amish who continued to socialize and anti-maskers, both prevalent in Geauga County;

- The narrow design of the pharmacy layout prevented social distancing with many narrow pinch-points that funneled works close to each other;

- A pharmacy policy that returned covid-exposed medications from covid patients to the pharmacy department for a "theoretical" decontamination process that exposed pharmacy staff to covid-contaminated products.

3

- Pharmacy managers did not adhere to CDC policy of 10 day quarantine for those exposed to persons who were covid positive;

- Pharmacy managers mistakenly believed that a negative covid test was assurance that a person could not transmit the virus.

For all of the above reasons, Dundee had a genuine, good faith belief that there was a "direct threat" of a significant and imminent risk of substantial harm from covid transmission, at shift change, on the morning of May 27,2020.

## Declaration in Support of Plaintiff's Opposition to the Defense Motion for Summary Judgment

The wave of remote work that has swept the nation since the COVID-19 pandemic has upended traditional notions about how and where work is performed. Advocates for disabled workers have lobbied for remote work for decades because the standard American workplace is designed around the nondisabled worker. The ability to work remotely is crucial to many workers with disabilities, such as the Plaintiff Dundee; it often determines whether they can maintain a job; *See Jen Geller, Remote Work Will Be a Legacy of Pandemic; Job Losses May Not Be Over, Survey Finds, CNBC (June 3, 2020, 10:25 AM), https://www.cnbc.com/2020/06/03/remote-work-will-be-legacy-of-pandemic-conference-board-survey-finds.html [https://perma.cc/6MAL-QHXL] ("Remote work may be the most influential legacy of the Covid-19 pandemic."); FRANK STEEMERS, ROBIN ERICKSON, AMANDA POPIELA & GAD LEVANON, CONF. BD., FROM IMMEDIATE RESPONSES TO PLANNING FOR THE REIMAGINED WORKPLACE:*

4

*HUMAN CAPITAL RESPONSES TO THE COVID-19 PANDEMIC 2 (Sara Churchville ed., 2020),https://www.conference-board.org/pdfdownload.cfm?masterProductID=20874 [https://perma.cc/M5XF-EPV6].*

And yet, most employers, UH being a prime example, have refused to embrace remote work as disability accommodation. The paradox and the irony is that remote work at UH, in the pharmacy department, has been established (and Ohio Pharmacy Board approved) at every hospital and urgent care facility in the University Hospitals Health System for at least a decade; this has been since the introduction of remote dispensing machines (Omnicell) on every Nursing Unit, Emergency Room, Surgery Unit and Cath Lab making upwards of 90% of pharmacy medication inventory available immediately to the end user, with or without remote authorization by a pharmacist.  The dispensing machines are remotely linked to the pharmacy computer system allowing the pharmacist to remain in the pharmacy while providing access to medications remotely, from a location that can be virtually anywhere in the world:

- https://youtu.be/cEDaV4OiEhU

- https://youtu.be/Rh3FQgxmdWo

The automatic resistance to remote work has often been based on assumptions, past practice, and a lack of imagination rather than a careful, evidence-based examination of what is feasible and reasonable in a particular situation, by the courts.  In litigation, courts typically side with employers, basing their holdings on evidentiary practices that inevitably elevate employers' concerns over those of employees.  Prior to the pandemic, when employees challenge employers' denials of remote work accommodations in court, the employees lose overwhelmingly: *See, e.g., Patrick Dorrian & Robert Iafolla, Asthmatic Worker Gets Covid-Related Telework Order, For*

*Now, BLOOMBERG L., DAILY LAB. REP. (Sept. 17, 2020, 5:38 PM),*

*https://news.bloomberglaw.com/daily-labor-report/asthmatic-worker-gets-covid-related-stay-*

*against-in-person-work [https://perma.cc/3RZV-TJLD]; Eisenstadt, supra note 127; Porter,*

*Working While Mothering, supra note 12, at 15; Iafolla, supra note 9; Erin Mulvaney,*

*Coronavirus Telework Tests Disability Accommodation Defense, BLOOMBERG L., DAILY*

*LAB.REP. (Mar. 16, 2020, 5:48 PM), https://news.bloomberglaw.com/daily-labor-report/*

*coronavirus-telework-challenges-disability-accommodation-defense [https://perma.cc/RJ7P-*

*6JKC] [hereinafter Mulvaney, Coronavirus]; Wagstaff & Quasius, supra note 128.*

This was made evident in **1:22CV01351** by surprising misstatements emanating from the Court during the Case Management Conference in December 2022, continuing through the Court's mediation conferences; those misstatements, "based on assumptions, past practice, and a lack of imagination rather than a careful, evidence-based examination of what is feasible and reasonable in a particular situation" forced the Plaintiff to file several Judicial Notices of Adjudicated Facts into the record to hopefully inform the Court "the wave of remote work that has swept the nation since the COVID-19 pandemic has upended traditional notions about how and where work is performed."

This Motion in Opposition makes two unique arguments related to the Plaintiff's reasonable requests for remote work accommodations, especially during the acute, "Direct Threat," phase of the covid pandemic:

- First, the Motion in Opposition identifies and categorizes the sometimes subtle, but usually dispositive, evidentiary practices and analyzes how each is legally unsound; what the pandemic has taught us about remote work further erodes the bases for these

practices, rendering them indefensible and Courts should abandon these evidentiary shenanigans.

Second, this Motion in Opposition studies federal remote work accommodations decisions between April 2020 and December 2022; the results are mixed, but there are hopeful signs that some courts are changing practices in light of the mountain of data the pandemic-induced nationwide remote work experiment has generated, in order to help disabled workers, like the Plaintiff/Pro Se, ensure they have a fair chance in court.

There are several faulty evidentiary practices courts have used in rejecting remote work accommodation claims.  One of the most prevalent and damaging evidentiary policies is the oldest, the court's presumption against remote work:  *See Vande Zande v. Wis. Dep't of Admin., 44 F.3d 538, 544–45 (7th Cir. 1995); Kanter, supra note 12, at 1950–52; Travis, Recapturing, supra note 47, at 29.*

This presumption states that because physical presence is required for nearly all jobs and that only in "very extraordinary" circumstances will remote work be feasible, remote work is presumably unreasonable.  The Court's presumptions were revealed in **1:22CV01351** during the Zoom Conference, CMC meeting in December 2022, where the Court presumed that the work environment of the hospital pharmacist was the same as the work environment the Court was familiar with at their local retail pharmacy.

The most influential case around presumption is the Seventh Circuit's 1995 decision in *Vande Zande v. Wisconsin Department of Administration; 44 F.3d 538 (7th Cir. 1995).*  Scholars have harshly criticized Vande Zande, and rightly so;  *See, e.g., Eisenstadt, supra note 127;*

*Hickox & Liao, supra note 5, at 42–43; Kanter, supra note 12, at 1950–52, 1954; Travis,*
*Recapturing, supra note 47, at 29–30.*

Even assuming Judge Posner was correct in 1995 that nearly no jobs could be performed
remotely, crafting a legal presumption based on that supposed fact is inconsistent with the ADA.

- The Plaintiff/Pro Se, by use of Judicial Notices of Adjudicative Facts in **1:22CV01351**,
  has tried to increase the Court's understanding that the extensive use of remote
  technology in the hospital pharmacy workplace is the rule rather than the exception; even
  when the Plaintiff/Pro Se is physically present in the workplace, he is working remotely.

Nothing in the ADA's text or regulations establishes a presumption against remote
work.  A core ADA principle is that each case is to be evaluated individually; presumptions are
incompatible with individualized inquiries. Presuming that every job requires physical presence
short-circuits the required case-by-case assessment and allows employers to get by with denying
remote work accommodations based on little to no evidence.

Judge Posner violated the ADA's individualized assessment requirement because he did not
analyze the specifics of Ms. Vande Zande's job before determining that her employer was not
required to allow her to work remotely; the Plaintiff/Pro Se, in **1:22CV01351,** was blindsided at
the CMC in December, 2022, with the Court's mistaken presumptions that would have short-
circuited the Plaintiff/Pro Se's claims, causing the filing of numerous Judicial Notices of
Adjudicative Facts to put facts in place of the Court's mistaken presumptions.

Communication and other technology have obviously exploded since 1995.  Many courts
relying on Vande Zande have quoted the first part of Judge Posner's statement—about all but the

most very extraordinary jobs not being conducive to effective performance at home—and skipped over the admonition that "[t]his will no doubt change as communications technology advances." More enlightened courts have recognized that technological breakthroughs have substantially undermined Judge Posner's rationale so that even if a presumption against remote work was justified in 1995 based on technological limitations, it is not today; especially the Plaintiff's multiple, reasonable requests for telework from home in a pharmacy department that is remotely driven; *See Ford, 782 F.3d at 776 (Moore, J., dissenting); Bixby v. JP Morgan Chase Bank, N.A., No. 10 C 405, 2012 WL 832889, at \*10 (N.D. Ill. Mar. 8, 2012). Even the Seventh Circuit has recognized that technology has weakened its rationale in Vande Zande. See Bilinsky v. Am. Airlines, Inc., 928 F.3d 565, 573 (7th Cir. 2019) ("Technological development and the expansion of telecommuting in the twenty-four years since Vande Zande likely mean that such an accommodation is not quite as extraordinary as it was then."); see also Eisenstadt, supra note 127 ("With millions of workers conducting all business through email, Zoom, Skype, Webex, FaceTime and the plethora of other online options, it should be clear to courts that the gut reaction of rejecting telecommuting claims out of hand is no longer defensible.").*

A second evidentiary practice that severely disadvantages disabled workers in remote work accommodations litigation is extreme deference to the employer's judgment. Employers commonly deny remote work accommodations because the employer has already judged that in-person work is preferable or that the job's essential functions must be performed in the office. In these situations, if the employer's judgment is entitled to the most weight, the worker essentially has no chance to prevail.

Some courts even go so far as to label the employer's judgment about essential job functions (a genuine issue of material fact in **1:22CV01351**) or where work must be done as a presumption

or state that an employer is entitled to summary judgment if it uniformly requires all workers in that job to be physically present.  Both the irony and the paradox are that Human Resource personnel and managers are far removed from the day-to-day workplace and often cobble together job descriptions that rely on decades old assumptions and presumptions about how the job is to be performed; guesswork rather than fact.  It is the employee who must perform, in real time, under circumstances mostly unknown to the person who wrote the essential functions in the job description.  The job description when Dundee was hired in May 2010 is the same job description cited by the Defendant in this case; yet it is not an accurate description of the essential function of the job duties and how they were being performed at the time Dundee was terminated, in June 2020.

As with the presumption against remote work, this extreme deference to employer judgment, revealed by this Court in **1:22CV01351** at the CMC in December, 2022 and the mediation conferences in Winter 2023, often circumvents any detailed evidentiary analysis of the particular job at issue and results in employer victories based on little more than vague and conclusory employer assurances that attendance at work is important.

*Fisher v. Vizioncore, Inc.* demonstrates this over-deference principle. This extreme deference to employer judgment is legally incorrect. As with the presumption against working from home, this level of deference violates a foundational ADA principle: every case should be evaluated individually.  Relying on evidentiary policies that bypass the need for actual detailed evidence about the plaintiff's specific job and how it is performed is fundamentally inconsistent with this individualized assessment.

Excessive employer deference by the courts is inconsistent with the conception of essential job functions in the statute and regulations. The statute says that "consideration shall be given" to

10

the employer's judgment and the written job description when assessing which job functions are essential. It says "consideration"—not deference, much less dispositive weight. If employer judgment were conclusive, "then an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is 'essential,' avoid the clear congressional mandate" to provide reasonable accommodations.

Moreover, while the statute says employer judgment is a factor, it does not say it is the only factor. The EEOC regulations provide other relevant factors, including the amount of time spent performing the function and the work experience of current and former employees in the same or similar jobs. These additional considerations are obviously relevant, and nothing in the statute or regulations states that employer judgment is the most important consideration or that it somehow trumps the rules of the Plaintiff's evidence to nullify otherwise relevant evidence: *See Solomon v. Vilsack, 763 F.3d 1, 10 (D.C. Cir. 2014) (internal quotation marks omitted); McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013); see also Borkowski v. Valley Cent. Sch. Dist., 63 F.3d131, 140 (2d Cir. 1995) ("To avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.").*

Courts have correctly recognized that employer judgment is but one factor that should be considered, among others, when assessing the job's essential requirements and whether they can be performed remotely. As the Sixth Circuit explained, "[a]lthough the employer's judgment receives some weight in this analysis, it is not the end-all—especially when an employee puts forth competing evidence." *Hostettler, 895 F.3d at 855*

Another common basis the court uses in upholding remote work accommodation

denials is relying on an employer's general policies and preferences. Employers often use standard policies—such as a general prohibition on remote work or a remote work to reject a disabled employee's accommodation request to work from home.  The issue in these situations, such as the instant case, is not the employee's ability to do the work remotely—rather, it is the employer's preference that employees work on-site;  *See, e.g., Credeur, 860 F.3d at 794 (denying remote work accommodation based on vague statements that litigation attorneys cannot work at home long term); Spielman, 33 F. App'x at 444 (denying remote work because employee did not meet a performance statistic); see also Rehrs v. Iams Co., 486 F.3d 353, 357 (8th Cir. 2007) (denying accommodation based on "work culture"); Trout v. Elec. Data Sys. Corp., 151 F. App'x 390, 393, 399 (6th Cir. 2005) (denying remote work accommodation because plaintiff had not met service length requirement).*

The Plaintiff has provided evidence that conclusively illustrates this point: the Plaintiff's initial request for telework from home, officially submitted in August 2018, was rejected out of hand by the UH ADA Review Committee and the UH Pharmacy reporting structure; UH held steadfastly to that position, without discussion, until the Plaintiff was terminated, under pretext, in June 2020.

As with the presumption against remote work and overly deferring to employer judgment, allowing employers to deny remote work accommodations based on such blanket policies or an employer's general dislike of remote work negates the statutory requirement to examine the individual circumstances and to engage in an interactive process.  Evidence of the plaintiff's job functions and the feasibility of or burdens associated with remotely performing them is irrelevant if the employer's remote work policy is the beginning and end of the discussion: *see The Sixth*

*Circuit's decision in Black v. Wayne Center, Nos. 99-1225, 99-1249, 2000 WL 1033026 (6th Cir.*
*July 17, 2000).*

Allowing employers to automatically rely on blanket policies and procedures
represents a fundamental misunderstanding of the ADA's reasonable accommodation
requirement. Courts say that employers are not obligated to change their policies
and practices; but that is the entire point of requiring reasonable accommodations.
Accommodations inherently require a change in current practice. Employer preference
and convenience are not the overriding concerns; if remote work is reasonable, and
there is no other reasonable accommodation, the employer's general preference for
in-person work is beside the point. The ADA's reasonable accommodation requirement
rejects the idea of mandatory uniformity. As Justice Breyer explained in *US Airways,*
*Inc. v. Barnett*, "[b]y definition any special 'accommodation' requires the employer
to treat an employee with a disability differently, i.e., preferentially."

The fact that the difference in treatment violates an employer's disability-neutral rule cannot
by itself place the accommodation beyond the Act's potential reach. Courts, by allowing such
policies to avoid the reasonable accommodation requirement would negate the Act entirely; *See*
*id. ("Were that not so, the 'reasonable accommodation' provision could not accomplish its*
*intended objective."); Holly, 492 F.3d at 1263 ("Allowing uniformly-applied, disability-neutral*
*policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate*
*that ADA requirement.").*

The plaintiff's evidence is obviously important in any lawsuit, and that is certainly
true in remote work accommodation litigation, where employees will need evidence such
as what their job duties are, how they perform those duties (in real time), and how they could be

performed from home. But many courts engage in various practices that undervalue or flat out disregard this type of evidence; examples of this were voiced by this Court at the CMC and the mediation conferences in this instant case; this despite the fact that Dundee, because of his varied and in-depth experience, became the first full-time pharmacist hired into the work-from-home program at the Cleveland Clinic Department of Pharmacy, in 2007. The work-from-home program was critical in Clinic pharmacy operations during the covid pandemic.

In addition to the presumption against remote work, overly deferring to employer judgment, and relying on employer policies and preferences, courts further tip the evidentiary scales against workers by gutting an employee's evidence; *See Sperino, supra note 15, at 2107 ("Federal employment discrimination law is rife with evidentiary inequality. . . . Courts exclude evidence that workers offer and downplay the significance of even admissible evidence, while allowing employers great latitude in what evidence to admit and great deference as to what that evidence establishes."); see also Stone, supra note 155, at 111 (discussing three evidence-based practices judges often use in denying plaintiffs relief in employment discrimination cases).*

The Plaintiff in the instant case has presented real-time, relevant and documented evidence that was brushed aside as so much "gobbledygook" by this Court at the CMC in December 2022, causing the Plaintiff to operate ever since from a severe disadvantage. It is hoped that the Court will scrutinize the Plaintiff's evidence in a new light and rule against the Defendant's Motion for Summary Judgement.

Courts' distrust and disregard of employee evidence is often applied to evidence regarding what the job is and how it is done, including how it might be performed outside of the workplace. And it is not just a matter of giving defendants' evidence more weight. These courts explicitly refuse to even consider the worker's evidence. The Eighth Circuit stated that a

worker's "specific personal experience is of no consequence in the essential functions equation."

*Dropinski, 298 F.3d at 709; accord Minnihan v. Mediacom Commc'ns Corp., 779 F.3d 803, 812*

*(8th Cir. 2015)* In other words, only the employer's view matters.

This attitude is especially egregious in the instant case, because the Plaintiff, Dundee, was

the first full-time employee hired into the Pharmacy Department "work-from-home program" at

the prestigious Cleveland Clinic in 2007; the first remote work program in hospital pharmacy in

the State of Ohio fully approved by the Ohio State Board of Pharmacy.  Dundee was hired

because of his 32 years of broad experience in hospital pharmacy, in order to use Dundee's

expertise to build and develop the Cleveland Clinic's program into a seamless and successful

operation.  Dundee's "specific personal experience in the essential functions equation" flies in

the face of the court's opinion in *Dropinski, 298 F.3d at 709; accord Minnihan v. Mediacom*

*Commc'ns Corp., 779 F.3d 803, 812 (8th Cir. 2015).*

Dundee was the perfect candidate to consult in establishing a telework program at UH for the

Pharmacy Department; Dundee had more knowledge and experience than any of the 27,000 UH

employees.  Dundee also had far more knowledge and experience of remote work related to

hospital pharmacy than any administrator from the Ohio State Board of Pharmacy.  Yet there

were never any discussions regarding the implementation of remote work from either the

Pharmacy Management team nor HR nor the UH ADA Team, in violation of Title I of the ADA

and in violation of the "direct threat standard."

University Hospitals animus towards Dundee, for speaking truth to power over the years,

precluded any discussions of implementing telework from home as a reasonable accommodation.

The Plaintiff's evidence reveals that UH played a waiting game as Dundee's disability worsened,

to either have Dundee resign, dismiss him on a Fitness For Duty charge or find a pretext to terminate him.

The EEOC sent a strong signal in September 2021 that the direct threat presented to disabled individuals by the covid pandemic changed the landscape for reasonable accommodations of telework. It sued an employer who refused to allow Ronisha Moncrief, an employee with chronic obstructive lung disease and hypertension, to continue partially working remotely after the office reopened, even though other employees continued remote work; **EEOC v. ISS Facility Servs., Inc., No. 1:21-cv-03708 (N.D. Ga. Sept. 7, 2021), ECF No. 1.

This was the first suit the EEOC filed involving a COVID-19-related request for remote work. This suit is an indicator that the EEOC will take particular care to scrutinize employer's denials of remote work requests; especially if the employer was using telework as an instrumental resource prior to and during the pandemic, as is the claim by the Plaintiff Dundee in the instant charge. **The court ruled in the plaintiff, Moncrief's, favor in December 2022.

Much of the failure of remote work as a reasonable accommodation is rooted in evidentiary practices that routinely work to the disadvantage of employees—the presumption against remote work, outsized deference to employer judgment, reliance on blanket policies and preferences, and devalued or ignored employee evidence. As previously discussed, each of these practices is flawed on its own terms and, whether individually or in combination, has unjustly deprived most federal court plaintiffs a fair shake at having their day in court.

But even if these prior evidentiary practices were correct at the time, they are indefensible after what we learned during the "direct threat standard" of the covid pandemic in March of 2020. Contrary to the presumption that almost no jobs can be done from home, we

now know that over one-third can be performed entirely from home, and many others can surely be performed partially from home.

Much of the prior case law is based on generalities and assumptions, not on actual evidence relating to a specific employee's circumstances. The pandemic remote work experiment has generated mountains of data to challenge these big-picture assumptions about what is generally feasible in the workplace; *See Dorrian & Iafolla, supra note 131; Eisenstadt, supra note 127; Hickox & Liao, supra note 5, at 26; Travis, Post-Pandemic, supra note 12, at 229.*

Courts themselves are workplaces that went online during the pandemic. This newfound understanding of what is (and what is not) workable should go beyond the emergency of COVID-19; *See Deutsch, supra note 12, at 123 ("[A]fter the pandemic, courts—whose own chambers likely had to rely on technologies like videoconferencing during the pandemic—should recognize that teleworking is more feasible than previously understood."); Dorrian & Iafolla, supra note 131 ("Judges may be more empathetic to requests for telework accommodations based on their experiences during the pandemic . . . .").*

Employers and courts both should be forced to evaluate remote work requests considering this evidence, rather than just categorically ignoring what happened during the direct threat of the COVID-19 pandemic as the product of an emergency with no relevance to ordinary circumstances.

Employees are winning more ADA claims for telework as a reasonable accommodation than pre-pandemic. In the sixty-five cases involving remote work accommodations where the court (1) decided a motion to dismiss or motion for summary judgment on the accommodation claim,

(2) ruled on an injunction request, or (3) reviewed a remote work accommodation decision on appeal, employers prevailed thirty-three times, and employees prevailed in the other thirty-two cases. Prevailing here means the plaintiffs at least survived to continue litigating their case. Surviving thirty-two of sixty-five times is 49.2%, and that is not insignificant, given the overall very low success rate of employment discrimination cases generally and disability cases in particular; *See supra notes 8–9 and accompanying text; Ruth Colker, Speculation About Judicial OutcomesUnder 2008 ADA Amendments: Cause for Concern, 2010 UTAH L. REV. 1029, 1029–32; Nicole Buonocore Porter, Explaining "Not Disabled" Cases Ten Years After the ADAAA: A Story of Ignorance, Incompetence, and Possibly Animus, 26 GEO.J. POVERTY L. & POL'Y 383, 384–86 (2019).*

How and where a disabled employee works is one of the most obvious influences on the daily lives of the disabled worker; and never has the where of working been in sharper focus than now. The wave of pandemic-induced remote work, especially factoring in the employer responsibility to assess their disabled employees under the "direct threat standard" of March 2020, has revolutionized the structure of American work. It is vital that part of this reshaping accounts for the needs of individuals with disabilities, such as the Plaintiff in this instant charge, who wanted to continue working via telework for University Hospitals. Remote work has long held promise for individuals with disabilities. It is not a perfect solution, but for many, like the Plaintiff, working from home makes working less painful, more dignified, and technologically feasible; the Plaintiff hoped very much that remote work would extend his career to age 70 and provide financial stability for his family.

University Hospitals allowed personal animus against the Plaintiff to cloud its judgement, preventing a win/win situation that would have increased pharmacy productivity and improved

patient care; UH had the perfect employee to telework from home, using the expertise and experience in telework that the Plaintiff had accumulated establishing the telework program at the Cleveland Clinic and the expertise and experience accumulated over at least a seven year period providing the essential functions of the job by telework for UH Conneaut Hospital, UH Geneva Hospital, UH Andover Emergency Clinic, UH Ashtabula Urgent Care and at UH Geauga Hospital.   For the Plaintiff, remote work provided the only path to remain in the workforce at UH.

## Statement of Genuine Issues of Material Fact in Dispute

The fact issues in the instant case are material. The Plaintiff/Pro Se has raised genuine issues of fact.  The genuine fact issues are not frivolous and have evidentiary support to back up the allegations that University Hospitals violated EEOC laws under the "direct threat standard," Title I of the ADA and under Title VII for retaliation against a protected activity. These facts are such that would be admissible in evidence at trial and are based on personal, firsthand knowledge, not hearsay or opinion.

In the instant case, a jury examining the facts could reasonably find for the Plaintiff by a preponderance of the evidence, 50 +1, as all reasonable inferences from the facts could be determined to be more likely than not in favor of the Plaintiff.  The material facts in dispute:

1.  The fact that employees Lisa Farah and Tina Creedon should have been permitted to quarantine for the CDC recommended 14 days, at the time, after exposure to immediate family members who were confirmed to be positive for the covid virus and not ordered to report to work on the morning of May 27, 2020.  The Court should note that Geauga

Pharmacy Department had more than enough staff to allow those two individuals to quarantine for 14 days.

2. The fact that both Lisa Farah and Tina Creedon presented a "direct threat" of transmitting the covid virus to pharmacy and hospital staff when ordered to report to work instead of being permitted to quarantine for 10 days, on May 27, 2020.

3. The fact that University Hospitals Health System Inc., accepted Federal funds under the CARES Act in order to compensate for paying employees under quarantine and paying for their replacements, in order to keep the workplace safe; and yet did not used those funds as directed.

4. The fact that under the CDC and EEOC designation of the covid pandemic as a 'direct threat" in March 2020, that the Plaintiff Dundee, being at high risk from covid at nearly age 67 and with a neuromuscular disability of Hereditary Spastic Paraplegia, was at high risk and presented a "direct threat" to himself by reporting to the workplace.

5. The fact that University Hospitals had an obligation under the EEOC "direct threat standard" to perform an assessment of all employees with known disabilities in order to determine accommodations that might be necessary to protect those individuals by removing such employees from the dangers of physical presence in the workplace; *See Plaintiff's Motion for Summary Judgement and Supplemental Pleading.*

6. The fact that under Title I of the ADA representatives from University Hospitals were obligated to discuss the reasonable accommodation request of remote work with Dundee and flatly refused such discussions over a period of nearly 22 months. Most egregiously, UH refused to discuss the reasonable accommodation of remote work during the acute

phase of the covid pandemic, from January 2020 to June 2020, including during the period of "direct threat" from March 2020:

- The fact that although UH will protest mightily that its representatives provided Dundee with "reasonable accommodations," over a period of years; reasonable persons could conclude that UH provided no meaningful accommodations under Title I of the ADA. Dundee was forced to use his own PTO time in order to work one less day per 7-day schedule, until his PTO was used up.

- Dundee was required to obtain the consent of the 2ⁿᵈ-shift pharmacist to be permitted to arrive late as needed.

- The most significant accommodation was that HR presented Dundee with a dedicated parking space nearer to the hospital entrance; and that parking space was taken away when the pharmacy department moved to the other side of the hospital in January 2020; from that point until his termination, Dundee had to travel, using his wheeled walker, much further just to reach the relocated pharmacy department, even as his disability worsened.

- Note that the UH Geauga Campus is located in the prime snowbelt area of Northeastern Ohio.

7.  The fact that there is much email evidence of "conversations" between Dundee and various representatives for UH, the Court should NOT mistake those emails as fulfilling the EEOC responsibilities for reasonable accommodation discussions; those emails were pleas from Dundee for an accommodation of remote work from home from August 2018 until June 2020.  Responses from UH, such as varied start times WITH APPROVAL, were merely delay tactics.  **It must also be noted by this Court that the requests from

Dundee for "part-time work" were desperate attempts to hang on (Dundee even stated as much saying that he couldn't even handle part-time, on-site, as it got closer to June, 2020).

8.  The fact that UH never officially confirmed nor provided Dundee with a part-time pharmacy position while he was actively employed.  Part-time was never set in stone.  And part-time would NOT have been an effective solution for Dundee's disability; just a stop-gap measure, possibly lasting fewer than two months due to Dundee's worsening condition.

9.  The fact that representatives of UH lied to OSHA, the EEOC, the Ohio State Board of Pharmacy and this Court by claiming that Dundee had abandoned the workplace and left a pharmacy technician alone in the pharmacy department and using such claims as a pretext to wrongly terminate and retaliate against Dundee; *See irrefutable data from the Plaintiff's Supplemental Pleading.*

10. The fact that Dundee had a reasonable belief that his life was under imminent danger from the "direct threat" posed by two staff members who had been exposed to immediate family members positive for covid and who were not permitted to quarantine for the recommended 14 days, on the morning of May 27, 2020.

11. The genuine dispute over the "essential functions" vs. the "marginal functions" of the job of the pharmacist, regarding granting Dundee's reasonable request for remote work from home.  The fact that Dundee provided the "essential functions of the job of pharmacist" to UH Geneva Hospital, UH Conneaut Hospital, UH Andover Emergency Room and UH Ashtabula Urgent Care one hundred percent remotely from his computer and phone located at UH Geauga Hospital.  In addition, Dundee provided all of the essential

functions of his job remotely at UH Geauga Community Hospital; any other services Dundee provided at UH Geauga would be considered "marginal" by reasonable jurors.

12. A NEGATIVE COVID TEST IS NOT CONCLUSIVE; only a positive test is conclusive; a negative test only indicates that the test did not detect the virus; the virus could be present and transmissible in the person who was exposed to the virus and tested negative. The only certain measure proven effective during the "Direct Threat" phase of the pandemic is a 14-day quarantine. People who test negative may still be infected. Rampant community transmission of the coronavirus and a crippled vaccine rollout boxed people into a corner: Relying on negative test results is inherently limited in usefulness, as a certificate of clearance to see family and friends or report to the workplace. A negative test result is not a pass to forgo social distancing, mask-wearing and other mitigation measures, such as quarantine. Early in an infection, the virus may not have reproduced enough to be detectable. The false negative rate of PCR tests on the day of exposure is 100 percent but falls to about 38 percent five days later as symptoms usually set in, according to an analysis published in the Annals of Internal Medicine. The rate decreases further, to about 20 percent, after three more days;  *See,*
*https://www.acpjournals.org/doi/10.7326/M20-1495*

13. The move to the new pharmacy in January 2020 was a watershed event that exacerbated the Plaintiff Dundee's disability of Hereditary Spastic Paraplegia. The layout, long and narrow, with most needed medications located below waist level and inches from the floor were the polar opposite of an accommodating workplace design for the disabled. The layout of the new pharmacy had a cumulative effect both during Dundee's shift and over the months from January 2020 until his termination in June 2020. Dundee was far

more fatigued both during the shift and towards the end of his 7-day rotation.  This made the reasonable accommodation request for telework from home a necessity if Dundee were to be able to continue working with his disability.

14. Lack of social distancing policy in the pharmacy department from January 2020, through June 2020; with the narrowness and pinch points and lack of staggered shifts (which were requested) resulted in an ideal environment for covid transmission among the staff.

# CONCLUSION

More remote work accommodations will not remove all the roadblocks impeding equal employment opportunities for individuals, such as the Plaintiff/Pro Se, with disabilities. Many scholars are writing about other needed changes, particularly in the post-pandemic world when so many assumptions about the workplace have been upended;  *See, e.g., Jeannette Cox, Work Hours and Disability Justice, 111 GEO. L.J. 1, 1 (2022) (advocating for more part-time work as a disability accommodation); Katherine A. Macfarlane, Disability Without Documentation, 90 FORDHAM L. REV. 59, 59 (2021) (explaining how disability documentation requirements burden and delay accommodations and urging abandonment of medical proof of disability); Porter, Working While Mothering, supra note 12, at 26–28 (explaining the benefits of universal accommodations); Travis, Post-Pandemic, supra note 12, at 203 (encouraging judges to use lessons learned from the pandemic to reexamine the nature of work to expand employment opportunities under the ADA and Title VII); Jennifer Haskin Will, The Case for the "No-Collar" Exemption: Eliminating Employer-Imposed Office Hours for Overworked, Remote-Ready*

*Workers, 16 U. ST. THOMAS J.L. & PUB. POL'Y, https://ssrn.com/abstract=3929549*
*[https://perma.cc/3F7R-DPN3] (arguing that white-collar workers engaged in cognitive labor*
*should be released from the confines of the nine-to-five workday).*

Courts that are hostile to disability claims may just find other ways to deny workers' claims. But following the documented evidence compiled by Dundee in the instant case and the increased employer obligations under the "direct threat standard," this Court can use the instant case to dismantle the evidentiary practices that have so thoroughly undermined past remote work accommodations efforts, fulfilling both the promise and the intent of the ADA; the "direct threat standard's" obligations for employers to assess their high-risk, disabled employees and provide reasonable accommodations can help the Court set precedent.  The covid pandemic was not the first use of the EEOC "direct threat standard," nor will it be the last.

In order to grant the Defendant's Motion for Summary Judgment in the instant case the Court must ignore both compelling evidence and the law.  The Defendant's contention for Summary Judgement blinks both the history of Title I of the ADA and the "direct threat standard" of the covid pandemic against the reality of the Plaintiff's high-risk disability.  UH's stonewalling, duplicity and outright denial of numerous requests for the reasonable accommodation of telework obligates the Court to deny their request for Summary Judgement.

Representatives of UH made demonstrably false statements about the Plaintiff's reasonable actions, in the face of imminent danger to his life, on the morning of May 27, 2020, to OSHA, the EEOC, the Ohio State Board of Pharmacy and this Court; *See Plaintiff's Supplemental Pleading.*

A parallel case to **1:22CV01351,** that demonstrates this principle, is *Peeples v. Clinical Support Options, Inc., 487 F. Supp. 3d 56 (D. Mass. 2020),* where an employee obtained a preliminary injunction to work remotely.  The plaintiff was a manager with moderate asthma and was approved to do telework at the beginning of the pandemic. Despite being able to do all the essential functions of the job remotely, the employer ordered all managers to return in person and denied the plaintiff's request to continue telework. The plaintiff "reluctantly" returned to work but remained fearful at work with limited PPE. (like Dundee from January to June 2020).

The plaintiff submitted requests for telework accommodation with letters from an allergist and a supervisor. The employer, however, failed to conduct an individualized assessment of the plaintiff's situation (an obligation under the EEOC direct threat standard) and instead continued to deny their request to work remotely (like in **1:22CV01351**). The district court held that asthma is a disability in the context of COVID-19 and that **"[t]he risk of irreparable harm to Plaintiff – in the form of the possible serious consequences of an infection if they are not permitted to telework – cannot be discounted."**  The court also noted the employer's failure to engage in a meaningful interactive process (like in **1:22CV01351**). The case was settled in December of 2020.

Congress took steps in the early days of the pandemic to provide needed support to ensure hospitals, such as UH Geauga Medical Center, would remain resilient. **These funds were for hospitals to use in supporting their workforce and specifically to be used to allow covid-exposed workers to quarantine for the recommended 14 days and be replaced.**  Earlier this month, a federal court unsealed a *qui tam* complaint against several New Jersey hospitals for allegedly refusing to return CARES Act Provider Relief Fund ("PRF") for allegedly using PRF money for impermissible purposes. *See United States ex rel. Singh v. Hudson Hospital OPCO,*

*LLC*, No 21-cv-19788 (D.N.J. Nov. 5, 2021).  This case is noteworthy because it is one of the first unsealed *qui tam* complaints raising allegations misuse of, PRF payments: reasonable persons might interpret an allegation of misuse of PRF funds, by UH, for refusing to allow both Tina Creedon and Lisa Farah to quarantine, for purely budgetary reasons.

Representatives of University Hospitals defied common sense by falsely claiming that Dundee's good faith, last-minute, absence in order to avoid imminent danger from covid transmission at shift-change, an absence of ONE MINUTE or less before another registered pharmacist arrived, justified Dundee's termination.  The wrongful termination was under pretext, based on lies, as a continuance of their personal animus, ill will, and spite in denying Dundee's lawful and reasonable requests for accommodation through remote work; most notably during the months from March 2020 to June 2020, under the EEOC direct threat standard.  For all the above reasons, the Court should reject the Defendant's Motion for Summary Judgement, accordingly.

Respectfully submitted,

Frank Dominic Dundee, Plaintiff Pro Se

Date: 8 · 6 · 2023

7707 Amberwood Trail, Boardman, Ohio 44512  fdundee@gmail.com

330-398-8274

FRANK DUNDEE
7707 Amberwood Trail
Boardman, Ohio 44512



**F**

U.S. POSTAGE
**$6.90**
FCM
44514
Date of sale
08/06/23  SSK
02    6W
9814400228
0571308081194739

## USPS FIRST-CLASS MAIL®

FRANK D DUNDEE                          5.10 oz
7707 AMBERWOOD TRAIL BOARDMAN OHIO
7707 AMBERWOOD TR                       **RDC 99**
YOUNGSTOWN OH  44512-4769

SHIP
TO:

CLERK O COURTS
CARL B STOKES US COURT HOUSE
801 WEST SUPERIOR AVENUE
CLEVELAND OH 44113

### USPS CERTIFIED MAIL®

9507 1066 7851 3218 2798 85

Carl B. Stokes U.S. Court House
801 West Superior Avenue
Cleveland, Ohio 44113
Clerk of Courts Office